MH:JL:RB/EN
F. #2007R00730

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -                                                     No. 08 CR 76 (NGG)

JOSEPH AGATE, <u>et al.</u>,

       Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X


## MEMORANDUM OF LAW IN SUPPORT OF THE
## <u>GOVERNMENT'S MOTION FOR PERMANENT ORDERS OF DETENTION</u>


                                      BENTON J. CAMPBELL
                                        United States Attorney
                                        Eastern District of New York
                                        271 Cadman Plaza East
                                        Brooklyn, New York  11201

MITRA HORMOZI
JOEY LIPTON
ROGER BURLINGAME
DANIEL BROWNELL
EVAN NORRIS
Assistant United States Attorneys
AMY COHN
Special Assistant United States Attorney
       (Of Counsel)

Table of Contents

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. Indictment and Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III. Motion for Detention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    A. Thomas Cacciopoli . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    B. Frank Cali . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    C. Charles Carneglia . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    D. Mario Cassarino . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

    E. Domenico Cefalu . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

    F. Joseph Corozzo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

    G. Nicholas Corozzo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

    H. John D'Amico . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

    I. Leonard DiMaria . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

    J. Vincent Dragonetti . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

    K. Louis Filippelli . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

    L. Vincent Gotti . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

    M. Richard G. Gotti . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

    N. Ernest Grillo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

    O. James Outerie . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

    P. Richard Ranieri . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

    Q. Angelo Ruggiero, Jr. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

i

R.     William Scotto . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163

IV.   Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

<u>PRELIMINARY STATEMENT</u>

The government hereby moves for a permanent order of detention with respect to the following defendants: Thomas Cacciopoli, Frank Cali, Charles Carneglia, Mario Cassarino, Domenico Cefalu, Joseph Corozzo, Nicholas Corozzo, John D'Amico, Leonard DiMaria, Vincent Dragonetti, Louis Filippelli, Vincent Gotti, Richard G. Gotti, Ernest Grillo, James Outerie, Richard Ranieri, Angelo Ruggiero, Jr. and William Scotto.

Each of these defendants is a member or associate of the Gambino organized crime family of La Cosa Nostra (the "Gambino family") – a violent criminal enterprise responsible for numerous murders and each is charged with crimes of violence.  All of these defendants, except Ranieri, are "made" members of the Gambino family, and eight hold or have held senior leadership positions as captains or acting captains.  In addition, John D'Amico currently serves as the acting boss of the Gambino family, Domenico Cefalu currently serves as the acting underboss, and Joseph Corozzo currently serves as the consigliere.

As further described below, each of these defendants poses a danger to the community and a risk of flight and thus should be detained pending trial.

1

I.      Indictment & Investigation

Brief overviews of the charges set forth in the indictment and the underlying investigation are detailed below.

A.      Indictment

On February 6, 2008, a grand jury in the Eastern District of New York returned a sealed 80 count indictment charging various crimes against 62 defendants.  Over half of those defendants are either members or associates of the Gambino family.  The 18 defendants as to whom the government seeks permanent orders of detention are charged with murder, attempted murder, murder conspiracy, felony murder, robbery, robbery conspiracy, extortion, attempted extortion, extortion conspiracy, extortionate extension of credit, extortionate extension of credit conspiracy, extortionate collection of credit, extortionate collection of credit conspiracy, cocaine distribution conspiracy, marijuana distribution conspiracy, illegal gambling, money laundering, money laundering conspiracy, securities fraud conspiracy, mail fraud, bribery of labor officials, embezzlement of union funds and theft of union benefits.

Those charges are summarized by defendant, count and racketeering act in the attached charts.

B.      Investigation

The indictment returned in this matter is the most recent result of a longstanding investigation by this Office, the New York State Attorney General's Office, Organized Crime Task Force, the Federal Bureau of Investigation, the Department of Labor and other law enforcement agencies into the ongoing criminal activities of the Gambino family.  During the course of this investigation, witnesses and recordings show that the Gambino family is still

2

entrenched in the construction and trucking industries and remains a violent criminal enterprise willing to engage in violence in order to make illegal profits.  Hundreds of hours of recorded conversations spanning three years detail both the grand scope of the Gambino family's efforts to wring illegal profits from scores of businesses representing nearly every facet of New York's construction industry as well as the day to day operation of these extortions.

These facts – including the positions of D'Amico, Cefalu and Joseph Corozzo – will be established at trial through the testimony of cooperating witnesses, recorded conversations and surveillance evidence.

II.     Legal Standard

A.     Bail Reform Act

Under the Bail Reform Act, 18 U.S.C. § 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight.  See 18 U.S.C. § 3142(e) ("no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community").  A finding of dangerousness must be supported by clear and convincing evidence.  See United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985).  A finding of risk of flight must be supported by a preponderance of the evidence.  See United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); Chimurenga, 760 F.2d at 405.

The Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged, (2) the history and characteristics of the defendant, (3) the seriousness of the danger posed by the defendant's release, and (4) the

3

evidence of the defendant's guilt.  See 18 U.S.C. § 3142(g).

     B.    Organized Crime Defendants

     Courts in this circuit routinely have faced the issue of pretrial detention of organized crime defendants charged with racketeering-related offenses.  See, e.g., United States v. Cirillo, Cr. No. 05-212 (SLT), slip op. (E.D.N.Y. 2005) (Genovese family acting bosses Dominick Cirillo and Lawrence Dentico, as well as Genovese family captain Anthony Antico, detained as dangers to the community), aff'd, 149 Fed. Appx. 40 (2d Cir. 2005); United States v. Gotti, 219 F. Supp. 2d 296, 299-300 (E.D.N.Y. 2002) (Gambino family acting boss Peter Gotti detained as danger to the community), aff'd, United States v. Ciccone, 312 F.3d 535, 543 (2d Cir. 2002); United States v. Defede, 7 F. Supp. 2d 390, 395 (S.D.N.Y. 1998) (Luchese family acting boss Joseph DeFede detained as danger to the community); United States v. Agnello, 101 F. Supp. 2d 108, 116 (E.D.N.Y. 2000) (Gambino family captain Carmine Agnello detained as danger to the community); United States v. Salerno, 631 F. Supp. 1364, 1375 (S.D.N.Y. 1986) (Genovese acting boss and captain detained as danger to the community), order vacated, 794 F.2d 64 (2d Cir.), order reinstated, 829 F.2d 345 (2d Cir. 1987).

     Together, these cases stand, at the very least, for the following propositions: (1) leaders of a violent organized criminal enterprise are dangerous due to their position of authority in that enterprise; (2) organized crime defendants often constitute dangers to the community due to the high likelihood that they will continue to commit crimes if released on bail; and (3) elaborate bail packages involving home detention and electronic monitoring are insufficient safeguards to protect the community against dangerous organized crime defendants.

1.     Organized Crime Leaders Are Dangers to the Community

Pretrial detention is warranted where defendants, charged with violent crimes, are leaders or high-ranking members of a criminal organization whose activities routinely include violence and threats of violence.  See Ciccone, 312 F.3d at 543; United States v. Colombo, 777 F.2d 96, 99-100 (2d Cir. 1985); United States v. Bellomo, 944 F. Supp. 1160, 1166 (S.D.N.Y. 1996).  Courts in this circuit have recognized that when organized crime depends on a pattern of violent conduct of the sort charged in this case, the risk to the community is substantial and justifies detention.

For example, in Salerno, in ordering the detention of two leaders of the Genovese family, the district court observed that:

> The activities of a criminal organization such as the Genovese Family do not cease with the arrest of its principals and their release on even the most stringent of bail conditions.  The illegal businesses, in place for many years, require constant attention and protection, or they will fail.  Under these circumstances, this court recognizes a strong incentive on the part of its leadership to continue business as usual.  When business as usual involves threats, beatings, and murder, the present danger such people pose in the community is self evident.

631 F. Supp. at 1375.

Similarly, in Defede, Joseph Defede, was charged with extortion and extortion conspiracy.  The district court ordered Defede's pretrial detention, finding that the government had shown by clear and convincing evidence that Defede was the acting boss of the Luchese family, thus rendering him a danger to public safety:  "The acting boss of the Luchese family supervises all of its far-flung criminal activities, including acts of violence.  Defede's continued liberty therefore presents a substantial danger to the public."  Defede, 7 F. Supp. 2d at 395.

5

Recently, Magistrate Judge Robert M. Levy denied bail to the acting boss of the Genovese family who "participated at the highest levels in directing an organization alleged in the indictment to be committed to acts of violence to perpetuate its activities and insulate itself from detection by law enforcement," Cirillo, slip. op. at 7, as well as a former acting boss who "is at the highest levels of the Genovese family, participating in highly secret induction ceremonies and sit-downs, and representing the family in important meetings," id. at 11.  The Second Circuit affirmed Judge Levy's decision by summary order.  See 149 Fed. Appx. 40 (2d Cir. 2005) ("This court has affirmed the detention of the leaders of organized crime enterprises on the ground that their continued liberty presents a risk to the public not only form their own violent activities but from those of subordinates whom they supervise.").

In addition, to be detained as a danger to the community, an organized crime defendant need not be charged in specific predicate acts of violence; it is enough that his position is at the helm of a violent organization.  Ciccone, 312 F.3d at 542-43; see also United States v. Ferranti, 66 F.3d 540, 543 (2d Cir. 1995) (noting that the defendant need not have committed the violence himself; he can be deemed dangerous if he directed others to commit acts of violence) (citing Colombo, 777 F.2d at 98).  As one court has pointed out, an organized crime leader "is dangerous because inherent in the leadership position is the supervision of criminal activity that cannot be curtailed by any condition or combination of conditions of release."  Gotti, 219 F. Supp. 2d at 299-300 (citations omitted).

To be sure, courts' decisions to deny bail to organized crime leaders have not been based solely on the defendants' mere "association" with organized crime, but rather on the evidence that members of organized crime, and in particular, high-ranking members of organized

crime, routinely engage in acts of violence as a result of their position in a criminal enterprise.

As the court held in Defede:

> it is well established that persons who hold Defede's status
> routinely engage in conduct that is a menace to public safety.  The
> argument thus is based not on the status, but on the inference that a
> person in Defede's position is quite likely to engage in dangerous
> conduct – just as one reasonably could infer that one holding the
> position of major league baseball pitcher is entirely likely to hurl a
> small white object in the direction of home plate.

7 F. Supp. 2d at 392.

Moreover, in enacting the Bail Reform Act, Congress itself recognized that high-ranking members of an organized crime family fall within the "small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community."  S. Rep. No. 225 98th Cong., 1st Sess. at 6-7, as reprinted in 1984 U.S. Code Cong. & Admin. News 3182 ("Senate Report"), 3188-89.

Nor is the above caselaw narrowly limited to organized crime "bosses" or "acting bosses."  In Salerno, 631 F. Supp. at 1374-75, the court held that a defendant would be a danger to the community if released on bail based on evidence that he was a captain in an organized crime family who managed the enforcement operations of the enterprise.  In Colombo, 777 F.2d at 99, a captain of a crew in the Colombo family was ordered detained because the operation of that organization posed a "risk to the public" and a "danger to the community" by its "consistent pattern of orchestrating a series of violent criminal operations."

7

2.      Organized Crime Defendants Are Likely
        to Commit Crimes if Released on Bail

Organized crime defendants pose a particular threat to the community due to the

continuing nature of the charged enterprise and its violent criminal activities.  At bottom,

because organized crime defendants are career criminals who belong to an illegal enterprise, they

pose a distinct threat to commit additional crimes if released on bail.  See Salerno, 631 F. Supp.

at 1375 (finding that the illegal businesses of organized crime require constant attention and

protection, and recognizing a strong incentive on the part of its leadership to continue business

as usual).

Congress noted that defendants pose a danger to the community not only when

they commit acts of violence, but when it is likely that they will commit even non-violent crimes

that are detrimental to the community.  See Senate Report at 3195 ("language referring to safety

of the community refers to the danger that the defendant might engage in criminal activity to the

detriment of the community . . . .  The Committee intends that the concern about safety be given

a broader construction than merely danger of harm involving physical violence").  In Salerno,

the court held:

> In light of Congress' direction that "[w]here there is a strong
> probability that a person will commit additional crimes if released,
> the need to protect the community becomes sufficiently
> compelling that detention is, on balance, appropriate" . . . .

631 F. Supp. at 1371 (quoting Senate Report at 3189).  See also Colombo, 777 F.2d at 99.

Ultimately, the court in Salerno detained two leaders of the Genovese organized crime family,

noting:

> The activities of a criminal organization such as the Genovese
> Family do not cease with the arrest of its principals and their

8

> release on even the most stringent of bail conditions.  The illegal
> businesses, in place for many years, require constant attention and
> protection, or they will fail.  Under these circumstances, this court
> recognizes a strong incentive on the part of its leadership to
> continue business as usual.  When business as usual involves
> threats, beatings, and murder, the present danger such people pose
> in the community is self evident.

631 F. Supp. at 1375.

### 3. Elaborate Bail Packages Are Insufficient to Protect the Community Against Violent Organized Crime Defendants

Finally, the Second Circuit repeatedly has rejected "elaborate" bail packages for

dangerous defendants, including leaders of organized crime families shown to be involved in

violent criminal activities.  See Ferranti, 66 F.3d at 543-44 (rejecting $1 million bail secured by

real property); United States v. Orena, 986 F.2d 628, 630-33 (2d Cir. 1993) (rejecting $3 million

bail secured with real property, in-home detention, restricted visitation and telephone calls, and

electronic monitoring); Colombo, 777 F.2d at 97, 100 (rejecting $500,000 bail secured by real

property).

The Second Circuit has viewed home detention and electronic monitoring as

insufficient to protect the community against dangerous individuals.  In United States v. Millan,

the Second Circuit held that:

> Home detention and electronic monitoring at best elaborately
> replicate a detention facility without the confidence of security
> such a facility instills.  If the government does not provide staff to
> monitor compliance extensively, protection of the community
> would be left largely to the word of [the defendants] that [they]
> will obey the conditions.

4 F.3d 1039, 1048-49 (2d Cir. 1993) (citations and internal quotations omitted).  See also Orena,

986 F.2d at 632 ("electronic surveillance systems can be circumvented by the wonders of science

9

and of sophisticated electronic technology") (internal quotation marks and citations omitted).

Similarly, courts in this district have denied dangerous defendants bail in recognition of the Second Circuit's dim view of the effectiveness of home detention and electronic monitoring.  See, e.g., United States v. Cantarella, 2002 WL 31946862, *3-4 (E.D.N.Y. 2002) (Garaufis, J.) (adopting "principle" of "den[ying] bail to 'dangerous' defendants despite the availability of home detention and electronic surveillance and notwithstanding the value of a defendant's proposed bail package"); Agnello, 101 F. Supp. 2d at 116 (Gershon, J.) ("the protection of the community provided by the proposed home detention remains inferior to that provided by confinement in a detention facility"); United States v. Masotto, 811 F. Supp. 878, 884 (E.D.N.Y. 1993) (rejecting bail because "the Second Circuit appears to be saying to us that in the case of 'dangerous defendants' the Bail Reform Act does not contemplate the type of conditions suggested by this Court [including home confinement and electronic monitoring] and that, even if it did, the conditions would not protect the public or the community, given the ease with which many of them may be circumvented").

III.   Motion for Detention

The government moves for a permanent order of detention with respect to defendants Thomas Cacciopoli, Frank Cali, Charles Carneglia, Mario Cassarino, Domenico Cefalu, Joseph Corozzo, Nicholas Corozzo, John D'Amico, Leonard DiMaria, Vincent Dragonetti, Louis Filippelli, Vincent Gotti, Richard G. Gotti, Ernest Grillo, James Outerie, Richard Ranieri, Angelo Ruggiero, Jr. and William Scotto, each of whom poses a danger to the community and a risk of flight.

Detailed below is a proffer of the relevant facts in support of the pretrial detention

10

of each of these defendants.  See United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir.

2000) (government entitled to proceed by proffer in detention hearings); Ferranti, 66 F.3d at 542

(same).

          In support of its application for permanent orders of detention, the government

presents its evidence by way of proffer.  See United States v. LaFontaine, 210 F.3d 125, 130-31

(2d Cir. 2000) (explaining that the government is entitled to proceed by proffer in a detention

hearing); Ferranti, 66 F.3d at 542 (same); United States v. Martir, 782 F.2d 1141, 1145 (2d Cir.

1986) (same).  As the Second Circuit has explained:

> [I]n the pre-trial context, few detention hearings involve live
> testimony or cross examination.  Most proceed on proffers.  See
> United States v. LaFontaine, 210 F.3d 125, 131 (2d Cir. 2000).
> This is because bail hearings are "typically informal affairs, not
> substitutes for trial or discovery."  United States v.
> Acevedo-Ramos, 755 F.2d 203, 206 (1st Cir. 1985) (Breyer, J.)
> (quoted approvingly in LaFontaine, 210 F.3d at 131). Indeed, §
> 3142(f)(2)(B) expressly states that the Federal Rules of Evidence
> do not apply at bail hearings; thus, courts often base detention
> decisions on hearsay evidence.  Id.

United States v. Abuhamra, 389 F.3d 309, 320 n.7 (2d Cir. 2004).

    A.    THOMAS CACCIOPOLI

          Thomas Cacciopoli, a captain in the Gambino family pled guilty to extortion

unrelated to this case in the Southern District of New York and received a 24 month term of

incarceration.  He is currently serving that term.  The government seeks pre-trial detention of

Cacciopoli based on factors outlined in the Bail Reform Act: that is, the nature and

circumstances of the offense charged, the weight of the evidence against Cacciopoli, the history

and characteristics of the defendant and the nature and seriousness of the danger to any person or

the community that would be posed by the person's release.  Specifically, Cacciopoli is a captain

in a violent criminal enterprise who is charged with extortions, which constitute crimes of violence.  Brief summaries of the evidence against him in connection with extortions with which he is charged follow.

        1.      <u>Extortion/Extortion Conspiracy - Trucking</u>

A cooperating witness is expected to testify to the following.[1]

In the mid-1990's, John Doe #4 and a partner formed a trucking company. Following the company's founding, while John Doe #4 was incarcerated, Gambino family captain Thomas Cacciopoli recovered a debt owed to the company and, in return, demanded monthly extortion payments from that point forward.

In 1999, John Doe #4 was released from prison and began making extortion payments to Cacciopoli.  Since that time, he has paid more than $160,000 to Cacciopoli in extortion payments related to the trucking business.  John Doe #4 made these payments directly to Cacciopoli and to Gambino family soldier Joseph Scopo, who collected the payments on Cacciopoli's behalf on numerous occasions.  In addition, on multiple occasions Gambino family soldier Robert Epifania relayed instructions from Cacciopoli to John Doe #4 concerning the operation of John Doe #4's trucking business.

The cooperating witness's testimony will be corroborated by (i) recordings made of conversations with Gambino family members, including dozens of recordings detailing the extortion of his extortion by the above-named defendants, (ii) surveillance confirming John Doe #4's contacts with various members of the Gambino family and the participants in many of the

---

[1]      The cooperating witness has signed a cooperation agreement with the government.

taped conversations, (iii) testimony from multiple cooperating witnesses who were members of

the Gambino family that Thomas Cacciopoli exerted control of John Doe #4's trucking business

and collected extortion payments from John Doe #4, and (iv) testimony from multiple

cooperating witnesses who were former Gambino family members that individuals and

companies being extorted by Gambino family members must make the extortion payments

demanded of them or face retaliation against their businesses, property or persons.

        2.      <u>Extortion/Extortion Conspiracy - Staten Island Cement Company Profits</u>

        A cooperating witness is expected to testify to the following.

In approximately December 2003, John Doe #4 approached Gambino family

captain Thomas Cacciopoli and requested permission to open a cement company on Staten

Island.  Due to the Gambino family's control of the New York cement industry, Cacciopoli,

together with Gambino family captain Louis Filippelli, engaged in a series of meetings to obtain

permission from the Gambino family's administration to open such a company.  Cacciopoli and

Filippelli succeeded and informed John Doe #4 that he could start the company provided that

following a one-year grace period, the Gambino family would receive 15% or $1 per yard for all

cement sold, with the payments to be collected by Filippelli and passed through to the family's

administration.

John Doe #4 opened the company in April 2004.  Since May 2005, he has paid

over $60,000 of extortion payments to the Gambino family.  The initial payments were collected

by Gambino family soldier Vincent Pacelli on behalf of then incarcerated Louis Filippelli.  After

Gambino family captain Nicholas Corozzo assumed control of John Doe #4 from Filippelli in

late June 2005, payments were collected on his behalf for the administration by DiMaria, who

controlled John Doe #4 for Corozzo while Corozzo was on supervised release, as well as by

Gambino family soldiers Mario Cassarino and Ernest Grillo.

        Multiple members of the Gambino family informed John Doe #4 that the profits

from his Staten Island cement company were passed along to the Gambino family

administration, and that the administration consists of acting boss John D'Amico, acting

underboss Domenico Cefalu and consigliere Joseph Corozzo.

        The cooperating witness's testimony will be corroborated by (i) recordings made

of conversations with Gambino family members, including scores of recordings detailing John

Doe #4's extortion by the defendants charged in the racketeering acts and counts related to this

extortion, (ii) surveillance confirming John Doe #4's contacts with various members of the

Gambino family and the participants in many of the taped conversations, (iii) testimony from

multiple cooperating witnesses who were members and associates of the Gambino family that

the family controlled the cement industry on Staten Island and would not allow someone to open

a cement company without paying extortion to the Gambino family, (iv) testimony from a

cooperating witness who is a former Gambino family soldier with extensive knowledge of the

family's construction rackets that extortion payments related to cement were passed along to the

administration of the family, and (v) multiple cooperating witnesses who were former Gambino

family members familiar with the family's construction rackets who are expected to testify that

individuals and companies being extorted by Gambino family members must make the extortion

payments demanded of them or face retaliation.

        3.      Extortion/Extortion Conspiracy - Staten
                  Island Cement Company Sale - John Doe #13

A cooperating witness is expected to testify to the following.

During the spring of 2007, a company offered to buy John Doe #4's Staten Island cement company.  In keeping with instructions from Gambino family captains Nicholas Corozzo and Leonard DiMaria to consult them before making any decisions concerning his business, John Doe #4 informed DiMaria of the offer.  DiMaria later informed John Doe #4 that the family had agreed to allow him to make the sale, provided he pay $100,000 to the Gambino family.

In early January 2008, Gambino family soldier Joseph Scopo approached John Doe #4 on behalf of Gambino family captain Thomas Cacciopoli and instructed him that when the sale of his cement company took place, John Doe #4 should not provide his partner with the more than $300,000 in sale proceeds due to him, and that Cacciopoli would collect the money himself when he was released from prison.  In a second conversation, Scopo stated that he would either collect the money himself for Cacciopoli, or that John Doe #4 should keep the money and deliver it to Cacciopoli when he was released from prison.  John Doe #4's partner also informed him that Gambino family soldier Robert Epifania had approached him and told him that Cacciopoli would take all the proceeds due to him from the sale of the cement company.

The cooperating witness's testimony will be corroborated by (i) recordings made of conversations with Gambino family members, including multiple recordings detailing the extortion of his partner by Scopo and Cacciopoli,  (ii) surveillance confirming John Doe #4's contacts with various members of the Gambino family and the participants in many of the taped conversations, (iii) testimony from multiple cooperating witnesses who were members and associates of the Gambino family that the family controlled the cement industry on Staten Island and would not allow someone to open a cement company without paying extortion to the Gambino family, and (iv) testimony from a cooperating witness who is a former Gambino family

15

soldier with extensive knowledge of the family's construction rackets that extortion payments related to cement were passed along to the administration of the family.

The government seeks pretrial detention of Cacciopoli based on dangerousness. Cacciopoli is a captain in a violent criminal enterprise. He is currently incarcerated on extortion conspiracy charges and, according to the Bureau of Prisons, is scheduled to be released on November 30, 2008. Should he be eligible for release during the pendency of this case, he should be detained. He has been charged with crimes of violence and was participating in such conduct while on pre-trial release. The case against him is strong, as he was captured on or referenced on more than 15 recordings detailing his participation in the crimes charged. Accordingly, he has shown that he does not follow instructions of the court. Because he is a leader in a violent criminal organization who has been engaged in crimes of violence, and because he did so while on supervised release, the government moves from pre-trial detention based on dangerousness as well as risk of flight.

B.   <u>FRANK CALI</u>

Frank Cali is an acting captain in the Gambino family. He has substantial familial ties to the Gambino family. He is the first cousin through marriage of Gambino family associate Tommy Gambino, the second cousin through marriage of Gambino family associate Frank Inzerillo and the brother-in-law of Gambino family soldier Pietro "Tall Pete" Inzerillo. According cooperating witnesses as discussed below, Cali became a made member of the Gambino family in the late 1990s and was in the crew of co-defendant John D'Amico, who was a Gambino family captain at the time. In approximately 2005, Cali became an acting captain when D'Amico was elevated to acting boss of the Gambino family.

16

Cali is charged in the indictment with extortion and extortion conspiracy – both crimes of violence – and faces a term of 40 years' imprisonment if convicted.  The government seeks to have a permanent order of detention entered against Cali on the ground that he is both a danger to the community and a risk of flight.

1.     Proffered Facts

The government hereby proffers the following facts relevant to the pretrial detention of Cali.

a.     Cali Is a Gambino Family Acting Captain

Cali is a longstanding Gambino family member.  The government will establish his position in the Gambino family through the testimony of cooperating witnesses and surveillance evidence.  At least four cooperating witnesses are expected to testify that Cali is a member of the Gambino family.

This testimony regarding Cali's membership in with the Gambino family will be corroborated by the testimony of an organized crime expert and the testimony of other law enforcement officials who have observed Cali at various organized crime events and locations, and a consensually recorded conversations.

As early as 1990 – nearly 18 years ago – Cali has been observed at locations and events relating to the Gambino family, including most recently at the following events: the wake of Gambino family boss John J. Gotti in 2002; the wake of the mother of incarcerated Gambino family soldier Ronald Trucchio and grandmother of Gambino family soldier Alphonse Trucchio in June 2006; the wake of the wife of Gambino family soldier Blaise Corozzo in January 2007; the wake of Gambino family soldier George Remini in March 2007; the wake of Pietro Inzerillo,

17

the father-in-law of Gambino family soldier Giuseppe "Joseph" Gambino and grandfather of

Gambino family soldier Pietro "Tall Pete" Inzerillo in April 2007; the wake of Gambino family

captain Giuseppe "Joseph" Arcuri in November 2007; and Cali's own Christmas party in

December 2007, attended by co-defendants Gambino family acting boss John D'Amico and

acting underboss Domenico Cefalu, among others.

        Additionally, in late 2005, Cali was observed by law enforcement officials

meeting with Gambino family captain Michael Paradiso and then meeting with Gambino family

acting boss John D'Amico and acting underboss Domenico Cefalu.  In late 2005, Cali was

further observed meeting with Paradiso, who is now incarcerated for extortion and loansharking,

and codefendant Angelo Ruggiero, Jr., a Gambino family soldier.  In 2007, law enforcement

officers observed Cali meeting with Cefalu on at least two occasions at Café Italiano in Brooklyn

and Café Euro in Queens.

        In addition, in November 2002, Cali was recorded during a consensually

monitored meeting with a former high-ranking member of the Gambino family discussing

promotions in the Gambino family.

b.    <u>Cali Is Charged with Crimes of Violence</u>

        Cali is charged with extortion of John Doe #4 relating to his work at the

NASCAR construction site.  The evidence of Cali's involvement is strong.  As set forth below, it

consists of testimony of a cooperating witness which is corroborated by consensually recorded

conversations.

        In January 2006, NASCAR had begun construction on a racetrack in Staten

Island.  Recine Trucking, a company under the control of Gambino family acting underboss

18

Domenico Cefalu, was among the first companies hired to bring fill to the site.  Thereafter,

Gambino family soldier Ernest Grillo acquired exclusive dumping rights at the site for John Doe

#4.

From late January 2006 to May 2006, Grillo, Cefalu and Gambino family

members Leonard DiMaria, Vincent Dragonetti, Nicholas Corozzo and Frank Cali negotiated the

amount of extortion John Doe #4 would be required to pay for the exclusive dumping rights.

Eventually, John Doe #4 received those rights on the condition that he make extortion payments

of $.50 per yard of fill dumped to Corozzo and DiMaria, and $.50 per yard of fill dumped to

Cefalu and Cali.

Before John Doe #4 could begin dumping at the site pursuant to these terms, the

exclusive dumping deal fell through.  Later, after a new deal was worked out, Corozzo and

DiMaria directed John Doe #4 to take the job on the condition that he pay them $1 for every yard

of fill dumped at the site.

John Doe #4 also was required to make a one-time $9,000 payment to NASCAR

employee Todd Polakoff on behalf have NASCAR executive William Kilgannon.

John Doe #4 worked at the site for a short time and made approximately $13,000

in extortion payments to Gambino family soldier Mario Cassarino, who collected the extortion

payments for Corozzo and DiMaria.

The cooperating witness's testimony is corroborated by recordings made of John

Doe #4's conversations with Gambino family members, including scores of recordings detailing

the extortion of John Doe #4 in connection with the NASCAR construction site.  In at least seven

separate conversations, including several in which Cali has been explicitly referenced by name,

co-conspirators have discussed his role in the extortion of John Doe #4.

The cooperating witness's testimony is further corroborated by surveillance confirming John Doe #4's contacts with various members of the Gambino family and the participants in many of the recorded conversations.  In addition, multiple cooperating witnesses, who were former Gambino family members familiar with the family's construction rackets, are expected to testify that individuals and companies being extorted by Gambino family members must comply with the demands of their Gambino family handlers and make the extortion payments demanded of them or face retaliation against their businesses, property or persons.

2.      Cali Constitutes a Danger to the Community and Should Be Detained

Cali poses a danger to the community.  He is an acting captain of a violent organized crime family and has himself engaged in a crime of violence in furtherance of the family's illegal activities.  Courts in this Circuit repeatedly have held that high-ranking members of organized crime constitute a danger to the community.  As discussed below, each of the relevant considerations under the Bail Reform Act favors detention of Cali.

a.      Nature and Circumstances of the Crimes Charged

Cali is charged with extortion and extortion conspiracy – both of which are crimes of violence.  See 18 U.S.C. § 3156(a)(4)(A) (defining "crime of violence" as an offense that has as one of its elements the "attempted use, or threatened use of physical force against the person or property of another").  Moreover, Cali currently heads a crew of soldiers sworn to follow his orders and commit violence upon his request.

b.      History and Characteristics of the Defendant

Cali is a longstanding member of the Gambino family who now serves as a

20

captain.  He has sworn an oath to a violent criminal enterprise.  Cali has no arrests or convictions however, several cooperating witnesses are expected to testify as to his history of criminal activity, including illegal gambling, extortion, fraud and loansharking.

Two cooperating witness, who were former Gambino family members, are expected to testify that in the late 1990s, Cali was involved in operating illegal joker poker gambling machines out of several establishments in Brooklyn, including approximately four or five machines in Café Italia in Brooklyn.  Cali split a percentage of the gambling profits with the owner of the restaurant with 10 percent off the top going to the administration of the Gambino family.  Cali also had approximately two or three machines in a café on 20th Avenue in Brooklyn and a soccer on 70th Street in Brooklyn.

Those cooperating witnesses are expected to testify that in the 1990s, Cali was involved in overseeing the Gambino family interest in the annual Italian Feast on 18th Avenue in Brooklyn.  The Gambino family received a percentage of the fees charged for the booths and rides, which generated tens of thousands of dollars each year.  Cali split the money with other Gambino family associates with 10 percent off the top going to the administration of the Gambino family.

Those cooperating witnesses and another cooperating witness, who is also a former Gambino family member, are expected to testify that in the mid-1990s, Cali was involved in a telephone card fraud with co-defendant John D'Amico and Gambino family associate Joseph Watts, in which they bought calling cards containing air-time minutes from telephone companies, such as WorldCom, and then sold them without paying the telephone companies.  Cali, D'Amico and Watts made tens of millions of dollars from this fraud.

21

One of the cooperating witness is expected to testify that in the early to mid-1990s, the cooperating witness was involved in loansharking with Cali. The cooperating witness loaned Cali money, which Cali in turn loaned to others at a usurious interest rate. The cooperating witness loaned Cali approximately $10,000, which Cali repaid in the mid-1990s with money he made from the telephone card fraud.

c.     Seriousness of Danger Posed by the Defendant's Release

Cali poses a clear danger if released. As noted above, the government will establish Cali's association with, and position of authority in, the Gambino family through a variety of sources, including the testimony of four cooperating witnesses, consensual recordings and surveillance evidence.

Courts in this circuit routinely detain high-ranking members of organized crime based on their leadership roles in criminal enterprises that engage in acts of violence. See, e.g., Defede, 7 F. Supp. 2d at 393 (detaining defendant on dangerousness based on the proffered testimony of cooperating witness and surveillance evidence that he was the acting boss of the Luchese family, an enterprise involved in extortionate conduct, among other crimes); Gotti, 312 F.3d at 542 ("Indeed, we made it quite clear in United States v. Colombo, 777 F.2d 96, 98 (2d Cir. 1985), that the [Bail Reform Act] 'does not require that the defendant himself commit acts of physical violence as a condition precedent to a detention order.'").

As an acting captain, Cali is one of the leaders of the Gambino family and has been involved in acts of violence, including the charged extortions with Gambino family captain Leonard DiMaria. The violent nature of the Gambino family's method of collecting money is made clear in the following recording of DiMaria: "You have to go bother these people for your

22

money . . . they are going to tell you we got to sit down and talk and this and that.  Rough them

up a little.  Tell them, 'You're a fucking stiff.'  Tell them what you have to tell them. . . . The

next guy that owes you money from there with them guys, you catch them, and that's what I'm

saying, that you check in with the other guys . . .  Crack a face, fuck them up.  Don't you do it,

send a fucking kid to rough them up, a fucking joke."  He thus falls within the "small but

identifiable group of particularly dangerous defendants as to whom neither the imposition of

stringent release conditions nor the prospect of revocation of release can reasonably assure the

safety of the community."  Senate Report at 3188-89.  Cali's position in the Gambino family

gives him the authority and resources to continue his criminal activities and to order and

accomplish acts of violence against potential witnesses or persons perceived as a threat – of

which there will be many during the course of this prosecution.

Moreover, if released, Cali likely will continue his criminal conduct.  He is a

professional criminal who supervises a continuing criminal enterprise, the needs of which

require constant monitoring.  As noted, courts in this circuit have recognized that when

organized crime defendants are charged with their participation in a criminal enterprise, the risk

of continued criminal conduct is substantial and justifies detention.  See Salerno, 631 F. Supp. at

1375.

d.   Evidence of the Defendant's Guilt

The government's evidence of Cali's guilt on the charged extortion offenses is

strong.  To prevail, the government must prove that: (1) the defendant obtained or attempted to

obtain property from another; (2) the defendant knowingly and intentionally used extortionate

means to obtain the property, and (3) as a result of the defendant's actions, interstate commerce

was delayed, obstructed, or affected in some way.

Here, the government will prove the elements of the crimes through, among other evidence, the testimony of cooperating witnesses, consensual recordings and surveillance.  One cooperating witness is expected to testify about Cali's involvement in the extortion and conspiracy to extort John Doe #4 in connection with the NASCAR construction site.  That cooperating witness will lay out the scheme by which Gambino family members provided the entree for John Doe #4 to obtain work at the site by securing the exclusive rights to dump fill and, once in place, how they exerted extortionate control over him – at the risk of losing the work.  The cooperating witness is expected to testify that the extortionate control was exerted by Cali and other Gambino family members who siphoned a percentage of the profits from John Doe #4.

The cooperating witness' testimony is corroborated by dozens of recorded conversations pertaining to the NASCAR construction site extortion including several conversations implicating Cali and setting forth his participation.  That evidence is further corroborated by at least three other cooperating witnesses, who are expected to testify about Cali's longstanding membership and leadership as an acting captain in the Gambino family.

Based on the foregoing, the government's evidence favors detention.

3.      Cali Also Constitutes a Risk of Flight

In addition to the reasons set forth above, Cali also constitutes a risk of flight. Cali, who has substantial ties to Italy and thus the ability to seek refuge outside the United States, faces 20 years' imprisonment on each count if convicted.  This risk of flight is heightened as a result of the strong evidence against Cali.  Accordingly, Cali should also be detained as a

24

risk of flight.

C.    CHARLES CARNEGLIA

Charles Carneglia is a longtime soldier in the Gambino family and is charged in the indictment with crimes of violence, including murder, robbery and extortion.  Carneglia, who is currently on supervised release as a result of a 2001 conviction for extortion conspiracy, faces a term of life in prison if convicted.

As part of the RICO conspiracy, Carneglia is charged with the following nine predicate acts: murder/murder conspiracy of Albert Gelb (February 10, 1975); murder of Michael Cotillo (November 6, 1977); murder of Salvatore Puma (July 29, 1983); murder/murder conspiracy of Louis DiBono (October 4, 1990); robbery of armored car company employees/felony murder Jose Delgado Rivera (December 14, 1990); robbery of funeral home employee (November 5, 1995); marijuana distribution conspiracy (June 1988 - December 1990); extortion/extortion conspiracy of John Doe #1 (January 1991 - January 2003); and securities fraud conspiracy (January 1995 - December 1996).

The murders, robberies and extortion for which Carneglia has been charged constitute crimes of violence.  Accordingly, the government seeks a permanent order of detention for Carneglia on the grounds that he is both a danger to the community and a risk of flight.

1.    Proffered Facts

The government hereby proffers the following facts relevant to the pretrial detention of Carneglia.

a.    Carneglia Is a Gambino Family Soldier

25

Carneglia is a longstanding Gambino family soldier.  The government will establish Carneglia's position in the Gambino family through the testimony of cooperating witnesses and surveillance evidence.

At least 10 cooperating witnesses are expected to testify that Carneglia is a longstanding member of the Gambino family.  Many of those cooperating witnesses are expected to testify that Carneglia became a member of the Gambino family in the early 1990s and was closely associated with his brother, John Carneglia, a captain in the Gambino family.  In 1989, John Carneglia was convicted of narcotics distribution conspiracy with Gambino family captain Eugene Gotti, and sentenced to 50 years' imprisonment.

This testimony regarding Carneglia's membership in with the Gambino family will be corroborated by the testimony of an organized crime expert and the testimony of other law enforcement officials who have observed Carneglia at various organized crime events and locations.  From the mid-1980s – more than 20 years ago – Carneglia has been observed at locations and events relating to the Gambino family.  Carneglia has been observed dozens of times in the late 1980s through the late 1990s at the Ravenite social club, Bergen Hunt and Fish Club and Our Friends Social Club, three Gambino family social clubs, which acted as the headquarters for John J. Gotti and thereafter for John A. Gotti when they ran the Gambino family.

In addition, Carneglia has been observed with other members of the Gambino family at more than 15 weddings and wakes.  Cooperating witnesses and an organized crime expert are expected to testify that these events are attended by dozens of other members and associates of organized crime, many of whom are convicted felons who committed those crimes

26

as part of an organized crime family, and that Gambino family business is routinely conducted at such events.

Prior to Carneglia's recent incarceration from approximately 2001 to 2005, he has been observed at the following Gambino family events: the wedding of Carmine Agnello, a Gambino family member, and Victoria Gotti, the daughter of former Gambino family boss John J. Gotti, on December 8, 1984; the wake of Gambino family soldier Robert Borriello on April 16, 1991; the wedding of John A. Gotti, the former boss of the Gambino family, on April 30, 1991; the wedding of Joseph Corozzo, Jr., the son of co-defendant Joseph Corozzo, the consigliere of the Gambino family on October 19, 1991; the wake of former Gambino family underboss Joseph Armone on February 29, 1992; the wake of Colombo family soldier Ralph Scopo on March 11, 1993; the wedding of the daughter of co-defendant Leonard DiMaria, a captain the Gambino family, on September 11, 1993; the wedding of the daughter of Gambino family captain Joseph Corrao on January 14, 1995; the wake of the father of co-defendants Joseph Corozzo and Nicholas Corozzo, a captain in the Gambino family, on January 11, 1996; the wake of Gambino family associate James Burke on April 16, 1996; the wake of the mother of Gambino family captain Anthony Ciccone on July 2, 1996; the wake of the father of co-defendant Robert Epifania, a soldier in the Gambino family, on February 11, 1998; the wedding of Gambino family captain Alphonse Trucchio on February 14, 1999; the wakes of Gambino family soldier Anthony Ruggiano and the father of Gambino family captain Ronald Trucchio on March 21, 1999; the wake of Gambino family member James Failla on August 13, 1999; the wedding of the daughter of Gambino family soldier Salvatore Scala on September 3, 1999; and the wake of the father-in-law of Gambino family captain Ronald Trucchio on April 6, 2000.

b.      Crimes of Violence

As noted above, Carneglia is charged in multiple crimes of violence including five murders, two robberies and an extortion.

i.      Murder of Albert Gelb

Carneglia is charged in the fatal shooting of Albert Gelb, a Brooklyn criminal court officer, near his home in Queens on March 11, 1976.  Gelb was expected to testify against Carneglia at trial arising from an altercation at a diner when Gelb stopped Carneglia for possessing a handgun.  The evidence of Carneglia's involvement is extremely strong.  It consists of testimony of five cooperating witness and several lay witnesses, crime scene evidence and the medical examiner's report.

Four cooperating witnesses are expected to testify about Carneglia's involvement in the murder.  At least two cooperating witness are expected to testify that Carneglia admitted his involvement in the murder.  Two cooperating witness are expected to testify that they learned from high ranking Gambino family members and a third cooperating witness is expected to testify that he learned from a Gambino family associate that Carneglia killed the court officer due to his gun arrest.

Several lay witnesses are expected to testify about the altercation between Gelb and Carneglia at the diner, in which Gelb attempted to arrest Carneglia after observing that he had a gun.  Gelb, in his testimony at Carneglia's preliminary hearing, explained the incident and how he was assaulted by Carneglia and others after confronting him over the gun.

Gelb, who was expected to testify at Carneglia's trial on March 15, 1976, was killed four days earlier on March 11, 1976.  The crime scene evidence will show that Gelb's

28

body was discovered in the front seat of a car near his home.  Consistent with the autopsy report, the medical examiner is expected to testify that Gelb died from multiple gunshot wounds to the chest and face.

ii.      Murder of Michael Cotillo

Carneglia is charged with the fatal stabbing of Michael Cotillo during an altercation outside of the Blue Fountain Diner in Queens.  The evidence of Carneglia's involvement is strong.  It consists of testimony of three cooperating witness and several lay witnesses, an intercepted conversation of Carneglia, crime scene evidence and the medical examiner's report.

One cooperating witnesses is expected to testify that he was present for and witnessed the altercation between Carneglia and Cotillo, immediately after which Cotillo collapsed on the ground and later died.  The cooperating witness is expected to testify that he discussed the stabbing with several Gambino family members, including a codefendant, who is a high-ranking member of the family.  The cooperating witness is expected to testify that the codefendant attended a "sitdown" to resolve the stabbing incident and implicated Carneglia in the murder on multiple occasions.   Another cooperating witness is expected to testify that he learned from several Gambino family associates that Carneglia was responsible for the stabbing outside the Blue Fountain Diner.  Another cooperating witness is expected to testify that he learned from several Gambino family associates, including one who was present at the Blue Fountain Diner with Carneglia, that Carneglia stabbed Michael at the diner.  In addition, several lay witnesses are expected to testify about the altercation at the diner.

The government also will introduce a court-authorized intercepted recording of

29

Carneglia.  On November 18, 1999, Carneglia was intercepted discussing the stabbing at the diner with Gambino family captain Eugene Gotti, who was incarcerated at FCI McKean at the time.[2]  During the course of this conversation, as set forth below with emphasis added, Carneglia admits that he committed the fatal stabbing.

Gotti:   You're talking about the thing at the diner, not that (UI).  Joe wasn't going nowhere.  Joe was lucky he didn't come.

Carneglia:   Yeah, they were gonna come after us for another reason.  And that's a reason I forgot.

Gotti:   Yeah, well, you stabbed somebody Charles. You stabbed one of their guys.

Carneglia:   I know that, I know that.  I know.

Gotti:   And that's why they wanted to get you.  They come (UI) at all.

Carneglia:   I know.

Gotti:   Tony ain't doing shit.  And that ended that.

Carneglia:   You're right.

Gotti:   Joe Lombardi.  I don't remember why.

Carneglia:   That was for the same reason.  For the diner.  That was the reason that Diane - Lenny was the one that told Angelo that we were on the hit parade.

Gotti:   Lenny was wrong (UI) that you stabbed somebody about that point.

Carneglia:   You know (UI) you knew.

Gotti:   (UI) I hear.  I'm dying to hear.

---

[2]      The intercepted conversations were previously disclosed in prior proceedings, including the trial of United States v. Peter Gotti, et al., No. 02 CR 606 (FB).

Carneglia:     <u>And he's the one that told Angelo that we were okayed.</u>

Gotti:         <u>Yeah, but you don't understand what you're saying.</u>

Carneglia:     <u>Okay.</u>

Gotti:         <u>He told Angelo that he okayed what?</u>

Carneglia:     <u>To kill me and my brother.</u>

Gotti:         That never happened.

Carneglia:     That never happened?  They didn't, they didn't mention the name, right.  They said Carneglia.  This thing you got to do.

Gotti:         Yes.  What would happen to the guy?

Carneglia:     Yes.

Gotti:         What happened?  I forgot.  That you went bye-bye.

                              *  *  *  *

Gotti:         The only guy I got that here that did that, I'm trying to tell you, don't even remember.  Remember when Willie Boy got really banged up bad?

Carneglia:     Right.

Gotti:         His face and everything?  And he gave two shots in the (UI) listed?  In that little joint?  Whose that guy that did that?  Well, we stopped it.

Carneglia:     Oh.

Gotti:         Cause we shirked them.

Carneglia:     Right.

Gotti:         <u>And you over that day and killed the other guy.</u>

Carneglia:     <u>I know, I know . . .</u>

Gotti:         They went all out.  That's what I've got.  You keep telling me I

                              31

|  | don't know where you got.  I get confused.  And that's a ways back. |
|---|---|
| Carneglia: | 30 years ago. |
| Gotti: | I remember . . .  What, it was more than 10 years ago. |
| Carneglia: | I didn't say 10.  I said 30. |
| Gotti: | Yeah, that's how long ago it was. |
| Carneglia: | (UI) I look at the calendar. I know. |
| Gotti: | Hey, anyway.  He's got everything else. |

An organized crime expert is expected to testify that in the context of the conversation between Carneglia and Gotti about events that occurred 30 years prior, "Lenny" is defendant Leonard DiMaria, a current Gambino family captain, "Angelo" is Angelo Ruggiero, a now-deceased but former Gambino family soldier, "Neil" is Aniello Dellacroce, the now deceased but former underboss of the Gambino family, "Joe Lombardi" is a former Gambino family soldier, and "Willie Boy" is Wilfred Johnson, a former Gambino family associate.

The crime scene evidence will show that on November 6, 1977, blood from the sidewalk outside the Blue Fountain Diner was recovered and consistent with the autopsy report, the medical examiner is expected to testify that Cotillo died from a stab wound to the chest.

### iii.    Murder of Salvatore Puma

Carneglia is charged in the fatal stabbing of Gambino family associate Salvatore Puma on a street corner in Queens on July 29, 1983.  Following an argument over money, Carneglia stabbed Puma in the chest, resulting in his death the following day at the hospital.  The evidence of Carneglia's involvement is extremely strong.  It consists of testimony of three cooperating witness and several lay witnesses and the medical examiner's report.

32

Three cooperating witnesses are expected to testify about Carneglia's involvement in the murder.  All three cooperating witnesses are expected to testify that Carneglia admitted that he stabbed Puma.  Several lay witnesses will also testify about Puma's condition immediately after he was stabbed and rushing him to the hospital.  Consistent with the autopsy report, the medical examiner is expected to testify that Puma died from a stab wound to the chest.

### iv.      Murder/Murder Conspiracy of Louis DiBono

Carneglia is charged in the murder and conspiracy to murder Gambino family soldier Louis DiBono.  On October 4, 1990, on the orders of John J. Gotti, the boss of the Gambino family at the time, Carneglia shot and killed DiBono in the parking garage of the World Trade Center in Manhattan, after DiBono had repeatedly disobeyed Gotti's orders to meet with him.[3]  The evidence against Carneglia is overwhelming.  It consists of testimony of three cooperating witness, intercepted conversations of Gotti, crime scene evidence and the medical examiner's report.

Three cooperating witnesses are expected to testify about Carneglia's involvement in the murder.  One of the cooperating witnesses participated in the murder with Carneglia.  He is expected to testify that Carneglia shot and killed DiBono in a car in the parking garage of the World Trade Center and left DiBono's body there.  Another cooperating witness participated in the murder conspiracy with Carneglia.  He is expected to testify that Carneglia was a member of the "hit team" ordered to find and kill DiBono and that a high-ranking member

---

[3]      In 1992, Gotti and Gambino family consigliere Frank Locascio were convicted after trial of RICO and RICO conspiracy that included the murder/murder conspiracy of DiBono.

of the Gambino family informed the cooperating witness that the DiBono murder had been carried out.  A third cooperating witness is expected to testify that Carneglia indicated he was looking for DiBono and later admitted his involvement in the murder.

The government also will introduce intercepted recordings of Gambino family boss John J. Gotti.  In late 1989 and early 1990, Gotti was intercepted, pursuant to a court-authorized bug in the apartment above the Ravenite social club in Manhattan, talking to Gambino family consigliere Frank Locascio about killing DiBono.[4]

- On December 12, 1989, Gotti told Locascio: "I took Sammy's (Gravano) word.  Louie DiBono.  And I sat with this guy.  I saw the papers and everything.  He didn't rob nothin'.  You know why he's dying?  He's gonna die because he refused to come in when I called.  He didn't do nothing else wrong."

- On January 24, 1990, Gotti told Locascio: "that's not, that don't belong to us.  That's their fucking 'crew.'  And he's gotta get 'whacked.'  Because he's getting the same, for the same reason that "Jelly Belly's" (referring to DiBono) getting it.  You wanna, you wanna challenge the 'administration,' we'll, we'll you will meet the challenge.  And you're 'going,' you motherfucker!"

The crime evidence will show that on October 4, 1990, DiBono's body was discovered in the parking garage in the World Trade Center lying face down across the front seat in his car.  Consistent with the autopsy report, the medical examiner is expected to testify that DiBono died from multiple gunshot wounds to the head, neck and chest.

> v.    Robbery/Robbery Conspiracy/
> Felony Murder of Jose Delgado Rivera

Carneglia is charged in the robbery/robbery conspiracy of an armored truck as it

---

[4]    The intercepted conversations were previously disclosed in several trials, including United States v. John Gotti, No. 90 CR 1051 (ILG).

was delivering money to the American Airlines building at John F. Kennedy International Airport ("JFK") in Queens on December 14, 1990.  In the course of the robbery, one of the armored truck guards, Jose Delgado Rivera, was shot and killed.  The evidence against Carneglia is overwhelming.  It consists of the testimony of two cooperating witnesses and lay witnesses, crime scene evidence and the medical examiner's report.

Two cooperating witnesses are expected to testify about Carneglia's involvement in the robbery and murder.  One of the cooperating witnesses participated in the robbery with Carneglia.  He is expected to testify that Carneglia participated in the robbery of the armored truck outside the American Airlines building at JFK and that during the course of the robbery money was stolen and one of the guards was shot.  Another cooperating witness participated in the robbery conspiracy with Carneglia.  He is expected to testify that Carneglia was involved in the plot to rob the armored truck and that he heard from a Gambino family associate involved in the robbery that Carneglia robbed the truck and one of the guard was shot.  Lay witnesses are expected to testify that the armored truck that delivers money to the American Airlines building at JFK was robbed and that one of the guards was shot.

The crime scene evidence will show that on December 14, 1990, Rivera was shot outside the American Airlines building at JFK airport.  Consistent with the autopsy report, the medical examiner is expected to testify that Rivera died from a shotgun wound to the back and a bullet wound to the abdomen.

vi.     Robbery/Robbery Conspiracy of Papavero Funeral Home

Carneglia is charged in the robbery of an employee of Papavero Funeral Home in Queens on November 5, 1995.  The evidence against Carneglia is overwhelming.  It consists of

35

the testimony of five cooperating witnesses and lay witnesses.

Three of the cooperating witnesses are expected to testify about Carneglia's involvement in the robbery.  All three of those cooperating witnesses participated in the robbery with Carneglia.  They are expected to testify that Carneglia was involved in the planning of robbery which targeted the funeral home because in excess of $300,000 in cash was thought to be in a safe.  All three cooperating witnesses are expected to testify that the safe was not found but money was taken from an employee of the funeral home, and shared with Carneglia.

### vii.   Marijuana Distribution Conspiracy

Carneglia is charged in a lucrative conspiracy to distribute marijuana from approximately June 1988 to December 1990.  The evidence of Carneglia's involvement is strong. It consists of the testimony of two cooperating witnesses, who are expected to testify about Carneglia's involvement in the marijuana distribution conspiracy.

One of the cooperating witnesses participated in the conspiracy with Carneglia. He is expected to testify that marijuana was purchased from a drug connection in Texas, arranged by Carneglia's brother John Carneglia.  The cooperating witness is expected to testify that John and Charles Carneglia received proceeds from the sale of the marijuana amounting to tens of thousands of dollars, until one of the shipments was intercepted by law enforcement. Another cooperating witness, who was close to Carneglia, is expected to testify that John and Charles Carneglia received money from a Gambino family associate from marijuana being shipped from Texas.

### viii.   Extortion/Conspiracy of John Doe #1

Carneglia is charged in a long-running conspiracy to extort weekly protection

36

payments from an individual identified as John Doe #1 in the indictment from approximately

January 1991 to January 2003.  The evidence against Carneglia is strong.  It consists of the

testimony of two cooperating witnesses, who are expected to testify about Carneglia's use of

extortionate means to secure the payments.

One of the cooperating witnesses is expected to testify that John Doe #1 was

approached in the early 1990s about paying Carneglia for protection in connection with his

business.  The cooperating witness is expected to testify that John Doe #1 paid Carneglia

approximately $400 per week over a ten year period – resulting in extortion payments totaling

more than $200,000.  The cooperating witness also is expected to testify that John Doe #1 made

"tribute payments" to Carneglia at Christmas each year, totaling more than $50,000.  Another

cooperating witness, who was close to Carneglia, is expected to testify that John Doe #1 made

weekly protection payments as well as holiday tribute payments to Carneglia throughout the

1990s.[5]

2.      Carneglia Constitutes a Danger to the Community and Should be Detained

As discussed above, Carneglia has been associated with the Gambino family for

more than 30 years.  During that time, he has committed numerous crimes of violence, including

murder, robbery and extortion.  Accordingly, he constitutes a danger to the community and

should be detained.

a.      Nature and Circumstances of the Crimes Charged

Carneglia is charged with serious crimes – racketeering conspiracy with crimes of

---

[5]      Though not considered a crime of violence, Carneglia also is charged with a
lucrative securities fraud conspiracy from approximately January 1995 to December 2006.

violence as predicate acts.  Murder, robbery and extortion are crimes of violence.  The nature

and circumstances of those crimes, as set forth above, clearly favors detention.

b.    <u>History and Characteristics of the Defendant</u>

Carneglia is a Gambino family soldier.  He is a life-long criminal who has sworn

an oath to a violent criminal enterprise.  Carneglia has multiple convictions and is currently on

supervised release following his conviction in 2001 for extortion.  Below is a brief summary of

Carneglia's arrests and convictions:

- On June 19, 1966, Carneglia was arrested in Brooklyn on charges of receiving stolen property.  The charges were dismissed.

- On July 3, 1967, Carneglia was arrested in Brooklyn on charges of petit larceny.  The charges were dismissed.

- On April 25, 1968, Carneglia was arrested in Brooklyn on charges of possession of stolen property and conspiracy.  The charges were dismissed.

- On December 10, 1968, Carneglia was arrested in Queens on charges of conspiracy.  The charges were dismissed.

- On January 10, 1969, Carneglia was arrested in the Eastern District of New York on charges of theft of interstate shipment.  The charges were dismissed.

- On February 26, 1970, Carneglia was convicted in Brooklyn on a felony charge of grand larceny and sentenced to one year imprisonment.

- On February 6, 1973, Carneglia was arrested in the Eastern District of New York on charges of theft of interstate shipment.  The charges were dismissed.

- On May 5, 1976, Carneglia was convicted in Brooklyn on a misdemeanor charge of petit larceny and sentenced to a $200 fine.

- On July 20, 1978, Carneglia was convicted in Queens on a misdemeanor charge of resisting arrest arising from the altercation with Officer Albert Gelb described above.  Carneglia was originally convicted at trial of two

38

counts of resisting arrest and sentenced to one year imprisonment. The conviction was overturned on appeal and thereafter Carneglia pleaded guilty and was sentenced to conditional discharge.

- On August 15, 1980, Carneglia was arrested in Brooklyn on charges of attempted murder, criminal possession of a weapon, assault with intent to cause physical injury with a weapon. The charges were dismissed.

- On November 13, 1981, Carneglia was arrested in Brooklyn on charges of assault with intent to cause physical injury and criminal mischief. Prosecution was declined.

- On September 5, 1985, Carneglia was convicted in Suffolk County on a charge of operating a motor vehicle impair by alcohol. He was sentenced to a $250 fine and his license was revoked.

- On December 1, 1988, Carneglia was arrested in the Eastern District of New York on RICO. The charges were dismissed.

Most recently, on November 2, 2001, Carneglia and Gambino family captain were convicted after trial in the Eastern District of New York on charges of extortion conspiracy and sentenced to 63 months' imprisonment. Carneglia and Scala were tried on charges premised on the extortions of two adult entertainment businesses in Suffolk County, the Forbidden Fruit and Cherries Video. At trial, the government proved that Carneglia is a Gambino family soldier and Scala is a Gambino family captain, who supervised the extortion of Cherries Video, which involved explicit threats of violence to the owner of Cherries Video, an assault, the collection of weekly protection money, and a further effort to force him to sign over a portion of his business to organized crime.

Given Carneglia's longstanding association with the Gambino family and his long history of arrests and convictions, which include grand larceny, resisting arrest and extortion conspiracy, this factor also favors detention. See Connolly, 1999 WL 1995186 (long history of arrests favors detention).

39

      c.      <u>Seriousness of Danger Posed by the Defendant's Release</u>

Carneglia is a career criminal and a murderer who has routinely engaged in violence as part of a dangerous criminal enterprise. His release clearly poses a serious threat of danger to the community both due to the violent crimes in which he has engaged and because of the likelihood that, if released on bail, Carneglia will continue to commit crimes. Even after his release from prison in May 2006, the evidence will show that Carneglia has continued to meet and communicate with members and associates of organized crime. Accordingly, this factor favors detention.

      d.      <u>Evidence of the Defendant's Guilt</u>

The government's evidence of Carneglia's guilt on the charged crimes is extremely strong. To prevail on the racketeering conspiracy charge, the government must prove that (a) the defendant knowingly agreed to conduct or participate – and conducted and participated – directly or indirectly, in the conduct of the affairs of the charged enterprise through a pattern of racketeering activity; (b) the enterprise, here the Gambino family, exists; (c) the enterprise engaged in, or its activities affect, interstate or foreign commerce; and (d) the defendant was employed by, or associated with, the enterprise.

The government will prove the existence of the Gambino family and Carneglia's membership in that enterprise through, among other evidence, the testimony of cooperating witnesses, consensual recordings and physical surveillance. More than a dozen cooperating witnesses are expected to testify that the Gambino family exists and at least 10 cooperating witnesses are expected to testify that Carneglia is a long-standing member of the family.

The government will satisfy the interstate commerce requirement by presenting

evidence that the Gambino family has engaged in a variety of crimes, including robbery, extortion and marijuana distribution conspiracy, among other crimes that affect interstate commerce.

Finally, the government will prove that Carneglia agreed to participate in the conduct of the affairs of the Gambino family through a pattern of racketeering activity.  As set forth above, the testimony of numerous cooperating witnesses, several of whom actually participated in the crime with Carneglia and will provide eye-witness testimony, and significant corroborating evidence will establish Carneglia's agreement to participate in the Gambino family through the charged pattern of racketeering activity – namely, the murders in 1975, 1977, 1983 and 1990, the robberies in 1990 and 1995 and the extortion from 1991to 1993.

The government's evidence of Carneglia's guilt is strong and clearly favors detention.

3.      Carneglia Constitutes a Risk Of Flight

In addition to the facts set forth above, given the certainty of a life sentence if convicted of the charged RICO conspiracy, Carneglia constitutes a risk of flight.  See United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (finding the possibility of a "severe sentence" heightens the risk of flight).

Further, Carneglia was deemed to be a fugitive for several years after he was indicted in United States v. Aniello Dellacroce, et al., No. 81 CR 695 (E.D.N.Y.).  Because Carneglia has already shown a willingness to abscond when faced with criminal charges, and in light of the severity of the sentence in this case should he be convicted, it is reasonable to assume a high probability exists that Carneglia would attempt to flee should he be released on bail.

41

Thus, Carneglia should also be detained as a risk of flight.

D.    MARIO CASSARINO

Mario Cassarino is a soldier in the Gambino family.  He is charged in Count One with racketeering conspiracy, including four predicate acts of extortion, attempted extortion and extortion conspiracy, and additional predicate acts of union benefit theft, conspiracy to embezzle union benefits, mail fraud, mail fraud conspiracy and false statements in connection to a union benefit fund.  Cassarino is also charged with extortion, attempted extortion and extortion conspiracy, union benefit theft, conspiracy to embezzle union benefits, mail fraud, mail fraud conspiracy and false statements in connection to a union benefit fund.

The extortion counts for which Cassarino has been charged constitute crimes of violence.  Accordingly, the government seeks a permanent order of detention for Cassarino on the grounds that he is both a danger to the community and a risk of flight.

1.    Proffered Facts

The government hereby proffers the following facts relevant to the pretrial detention of Cassarino.

a.    Cassarino Is a Gambino Family Soldier

Cassarino is a Gambino family soldier.  The government will establish Cassarino's position in the Gambino family through the testimony of cooperating witnesses, consensual recordings and surveillance evidence.  Each category of evidence is briefly discussed below.

At least three cooperating witnesses are expected to testify that Cassarino is a soldier in the Gambino family.  This testimony is corroborated by more than 90 consensual

recordings of Cassarino engaging in Gambino family business, dozens of which show his

position as a soldier of Gambino family captain Nicholas Corozzo's crew.

The available surveillance evidence also establishes Cassarino's  association with

and position in the Gambino family.  Cooperating witnesses and an organized crime expert are

expected to testify that weddings and wakes of members of organized crime or their relatives are

often places where Gambino family business is discussed.  Cassarino was been observed with

other members of the Gambino family at the January 2001 wake of Antoinette Fappiano, the

mother of Gambino soldier Frank Fappiano.  In the past year, Cassarino was surveilled at the

wake of Gambino soldier Pietro Inzerillo, the father-in-law of Gambino family soldier Guiseppe

Gambino and the grandfather of Gambino family soldier Pietro Inzerillo,  the father-in-law of

Gambino family soldier Guiseppe Gambino and the grandfather of Gambino family soldier

Pietro Inzerillo..

b.      Crimes of Violence

As noted above, Cassarino is charged in multiple extortions, all crimes of

violence.  A brief proffer of the facts pertaining to each of the extortions follows.

i.      Extortion /Extortion Conspiracy -
                Staten Island Cement Company Profits

A cooperating witness is expected to testify to the following.

In approximately December 2003, John Doe #4 approached Gambino family

captain Thomas Cacciopoli and requested permission to open a cement company on Staten

Island.  Due to the Gambino family's control of the New York cement industry, Cacciopoli,

together with Gambino family captain Louis Filippelli, engaged in a series of meetings to obtain

permission from the Gambino family's administration to open such a company.  Cacciopoli and

Filippelli succeeded and informed John Doe #4 that he could start the company provided that following a one-year grace period, the Gambino family would receive 15% or $1 per yard for all cement sold, with the payments to be collected by Filippelli and passed through to the family's administration.

John Doe #4 opened the company in April 2004.  Since May 2005, he has paid over $60,000 of extortion payments to the Gambino family.  The initial payments were collected by Gambino family soldier Vincent Pacelli on behalf of the then incarcerated Louis Filippelli. After Gambino family captain Nicholas Corozzo assumed control of John Doe #4 from Filippelli in late June 2005, payments were collected on his behalf for the administration by DiMaria, who controlled John Doe #4 for Corozzo while Corozzo was on supervised release, as well as by Gambino family soldiers Mario Cassarino and Ernest Grillo.

Multiple members of the Gambino family informed John Doe #4 that the profits from his Staten Island cement company were passed along to the Gambino family administration, which consists of acting boss John D'Amico, acting underboss Domenico Cefalu and consigliere Joseph Corozzo.

The cooperating witness's testimony will be corroborated by (i) recordings made of conversations with Gambino family members, including scores of recordings detailing John Doe #4's extortion by the defendants charged in the racketeering acts and counts related to this extortion, (ii) surveillance confirming John Doe #4's contacts with various members of the Gambino family and the participants in many of the taped conversations, (iii) testimony from multiple cooperating witnesses who were members and associates of the Gambino family that the family controlled the cement industry on Staten Island and would not allow someone to open

44

a cement company without paying extortion to the Gambino family, (iv) testimony from a cooperating witness who is a former Gambino family soldier with extensive knowledge of the family's construction rackets that extortion payments related to cement were passed along to the administration of the family, and (v) multiple cooperating witnesses who were former Gambino family members familiar with the family's construction rackets who are expected to testify that individuals and companies being extorted by Gambino family members must make the extortion payments demanded of them or face retaliation.

ii.     Extortion/Extortion Conspiracy -
        NASCAR Construction Site

A cooperating witness is expected to testify to the following.

In January 2006, NASCAR had begun construction on a racetrack in Staten Island.  Recine Trucking, a company under the control of Gambino family acting underboss Domenico Cefalu, was among the first companies hired to bring fill to the site.  Thereafter, Gambino family soldier Ernest Grillo acquired exclusive dumping rights at the site for John Doe #4.

From late January 2006 to May 2006, Grillo, Cefalu and Gambino family members Leonard DiMaria, Vincent Dragonetti, Nicholas Corozzo and Frank Cali negotiated the amount of extortion John Doe #4 would be required to pay for the exclusive dumping rights. Eventually, John Doe #4 received those rights on the condition that he make extortion payments of $.50 per yard of fill dumped to Corozzo and DiMaria, and $.50 per yard of fill dumped to Cefalu and Cali.

Before John Doe #4 could begin dumping at the site pursuant to these terms, the exclusive dumping deal fell through.  Later, after a new deal was worked out, Corozzo and

DiMaria directed John Doe #4 to take the job on the condition that he pay them $1 for every yard of fill dumped at the site.

John Doe #4 also was required to make a one-time $9,000 payment to NASCAR employee Todd Polakoff on behalf have NASCAR executive William Kilgannon.

John Doe #4 worked at the site for a short time and made approximately $13,000 in extortion payments to Gambino family soldier Mario Cassarino, who collected the extortion payments for Corozzo and DiMaria.

The cooperating witness's testimony will be corroborated by (i) recordings made of conversations with Gambino family members, including scores of recordings detailing John Doe #4's extortion by the defendants charged in the racketeering acts and counts related to this extortion, (ii) surveillance confirming John Doe #4's contacts with various members of the Gambino family and the participants in many of the taped conversations, and (iii) multiple cooperating witnesses who were former Gambino family members familiar with the family's construction rackets who are expected to testify that individuals and companies being extorted by Gambino family members must comply with the demands of their Gambino family handlers and make the extortion payments demanded of them or face retaliation against their businesses, property or persons.

2.     Cassarino Constitutes a Danger to the
        Community and Should Be Detained

As discussed below, Cassarino is a Gambino family soldier with a violent past who has continued to engage in acts of violence.

a.       Nature and Circumstances of the Crimes Charged

Cassarino is charged in four predicate acts and eight counts of extortion, which are considered crimes of violence.  See 18 U.S.C. § 3156(a)(4)(A) (defining "crime of violence" as an offense that has as one of its elements the "attempted use, or threatened use of physical force against the person or property of another").  Cassarino is a soldier in a violent criminal organization who acted as an enforcer for Nicholas Corozzo, a powerful and violent captain in the family, by collecting extortion payments for him on numerous occasions.  Further, Cassarino did Corozzo's bidding  while Corozzo was on under court supervision.  He thus knowingly aided his superior commit crimes and ignore court orders.  Thus the nature and circumstances of the crimes charged favor detention.

b.       History and Characteristics of the Defendant

As a soldier in the Gambino family, Cassarino has sworn an oath to a violent criminal enterprise.  Further, Cassarino has a history of criminal conduct.  Below is a brief summary of Cassarino's arrests and convictions:

- On August 19, 1983, Cassarino was arrested for Robbery in the Second Degree and pled guilty to petit larceny and disorderly conduct on November 9, 1983.  He received a sentence of a conditional discharge.

- On January 24, 1985, Cassarino was arrested for Assault in the Second Degree and Assault in the Third Degree and Possession of a Dangerous Weapon.  He pled guilty on January 24, 1985 to Attempted Assault in the Third Degree, Possession of a Weapon in the Fourth Degree and Resisting Arrest.  He received a sentence of a $100 fine.

- On April 7, 1986, Cassarino was arrested for Possession of the Forged Instrument in the Second Degree and Aggravated Unlicensed Operation of the Motor Vehicle.  On April 8, 1986, Cassarino pled guilty to Attempted Possession of a Forged Instrument and was sentenced to a $100 fine or 10 days incarceration.

47

- On February 4, 1988, Cassarino was arrested and convicted of Robbery in the First Degree, Theft with a Deadly Firearm, Robbery in the Second Degree, Grand Larceny and Unlawful Imprisonment. He received a sentence of 42 to 126 months imprisonment. He was released on April 28, 1999.

Cassarino's criminal history, coupled with the fact that he helped his superior commit crimes while on supervised release and those crimes were all crimes of violence favor detention.

c.      Seriousness of Danger Posed by the Defendant's Release

Cassarino has long engaged in violence on behalf of the Gambino family. His recent involvement in acts of violence include the multiple charged extortions with Gambino family captain Leonard DiMaria. The violent nature of the Gambino family's method of collecting money is made clear in the following recording of DiMaria: "You have to go bother these people for your money. . . they are going to tell you we got to sit down and talk and this and that. Rough them up a little. Tell them, 'You're a fucking stiff.' Tell them what you have to tell them. . . . The next guy that owes you money from there with them guys, you catch them, and that's what I'm saying, that you check in with the other guys . . . Crack a face, fuck them up. Don't you do it, send a fucking kid to rough them up, a fucking joke."

The crimes charged, coupled with his prior convictions for robbery and assault with a dangerous weapon, make clear that Cassarino is a danger to the community.

d.      Evidence of the Defendant's Guilt

The government's evidence of Cassarino's guilt on the charged crimes is strong. To prevail on the racketeering conspiracy charge, the government must prove the following four elements: (a) that the defendant knowingly agreed to conduct or participate – and conducted and

48

participated – directly or indirectly, in the conduct of the affairs of the charged enterprise through a pattern of racketeering activity; (b) that the enterprise, here the Gambino family, exists; (c) that the enterprise engaged in, or its activities affect, interstate or foreign commerce; and (d) that the defendant was employed by, or associated with, the enterprise.

First, the government will prove the existence of the Gambino family and Cassarino's membership in that enterprise through, among other evidence, the testimony of cooperating witnesses, consensual recordings and surveillance evidence.  Numerous cooperating witnesses are expected to testify that the Gambino family exists and at least three will confirm that Cassarino is a member of the family.

The second element, the interstate commerce requirement, is also easily proved as the Gambino family has engaged in a variety of crimes, including narcotics trafficking, robbery, extortion of businesses and other crimes which affect interstate commerce.  Finally, to prove that Cassarino engaged in the charged pattern of racketeering activity,  the government will offer the testimony of  law enforcement witnesses, numerous cooperating witnesses and consensual recordings.  For example, the government has more than a dozen recordings documenting Cassarino's involvement in the extortions for which he is indicted in this case.  Thus, the government's evidence of Cassarino's guilt is strong and clearly favors detention.

> 3.    Cassarino Also Constitutes a Risk of Flight

In addition to the facts above, given that he faces a term of 20 years' imprisonment for each extortion if he were convicted, Cassarino constitutes a risk of flight.  See United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (finding the possibility of a

"severe sentence" heightens the risk of flight).  The strength of the government's case makes

Cassarino's incentive to flee even stronger.

      E.     <u>DOMENICO CEFALU</u>

      Domenico Cefalu is the current acting underboss of the Gambino family and a

convicted felon.  Cefalu is charged is charged in Count One with racketeering conspiracy,

including three predicate acts of extortion.  Cefalu is also charged with extortion and extortion

conspiracy.  If convicted as charged, Cefalu faces a term of 20 years' imprisonment for each of

the racketeering conspiracy, extortion and extortion conspiracy counts.  If he is sentenced

consecutively for the two different extortion schemes in which he participated, the 61-year-old

Cefalu faces an effective life sentence.

      The government seeks to have a permanent order of detention entered against

Cefalu on the ground that he is both a danger to the community and a risk of flight.

      1.     <u>Proffered Facts</u>

      The government hereby proffers the following facts relevant to the charges lodged

against Cefalu.

      a.     <u>Cefalu Is the Acting Underboss of The Gambino Family</u>

      Cefalu is a longstanding member and captain in the Gambino family; he currently

serves as the acting underboss.  The government will establish Cefalu's position in the Gambino

family through the testimony of cooperating witnesses, consensual recordings and surveillance

evidence.  Each category of evidence is briefly discussed below.

      More than three cooperating witnesses are expected to testify that Cefalu is a

longstanding member and captain in the Gambino family.  At least two witnesses are expected to

testify that Cefalu is presently the acting underboss of the Gambino family.

This testimony is corroborated by consensual recordings detailing his leadership role within the Gambino family and confirming his current status as a member of the family's administration.

Surveillance evidence also establishes Cefalu's long-lived association with and position in the Gambino family.  Cefalu has been observed at numerous locations and events relating to the Gambino family.  He has been observed with other members of the Gambino family at 13 weddings and wakes.  Cooperating witnesses and an organized crime expert are expected to testify that these events are attended by dozens of other members and associates of organized crime, many of whom are convicted felons who committed those crimes as part of an organized crime family, and that Gambino family business is routinely conducted at such events. Cefalu was observed at the 2002 wake of Gambino family acting boss John Gotti.  In the past two years alone, Cefalu was surveilled attending the June 2006 wake of Anna Trucchio, mother of incarcerated Gambino family soldier Ronald Trucchio and grandmother of Gambino family soldier Alphonse Trucchio; the September 2006 wake of the sister of Gambino family captain Bartolomeo "Baboots" Vernace; the January 2007 wake of Maryann Corozzo, the wife of Gambino family soldier Blaise Corozzo; the March 2007 wake of Gambino family soldier George Remini; the April 2007 wake of Pietro Inzerillo, the father-in-law of Gambino family soldier Giuseppe "Joseph" Gambino and grandfather of Gambino family of Pietro "Tall Pete" Inzerillo; the November 2007 wake of Gambino family captain Giuseppe "Joseph" Arcuri; Gambino family captain (and co-defendant) Frank Cali's December 2007 Christmas party.  In just 2007, Cefalu was observed meeting with Gambino family captains on more than five

51

occasions and with Gambino family soldiers on more than five other occasions.  Further, in late 2005, Cefalu was observed meeting with Gambino family captain Frank Cali and acting underboss Domenico Cefalu.

b.    <u>Cefalu Is Charged with Crimes of Violence</u>

As noted above, Cefalu is charged in multiple extortions, all crimes of violence. A brief proffer of the facts pertaining to each of the extortions follows.

i.    Extortion Conspiracy/Extortion - <br><u>Staten Island Cement Company Profits</u>

A cooperating witness is expected to testify to the following.

In approximately December 2003, John Doe #4 approached Gambino family captain Thomas Cacciopoli and requested permission to open a cement company on Staten Island.  Due to the Gambino family's control of the New York cement industry, Cacciopoli, together with Gambino family captain Louis Filippelli, engaged in a series of meetings to obtain permission from the Gambino family's administration to open such a company.  Cacciopoli and Filippelli succeeded and informed John Doe #4 that he could start the company provided that following a one-year grace period, the Gambino family would receive 15% or $1 per yard for all cement sold, with the payments to be collected by Filippelli and passed through to the family's administration.

John Doe #4 opened the company in April 2004.  Since May 2005, he has paid over $60,000 of extortion payments to the Gambino family.  The initial payments were collected by Gambino family soldier Vincent Pacelli on behalf of then incarcerated Louis Filippelli.  After Gambino family captain Nicholas Corozzo assumed control of John Doe #4 from Filippelli in late June 2005, payments were collected on his behalf for the administration by DiMaria, who

52

controlled John Doe #4 for Corozzo while Corozzo was on supervised release, as well as by

Gambino family soldiers Mario Cassarino and Ernest Grillo.

Multiple members of the Gambino family informed John Doe #4 that the profits

from his Staten Island cement company were passed along to the Gambino family

administration, and that the administration consists of acting boss John D'Amico, acting

underboss Domenico Cefalu and consigliere Joseph Corozzo.

The cooperating witness's testimony will be corroborated by (i) recordings made

of conversations with Gambino family members, including scores of recordings detailing John

Doe #4's extortion by the defendants charged in the racketeering acts and counts related to this

extortion, (ii) surveillance confirming John Doe #4's contacts with various members of the

Gambino family and the participants in many of the taped conversations, (iii) testimony from

multiple cooperating witnesses who were members and associates of the Gambino family that

the family controlled the cement industry on Staten Island and would not allow someone to open

a cement company without paying extortion to the Gambino family, (iv) testimony from a

cooperating witness who is a former Gambino family soldier with extensive knowledge of the

family's construction rackets that extortion payments related to cement were passed along to the

administration of the family, and (v) multiple cooperating witnesses who were former Gambino

family members familiar with the family's construction rackets who are expected to testify that

individuals and companies being extorted by Gambino family members must make the extortion

payments demanded of them or face retaliation.

ii.    Extortion Conspiracy/Extortion -<br>
<u>Staten Island Cement Company Sale</u>

A cooperating witness is expected to testify to the following.

53

During the spring of 2007, a company offered to buy John Doe #4's Staten Island cement company.  In keeping with instructions from Gambino family captains Nicholas Corozzo and Leonard DiMaria to consult them before making any decisions concerning his business, John Doe #4 informed DiMaria of the offer.  DiMaria later told John Doe #4 that the family had agreed to allow him to make the sale, provided he pay $100,000 to the administration of the Gambino family, which includes Cefalu.

In January 2008, John Doe #4 sold the Staten Island cement company. Thereafter, Gambino family consigliere Joseph Corozzo, through Gambino family solider Gus Sclafani, directed John Doe #4 to deliver the $100,000 to Joseph Corozzo.  Later, Nicholas Corozzo and Leonard DiMaria directed John Doe #4 to deliver the money to Leonard DiMaria for distribution to the administration.  As directed, John Doe #4 made a payment of the proceeds of the sale of the cement company to DiMaria.

The cooperating witness's testimony will be corroborated by (i) recordings made of conversations with Gambino family members, including multiple recordings detailing John Doe #4's extortion by the defendants charged in the racketeering acts and counts related to this extortion, (ii) surveillance confirming John Doe #4's contacts with various members of the Gambino family and the participants in many of the taped conversations, (iii) testimony from multiple cooperating witnesses who were members and associates of the Gambino family that the family controlled the cement industry on Staten Island and would not allow someone to open a cement company without paying extortion to the Gambino family, (iv) testimony from a cooperating witness who is a former Gambino family soldier with extensive knowledge of the family's construction rackets that extortion payments related to cement were passed along to the

administration of the family, and (v) multiple cooperating witnesses who were former Gambino

family members familiar with the family's construction rackets who are expected to testify that

individuals and companies being extorted by Gambino family members must make the extortion

payments demanded of them or face retaliation against their businesses, property or persons.

iii.   Extortion Conspiracy/Extortion -
NASCAR Construction Site

A cooperating witness is expected to testify to the following.

In January 2006, NASCAR had begun construction on a racetrack in Staten

Island.  Recine Trucking, a company under the control of Gambino family acting underboss

Domenico Cefalu, was among the first companies hired to bring fill to the site.  Thereafter,

Gambino family soldier Ernest Grillo acquired exclusive dumping rights at the site for John Doe

#4.

From late January 2006 to May 2006, Grillo, Cefalu and Gambino family

members Leonard DiMaria, Vincent Dragonetti, Nicholas Corozzo and Frank Cali negotiated the

amount of extortion John Doe #4 would be required to pay for the exclusive dumping rights.

Eventually, John Doe #4 received those rights on the condition that he make extortion payments

of $.50 per yard of fill dumped to Corozzo and DiMaria, and $.50 per yard of fill dumped to

Cefalu and Cali.

Before John Doe #4 could begin dumping at the site pursuant to these terms, the

exclusive dumping deal fell through.  Later, after a new deal was worked out, Corozzo and

DiMaria directed John Doe #4 to take the job on the condition that he pay them $1 for every yard

of fill dumped at the site.

John Doe #4 also was required to make a one-time $9,000 payment to NASCAR

55

employee Todd Polakoff on behalf have NASCAR executive William Kilgannon.

John Doe #4 worked at the site for a short time and made approximately $13,000 in extortion payments to Gambino family soldier Mario Cassarino, who collected the extortion payments for Corozzo and DiMaria.

The cooperating witness's testimony will be corroborated by (i) recordings made of conversations with Gambino family members, including scores of recordings detailing John Doe #4's extortion by the defendants charged in the racketeering acts and counts related to this extortion, (ii) surveillance confirming John Doe #4's contacts with various members of the Gambino family and the participants in many of the taped conversations, and (iii) multiple cooperating witnesses who were former Gambino family members familiar with the family's construction rackets who are expected to testify that individuals and companies being extorted by Gambino family members must comply with the demands of their Gambino family handlers and make the extortion payments demanded of them or face retaliation against their businesses, property or persons.

## 2.   Cefalu Constitutes a Danger to the Community and Should Be Detained

The defendant Domenico Cefalu poses a danger to the community.  He is the current acting underboss of a violent organized crime family and has himself engaged in crimes of violence in furtherance of the family's illegal businesses.  Courts in this circuit repeatedly have held that high-ranking members of organized crime constitute a danger to the community. The Second Circuit's decision in United States v. Ciccone, 312 F.3d 535 (2d Cir. 2002) is particularly instructive.  There, Gambino family acting boss Peter Gotti was indicted on

56

racketeering charges that included predicate acts of extortion against others.  Peter Gotti, himself, was not charged with any predicate acts of extortion; only money laundering and money laundering conspiracy.

At the detention hearing, the government contended that Gotti, as the leader of the Gambino family, was able to direct the activities of his co-defendants and therefore was responsible for the extortions and the other crimes committed by them.  Magistrate Judge Pollak ordered Gotti detained finding that Gotti had been "charged with a crime of violence" and therefore could be detained on grounds of dangerousness.  Id. at 538.  Judge Pollak held that the government had clearly shown that Gotti was the acting boss of the Gambino family, and as such, was responsible for controlling the activities of the enterprise.  Id.  Thus, while Gotti was not named in the specific racketeering acts charging extortion, he could nonetheless be held responsible for the acts of the members of his organization given his status as the acting boss of the family.  Because extortions are crimes of violence, Judge Pollack ordered Gotti detained as a danger to the community.  Id. at 538-39.

On appeal, the Second Circuit upheld the court's findings that Gotti constituted a danger to the community.  The court held that it was proper for a court to consider the RICO enterprise as a whole when considering the dangerousness of one of its leaders.  Id. at 542.  The court found once the government demonstrated Gotti's leadership role in the enterprise, and the enterprise was charged with crimes of violence, there was clear and convincing evidence for the court to have found that Gotti was a danger to the community and therefore should be detained.  Id. at 542-43.

As discussed below, Cefalu is currently the acting underboss of the Gambino

57

family.  Not only are other members of the Gambino family charged with multiple counts of

extortion and murder, but here, Cefalu himself is charged with extortions.  Accordingly, the

evidence supporting the government's argument for detention here is stronger than that in

Ciccone.  See also United States v. Cirillo, Cr. No. 05-212 (SLT), slip op. (E.D.N.Y. 2005)

(Genovese family acting bosses Dominick Cirillo and Lawrence Dentico, as well as Genovese

family captain Anthony Antico, who were charged with extortion and extortion conspiracy,

detained as dangers to the community), aff'd, 149 Fed. Appx. 40 (2d Cir. 2005).  As set forth

below, each of the relevant considerations under the Bail Reform Act favors detention here.

a.      Nature and Circumstances of the Crimes Charged

In addition to racketeering conspiracy, Cefalu is charged as the acting underboss

of a violent criminal organization with extortion and extortion conspiracy – both of which are

crimes of violence.  See 18 U.S.C. § 3156(a)(4)(A) (defining "crime of violence" as an offense

that has as one of its elements the "attempted use, or threatened use of physical force against the

person or property of another").  Moreover, Cefalu currently leads a violent criminal enterprise

and has at his disposal more than 200 made men – soldiers – sworn to follow his orders and

commit violence upon his request.  Cefalu faces 20 years' imprisonment for each of the five

counts with which he is charged.  Thus, the nature and circumstances of the crimes charged

favors detention.

b.      History and Characteristics of the Defendant

Cefalu is a long-standing member of the Gambino family who now serves as its

underboss.  He is a life-long criminal who has sworn an oath to a violent criminal enterprise.  He

also is a multiple convicted felon. Below is a brief summary of Cefalu's arrests and

convictions:

- On June 24, 1981, Cefalu was arrested in New York and charged with conspiracy to import heroin (21 U.S.C. § 963) and violating bank secrecy laws (31 U.S.C. § 1059); he was convicted on the heroin conspiracy charges and sentenced to eight years in prison;

- On June 13, 1995, Cefalu was charged with contempt of court and sentenced to 33 months in prison.

Cefalu's position of leadership in the Gambino family combined with his history of criminal activity favors detention.

> c.    Seriousness of Danger Posed by the Defendant's Release

Cefalu poses a clear danger if released.  As noted above, the government will establish Cefalu's association with, and position of authority in, the Gambino family through a variety of sources, including the testimony of cooperating witnesses, consensual recordings and surveillance evidence.

Courts in this circuit routinely detain high-ranking members of organized crime based on their leadership roles in criminal enterprises that engage in acts of violence.  See, e.g, Defede, 7 F. Supp. 2d at 393 (detaining defendant on dangerousness based on the proffered testimony of cooperating witness and surveillance evidence that he was the acting boss of the Luchese family, an enterprise involved in extortionate conduct, among other crimes); Gotti, 312 F.3d at 542 ("Indeed, we made it quite clear in United States v. Colombo, 777 F.2d 96, 98 (2d Cir. 1985), that the [Bail Reform Act] 'does not require that the defendant himself commit acts of physical violence as a condition precedent to a detention order.'").

Cefalu is one of the current leaders of the Gambino family "on the street" and he has been involved in acts of violence, including extortions with Gambino family captain Leonard

59

DiMaria.  The violent nature of the Gambino family's method of collecting money is made clear in the following recording of DiMaria:  "You have to go bother these people for your money. . . they are going to tell you we got to sit down and talk and this and that.  Rough them up a little.  Tell them, 'You're a fucking stiff.'  Tell them what you have to tell them. . . . The next guy that owes you money from there with them guys, you catch them, and that's what I'm saying, that you check in with the other guys . . .  Crack a face, fuck them up.  Don't you do it, send a fucking kid to rough them up, a fucking joke."

He thus falls within the "small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community."  Senate Report at 3188-89.  As demonstrated by the recorded conversations, Cefalu's position in the Gambino family gives him the authority and resources to continue his criminal activities and to order and accomplish acts of violence against potential witnesses or any person he perceives as a threat – of which there will be many during the course of this prosecution.

Finally, Cefalu likely will continue his criminal conduct if released; he is a convicted felon and career criminal who heads a continuing criminal enterprise, the needs of which require constant monitoring.  As noted, courts in this circuit have recognized that when organized crime defendants are charged with their participation in a criminal enterprise, the risk of continued criminal conduct is substantial and justifies detention.  See Salerno, 631 F. Supp. at 1375.

       d.     Evidence of the Defendant's Guilt

The government's evidence of Cefalu's guilt on the charged crimes is strong.  To prevail on the racketeering conspiracy and racketeering counts, the government must prove the following four

elements: (a) that the defendant knowingly agreed to conduct or participate – and conducted or participated – directly or indirectly, in the conduct of the affairs of the charged enterprise through a pattern of racketeering activity; (b) that the enterprise, here the Gambino family, exists; (c) that the enterprise engaged in, or its activities affected interstate or foreign commerce; and (d) that the defendant was employed by, or associated with, the enterprise.

First, the government will prove the existence of the Gambino family and Cefalu's membership in that enterprise through, among other evidence, the testimony of cooperating witnesses, consensual recordings and surveillance photographs.  Numerous cooperating witnesses are expected to testify that the Gambino family exists and that Cefalu is a longstanding member of the family and a captain.  At least two witnesses are expected to testify that Cefalu currently serves as the underboss of the Gambino family.

The second element, the interstate commerce requirement, is also easily proved as the Gambino family has engaged in a variety of crimes, including narcotics trafficking, robbery, extortion of businesses and other crimes which affect interstate commerce.

Finally, to prove that Cefalu engaged in the charged pattern of racketeering activity, the government will offer the testimony of the extortion victim, which is corroborated by law enforcement witnesses, cooperating witnesses and consensual recordings, including more than a dozen recordings detailing Cefalu's involvement in the extortions for which he is indicted.

Accordingly, the government's evidence of Cefalu's guilt clearly favors detention.

3.      Cefalu Also Constitutes a Risk of Flight

In addition to the facts set forth above, given that he faces 20 years' imprisonment on each of the five counts in which he is charged, Cefalu constitutes a risk of flight and should be detained.

See <u>United States v. Dodge</u>, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (finding the possibility of a "severe sentence" heightens the risk of flight).  This risk of flight is heightened as a result of the strong evidence against Cefalu and the fact that he maintains ties to Italy.  For these reasons, detention is warranted.

F.    <u>JOSEPH COROZZO</u>

Joseph Corozzo currently is the consigliere of the Gambino family and a convicted felon. Corozzo is charged in Count One with racketeering conspiracy, including predicate acts of cocaine distribution conspiracy, extortion and extortion conspiracy.  Corozzo is also charged with extortion and extortion conspiracy.  If convicted as charged, Corozzo faces a term of life imprisonment.

The government seeks to have a permanent order of detention entered against Corozzo on two grounds:  that he is a danger to the community and a risk of flight.

1.    <u>Proffered Facts</u>

The government hereby proffers the following facts relevant to the charges lodged against Corozzo.

a.    <u>Corozzo Is the Consigliere of the Gambino Family</u>

Corozzo is a longstanding member and captain in the Gambino family; he currently serves as the consigliere – the third highest-ranking position.  The government will establish Corozzo's position in the Gambino family through the testimony of cooperating witnesses, an undercover law enforcement officer, consensual recordings and surveillance evidence.  Each category of evidence is briefly discussed below.

At least five cooperating witnesses are expected to testify that Corozzo is a longstanding member

62

and captain in the Gambino family who presently serves as the consigliere of the family. This testimony will be corroborated by consensual recordings, as well as an undercover law enforcement officer who penetrated the Gambino family and are expected to testify that he heard Joseph Corozzo constantly referred to as the family's consigliere.

The available surveillance evidence also establishes Corozzo's long-lived association with and position in the Gambino family. As early as 1976 – more than 30 years ago – Corozzo has been observed at locations and events relating to the Gambino family. He has been observed with other members of the Gambino family at least 25 weddings and wakes. Cooperating witnesses and an organized crime expert are expected to testify that these events are attended by dozens of other members and associates of organized crime, many of whom are convicted felons who committed those crimes as part of an organized crime family, and that Gambino family business is routinely conducted at such events. Corozzo was observed at the following events: the 1976 wake of Carlo Gambino, the former boss of the Gambino family; the December 1984 wedding of Gambino family soldier Carmine Agnello and Victoria Gotti, the daughter of Gambino family boss John J. Gotti wedding; the 1991 wedding of John A. Gotti, the son of the then-Gambino family boss; the 1992 wake of Gambino family boss John J. Gotti.

In the past two years alone, Corozzo was surveilled attending the wake of the sister of Gambino family captain Bartolomeo "Baboots" Vernace; the wake of Gambino family soldier George Remini (and leaving with Gambino family underboss Domenico Cefalu and captain Frank Cali); and the wake of former Gambino family underboss Guiseppe Arcuri.

Further, consensual recordings corroborate Corozzo's position of leadership in the family.

63

b.      Corozzo Is Charged with Crimes of Violence
        and with Cocaine Distribution Conspiracy

As noted above, Corozzo is charged in multiple extortions, all crimes of violence.  A brief

proffer of the facts pertaining to each of the extortions follows.

i.      Cocaine Distribution Conspiracy

At least four cooperating witnesses are expected to testify that Corozzo was

involved from the mid 1980s through the mid-1990s in a conspiracy to distribute over five kilograms of

cocaine in Ozone Park, Queens.  In approximately the mid-1980s, Corozzo, Gambino family

soldier Vincent Gotti and others financed and helped consolidate the drug distribution activity in

Ozone Park.  During that time, the minimum amount of drugs sold per week was approximately

two kilograms.

A witness is expected to testify that on one occasion, Corozzo threatened to kill him because

Corozzo and the others believed the witness might be an undercover police officer.  The

witnesses are expected to testify that the cocaine trafficking conspiracy continued through the

mid-1990s.

ii.      Extortion Conspiracy/Extortion -
         Staten Island Cement Company Profits

A cooperating witness is expected to testify to the following.

In approximately December 2003, John Doe #4 approached Gambino family captain Thomas

Cacciopoli and requested permission to open a cement company on Staten Island.  Due to the

Gambino family's control of the New York cement industry, Cacciopoli, together with Gambino

family captain Louis Filippelli, engaged in a series of meetings to obtain permission from the

Gambino family's administration to open such a company.  Cacciopoli and Filippelli succeeded

and informed John Doe #4 that he could start the company provided that following a one-year grace period, the Gambino family would receive 15% or $1 per yard for all cement sold, with the payments to be collected by Filippelli and passed through to the family's administration.

John Doe #4 opened the company in April 2004. Since May 2005, he has paid over $60,000 of extortion payments to the Gambino family. The initial payments were collected by Gambino family soldier Vincent Pacelli on behalf of then incarcerated Louis Filippelli. After Gambino family captain Nicholas Corozzo assumed control of John Doe #4 from Filippelli in late June 2005, payments were collected on his behalf for the administration by DiMaria, who controlled John Doe #4 for Corozzo while Corozzo was on supervised release, as well as by Gambino family soldiers Mario Cassarino and Ernest Grillo.

Multiple members of the Gambino family informed John Doe #4 that the profits from his Staten Island cement company were passed along to the Gambino family administration, and that the administration consists of acting boss John D'Amico, acting underboss Domenico Cefalu and consigliere Joseph Corozzo.

The cooperating witness's testimony will be corroborated by (i) recordings made of conversations with Gambino family members, including scores of recordings detailing John Doe #4's extortion by the defendants charged in the racketeering acts and counts related to this extortion, (ii) surveillance confirming John Doe #4's contacts with various members of the Gambino family and the participants in many of the taped conversations, (iii) testimony from multiple cooperating witnesses who were members and associates of the Gambino family that the family controlled the cement industry on Staten Island and would not allow someone to open a cement company without paying extortion to the Gambino family, (iv) testimony from a

65

cooperating witness who is a former Gambino family soldier with extensive knowledge of the family's construction rackets that extortion payments related to cement were passed along to the administration of the family, and (v) multiple cooperating witnesses who were former Gambino family members familiar with the family's construction rackets who are expected to testify that individuals and companies being extorted by Gambino family members must make the extortion payments demanded of them or face retaliation.

        iii.     Extortion Conspiracy/Extortion -
                      <u>Staten Island Cement Company Sale</u>

A cooperating witness is expected to testify to the following.

During the spring of 2007, a company offered to buy John Doe #4's Staten Island cement company.  In keeping with instructions from Gambino family captains Nicholas Corozzo and Leonard DiMaria to consult them before making any decisions concerning his business, John Doe #4 informed DiMaria of the offer.  DiMaria later told John Doe #4 that the family had agreed to allow him to make the sale, provided he pay $100,000 to the Gambino family.

In January 2008, John Doe #4 sold the Staten Island cement company.  Thereafter, Gambino family consigliere Joseph Corozzo, through Gambino family solider Gus Sclafani, directed John Doe #4 to deliver the $100,000 to Joseph Corozzo.  Later, Nicholas Corozzo and Leonard DiMaria directed John Doe #4 to deliver the money to Leonard DiMaria for distribution to the administration.  As directed, John Doe #4 made a payment of the proceeds of the sale of the cement company to DiMaria.

The cooperating witness's testimony will be corroborated by (i) recordings made of conversations with Gambino family members, including multiple recordings detailing John Doe #4's extortion by the defendants charged in the racketeering acts and counts related to this

extortion, (ii) surveillance confirming John Doe #4's contacts with various members of the Gambino family and the participants in many of the taped conversations, (iii) testimony from multiple cooperating witnesses who were members and associates of the Gambino family that the family controlled the cement industry on Staten Island and would not allow someone to open a cement company without paying extortion to the Gambino family, (iv) testimony from a cooperating witness who is a former Gambino family soldier with extensive knowledge of the family's construction rackets that extortion payments related to cement were passed along to the administration of the family, and (v) multiple cooperating witnesses who were former Gambino family members familiar with the family's construction rackets who are expected to testify that individuals and companies being extorted by Gambino family members must make the extortion payments demanded of them or face retaliation against their businesses, property or persons.

2.     Corozzo Constitutes a Danger to the Community and Should Be Detained

The defendant Joseph Corozzo poses a danger to the community. He is the consigliere of a violent organized crime family and has himself engaged in crimes of violence in furtherance of the family's illegal businesses. Courts in this circuit repeatedly have held that high-ranking members of organized crime constitute a danger to the community. The Second Circuit's decision in United States v. Ciccone, 312 F.3d 535 (2d Cir. 2002) is particularly instructive. There, Gambino family acting boss Peter Gotti was indicted on racketeering charges that included predicate acts of extortion against others. Peter Gotti, himself, was not charged with any predicate acts of extortion; only money laundering and money laundering conspiracy. At the detention hearing, the government contended that Gotti, as the leader of the Gambino family, was able to direct the activities of his co-defendants and therefore was responsible for the

67

extortions and the other crimes committed by them.  Magistrate Judge Pollak ordered Gotti detained finding that Gotti had been "charged with a crime of violence" and therefore could be detained on grounds of dangerousness.  Id. at 538.  Judge Pollak held that the government had clearly shown that Gotti was the acting boss of the Gambino family, and as such, was responsible for controlling the activities of the enterprise.  Id.  Thus, while Gotti was not named in the specific racketeering acts charging extortion, he could nonetheless be held responsible for the acts of the members of his organization given his status as the acting boss of the family.  Because extortions are crimes of violence, Judge Pollack ordered Gotti detained as a danger to the community.  Id. at 538-39.

On appeal, the Second Circuit upheld the court's findings that Gotti constituted a danger to the community.  The court held that it was proper for a court to consider the RICO enterprise as a whole when considering the dangerousness of one of its leaders.  Id. at 542.  The court found once the government demonstrated Gotti's leadership role in the enterprise, and the enterprise was charged with crimes of violence, there was clear and convincing evidence for the court to have found that Gotti was a danger to the community and therefore should be detained.  Id. at 542-43.

As discussed below, Corozzo is the current consigliere, a position in the family administration designed to counsel the boss of the Gambino family.  Not only are other members of the Gambino family charged with multiple counts of extortion and murder, but here, Corozzo, himself, along with the acting boss and acting underboss of the Gambino family, is charged with extortions.  Accordingly, the evidence supporting the government's argument for detention here is stronger than that in Ciccone.  See also United States v. Cirillo, Cr. No. 05-212 (SLT), slip op.

68

(E.D.N.Y. 2005) (Genovese family acting bosses Dominick Cirillo and Lawrence Dentico, as well as Genovese family captain Anthony Antico, who were charged with extortion and extortion conspiracy, detained as dangers to the community), aff'd, 149 Fed. Appx. 40 (2d Cir. 2005).  As set forth below, each of the relevant considerations under the Bail Reform Act favors detention here.

      a.     <u>Nature and Circumstances of the Crimes Charged</u>

In addition to racketeering conspiracy, Corozzo is charged with extortion and extortion conspiracy – both of which are crimes of violence.  <u>See</u> 18 U.S.C. § 3156(a)(4)(A) (defining "crime of violence" as an offense that has as one of its elements the "attempted use, or threatened use of physical force against the person or property of another").  Moreover, Corozzo currently helps to lead a violent criminal enterprise and has at his disposal dozens of made men – soldiers – sworn to follow his orders and commit violence upon his request.  Corozzo is also charged as part of the racketeering conspiracy with conspiracy to distribute over five kilograms of cocaine.   Accordingly the offenses for which he is charged are either crimes of violence of involve narcotics and Corozzo faces life imprisonment if convicted.  <u>See</u> 18 U.S.C. § 3142(g)(1). This prong of the analysis warrants detention.

      b.     <u>History and Characteristics of the Defendant</u>

Corozzo is a long-standing member of the Gambino family who presently serves as the consigliere.  In the 1980s, Corozzo was for a time John J. Gotti's driver.  He was involved in drug trafficking in the 1980s and in the 1990s, labor racketeering, extortion and illegal gambling.  Corozzo was convicted in 1996 in the Eastern District of Louisiana for labor racketeering and gambling violations.  Accordingly, the defendant's history and characteristics favor detention.

c.    Seriousness of Danger Posed by the Defendant's Release

Corozzo poses a clear danger if released.  As noted above, the government will

establish Corozzo's association with, and position of authority in, the Gambino family through a variety of

sources, including the testimony of more than five cooperating witnesses, consensual recordings

and surveillance evidence.

Courts in this circuit routinely detain high-ranking members of organized crime based on their

leadership roles in criminal enterprises that engage in acts of violence.  See, e.g.,  United States

v. Cirillo, Cr. No. 05-212 (SLT), slip op. (E.D.N.Y. 2005) (Genovese family acting bosses

Dominick Cirillo and Lawrence Dentico, as well as Genovese family captain Anthony Antico,

detained as dangers to the community), aff'd, 149 Fed. Appx. 40 (2d Cir. 2005) ;  Defede, 7 F.

Supp. 2d at 393 (detaining defendant on dangerousness based on the proffered testimony of

cooperating witness and surveillance evidence that he was the acting boss of the Luchese family,

an enterprise involved in extortionate conduct, among other crimes); Gotti, 312 F.3d at 542

("Indeed, we made it quite clear in United States v. Colombo, 777 F.2d 96, 98 (2d Cir. 1985),

that the [Bail Reform Act] 'does not require that the defendant himself commit acts of physical

violence as a condition precedent to a detention order.'").

Corozzo is presently the consigliere of the Gambino family and he has been involved in acts of

violence, including extortions with Gambino family captain Leonard DiMaria. The violent

nature of the Gambino family's method of collecting money is made clear in the following

recording of DiMaria:  "You have to go bother these people for your money. . . they are going to

tell you we got to sit down and talk and this and that.  Rough them up a little.  Tell them, 'You're

a fucking stiff.'  Tell them what you have to tell them. . . . The next guy that owes you money

70

from there with them guys, you catch them, and that's what I'm saying, that you check in with the other guys . . .  Crack a face, fuck them up.  Don't you do it, send a fucking kid to rough them up, a fucking joke."

He thus falls within the "small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community."  Senate Report at 3188-89.

Corozzo's position in the Gambino family gives him the authority and resources to continue his criminal activities and to order and accomplish acts of violence against potential witnesses or any person he perceives as a threat – of which there will be many during the course of this prosecution.

Finally, Corozzo likely will continue his criminal conduct if released; he helps head a continuing criminal enterprise, the needs of which require constant monitoring.  As noted, courts in this circuit have recognized that when organized crime defendants are charged with their participation in a criminal enterprise, the risk of continued criminal conduct is substantial and justifies detention.  See Salerno, 631 F. Supp. at 1375.

       d.    <u>Evidence of the Defendant's Guilt</u>

The government's evidence of Corozzo's guilt on the charged crimes is strong.  To prevail on the racketeering conspiracy and racketeering counts, the government must prove the following four elements: (a) that the defendant knowingly agreed to conduct or participate – and conducted or participated –  directly or indirectly, in the conduct of the affairs of the charged enterprise through a pattern of racketeering activity; (b) that the enterprise, here the Gambino family, exists; (c) that the enterprise engaged in, or its activities affected interstate or foreign commerce;

and (d) that the defendant was employed by, or associated with, the enterprise.

First, the government will prove the existence of the Gambino family and Corozzo's membership in that enterprise through, among other evidence, the testimony of numerous cooperating witnesses, consensual recordings and surveillance photographs. More than five cooperating witnesses, all members and/or associates of the Gambino family are expected to testify that the Gambino family exists and that Corozzo is a longstanding member of the family and a captain. More than three cooperating witnesses are expected to testify that Corozzo currently serves as the consigliere of the Gambino family.

The second element, the interstate commerce requirement, is also easily proved as the Gambino family has engaged in a variety of crimes, including narcotics trafficking, robbery, extortion of businesses and other crimes which affect interstate commerce.

Finally, to prove that Corozzo engaged the charged pattern of racketeering activity, the government will offer law enforcement witnesses, cooperating witnesses and consensual recordings in which Corozzo is caught speaking on multiple occasions regarding the Staten Island Cement Company extortion. The evidence regarding predicate acts charged is very strong. With respect to the cocaine trafficking conspiracy, more than four cooperating witnesses will detail the nature of the conspiracy and the day-to-day operation of the drug conspiracy. Further, law enforcement witnesses will corroborate the testimony of the cooperating witnesses, as will surveillance evidence. With respect to the extortion counts, cooperating witnesses as well as more than a dozen consensual recordings prove the defendant's involvement in the charged extortions. Accordingly, the government's evidence of Corozzo's guilt is thus overwhelming and clearly favors detention.

3.     <u>Corozzo Also Constitutes a Risk of Flight</u>

In addition to the reasons set forth above, given that he faces the certainty of a life sentence if convicted, Corozzo constitutes a risk of flight.  <u>See</u> <u>United States v. Dodge</u>, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (finding the possibility of a "severe sentence" heightens the risk of flight).  Even if he were not facing life in prison, Corozzo, who is 67 years old, will very likely spend the remainder of his life in jail.  Accordingly, Corozzo should also be detained as a risk of flight.

G.     <u>NICHOLAS COROZZO</u>

Nicholas Corozzo is charged in Count One with racketeering conspiracy, including two predicate acts of murder and murder conspiracy, ten predicate acts of extortion, attempted extortion and extortion conspiracy, and additional predicate acts of money laundering and illegal gambling. Corozzo is also charged with twenty counts of extortion, attempted extortion and extortion conspiracy, and counts of money laundering, money laundering conspiracy and illegal gambling. If convicted as charged, Corozzo faces a mandatory term of life imprisonment.  Corozzo is 67 years old, is a multiple convicted felon, and has criminal convictions dating to the 1970's.  The government seeks to have a permanent order of detention entered against Corozzo on the ground that he is a danger to the community and as well as based on  risk of flight.

1.     <u>Proffered Facts</u>

The government hereby proffers the following facts relevant to the charges lodged against Corozzo.

a.     <u>Corozzo Is a Captain in the Gambino Family</u>

Nicholas Corozzo is a longstanding member of the Gambino family who currently serves as a

captain.  The government will establish Corozzo's position in the Gambino family through the testimony of cooperating witnesses, consensual recordings and surveillance evidence.  Each category of evidence is briefly discussed below.

More than five cooperating witnesses are expected to testify that Corozzo is a longstanding member and an extremely powerful captain in the Gambino family.

This testimony is corroborated by the more than ten recorded conversations totaling approximately ten hours in which Corozzo participated, as well as hundreds of recorded conversations in which Corozzo is referenced by other members of the Gambino family in connection with the Gambino family's illegal activities.  During the course of the recordings, Corozzo is heard directing Gambino family business – commanding crimes be committed, discussing the enterprise, its criminal activities, its members and rules of operation.  His uniquely powerful captain status is made plain by, among other things, myriad statements demonstrating his control over members of the Gambino family, including other captains.

The available surveillance evidence also establishes Corozzo's long-lived association with and position in the Gambino family.  As early as 1976 – over 30 years ago – Corozzo has been observed at locations and events relating to the Gambino family.  He has been observed with other members of the Gambino family at over 15 weddings and wakes. Cooperating witnesses and an organized crime expert are expected to testify that these events are attended by dozens of other members and associates of organized crime, many of whom are convicted felons who committed those crimes as part of an organized crime family, and that Gambino family business is routinely conducted at such events.  Corozzo's attendance at these events stretches from the wake of boss Carlo Gambino in 1976 to the 1985 wake of underboss Aniello Dellacroce, to the

74

1992 wake of boss John Gotti, to the November 29, 2007 wake of captain Giuseppe "Joseph"

Arcuri.  Further, Corozzo's immediate family's wakes and wedding have been well attended by

the upper reaches of the Gambino family, including boss John D'Amico, underboss Domenico

Cefalu and more than a dozen captain and soldiers from within the defendants in just this case.

Finally, Nicholas Corozzo is the brother of Gambino family consigliere Joseph Corozzo.

>   b.   Corozzo Is Charged with Crimes of Violence

Nicholas Corozzo is charged in count one's racketeering conspiracy with ordering the 1996

double murder of Robert Arena and Thomas Maranga.  He is also charged with extortion,

attempted extortion and extortion conspiracy in 10 racketeering acts, as well as in 20 substantive

counts of the indictment – all crimes of violence.   A brief proffer of the evidence underlying the

murder charges and each of the extortions follows.

>   i.   Murder Conspiracy/Murder

In January 1996, Nicholas Corozzo ordered the murder of Luchese family associate Robert

Arena in retaliation for ignoring Corozzo's demand that Arena return marijuana he had robbed

from a narcotics dealer and for Arena's believed participation in the murder of a member of

Corozzo's crew.  Arena's friend, Robert Maranga, was not a target of the murder, but was

accompanying Arena at the time of the murder.  Corozzo's order was carried out by Gambino

family associate Michael Yannotti, who shot and killed Arena and Maranga on January 26, 1996.

Two cooperating witnesses will detail the events creating the motive for the murder, including

the February 1995 slaying of Anthony "Tough Tony" Placido, a favorite associate in Corozzo's

crew, for which Arena came under suspicion, Arena's failure to return narcotics Arena had

stolen in contravention of Corozzo's wishes, and fraying relations between Corozzo's crew and

the Luchese crew to which Arena belonged.  The witnesses will also testify to the fact that

Michael Yannotti, an associate of Corozzo's confessed that he killed Arena and Maranga.

Another cooperating witness is expected to testify that Corozzo admitted that he had ordered the

killing of Arena to avenge the death of someone close to him as well as to settle a beef with

Arena, and that Maranga was "in the wrong place at the wrong time."  A fourth cooperating

witness is expected testify to statements by Corozzo after the murders that Yannotti "did good

work" – an apparent reference to the Arena and Maranga murders.  The witnesses testimonies

will be corroborated by both physical evidence and ballistics evidence.

    ii.    Extortion Conspiracy/Extortion -
            Staten Island Cement Company Profits

A cooperating witness is expected to testify to the following.

In approximately December 2003, John Doe #4 approached Gambino family captain Thomas

Cacciopoli and requested permission to open a cement company on Staten Island.  Due to the

Gambino family's control of the New York cement industry, Cacciopoli, together with Gambino

family captain Louis Filippelli, engaged in a series of meetings to obtain permission from the

Gambino family's administration to open such a company.  Cacciopoli and Filippelli succeeded

and informed John Doe #4 that he could start the company provided that following a one-year

grace period, the Gambino family would receive 15% or $1 per yard for all cement sold, with the

payments to be collected by Filippelli and passed through to the family's administration.

John Doe #4 opened the company in April 2004.  Since May 2005, he has paid over $60,000 of

extortion payments to the Gambino family.  The initial payments were collected by Gambino

family soldier Vincent Pacelli on behalf of then incarcerated Louis Filippelli.  After Gambino

family captain Nicholas Corozzo assumed control of John Doe #4 from Filippelli in late June

76

2005, payments were collected on his behalf for the administration by DiMaria, who controlled John Doe #4 for Corozzo while Corozzo was on supervised release, as well as by Gambino family soldiers Mario Cassarino and Ernest Grillo.

Multiple members of the Gambino family informed John Doe #4 that the profits from his Staten Island cement company were passed along to the Gambino family administration, and that the administration consists of acting boss John D'Amico, acting underboss Domenico Cefalu and consigliere Joseph Corozzo.

The cooperating witness's testimony will be corroborated by (i) recordings made of conversations with Gambino family members, including scores of recordings detailing John Doe #4's extortion by the defendants charged in the racketeering acts and counts related to this extortion, (ii) surveillance confirming John Doe #4's contacts with various members of the Gambino family and the participants in many of the taped conversations, (iii) testimony from multiple cooperating witnesses who were members and associates of the Gambino family that the family controlled the cement industry on Staten Island and would not allow someone to open a cement company without paying extortion to the Gambino family, (iv) testimony from a cooperating witness who is a former Gambino family soldier with extensive knowledge of the family's construction rackets that extortion payments related to cement were passed along to the administration of the family, and (v) multiple cooperating witnesses who were former Gambino family members familiar with the family's construction rackets who are expected to testify that individuals and companies being extorted by Gambino family members must make the extortion payments demanded of them or face retaliation.

      iii.    Extortion Conspiracy/Extortion -
                  <u>Staten Island Cement Company Sale</u>

A cooperating witness is expected to testify to the following.

During the spring of 2007, a company offered to buy John Doe #4's Staten Island cement company.  In keeping with instructions from Gambino family captains Nicholas Corozzo and Leonard DiMaria to consult them before making any decisions concerning his business, John Doe #4 informed DiMaria of the offer.  DiMaria later told John Doe #4 that the family had agreed to allow him to make the sale, provided he pay $100,000 to the Gambino family. In January 2008, John Doe #4 sold the Staten Island cement company.  Thereafter, Gambino family consigliere Joseph Corozzo, through Gambino family solider Gus Sclafani, directed John Doe #4 to deliver the $100,000 to Joseph Corozzo.  Later, Nicholas Corozzo and Leonard DiMaria directed John Doe #4 to deliver the money to Leonard DiMaria for distribution to the administration.  As directed, John Doe #4 made a payment of the proceeds of the sale of the cement company to DiMaria.

The cooperating witness's testimony will be corroborated by (i) recordings made of conversations with Gambino family members, including multiple recordings detailing John Doe #4's extortion by the defendants charged in the racketeering acts and counts related to this extortion, (ii) surveillance confirming John Doe #4's contacts with various members of the Gambino family and the participants in many of the taped conversations, (iii) testimony from multiple cooperating witnesses who were members and associates of the Gambino family that the family controlled the cement industry on Staten Island and would not allow someone to open a cement company without paying extortion to the Gambino family, (iv) testimony from a cooperating witness who is a former Gambino family soldier with extensive knowledge of the

family's construction rackets that extortion payments related to cement were passed along to the administration of the family, and (v) multiple cooperating witnesses who were former Gambino family members familiar with the family's construction rackets who are expected to testify that individuals and companies being extorted by Gambino family members must make the extortion payments demanded of them or face retaliation against their businesses, property or persons.

        iv.    <u>Attempted Extortion/Extortion Conspiracy - Pump Truck</u>

A cooperating witness is expected to testify to the following.

In June 2005, John Doe #4 sought permission from Gambino family captain Leonard DiMaria, who exercised day to day control over John Doe #4 for Gambino family captain Nicholas Corozzo, to purchase a cement pump truck and open a business. Later, DiMaria allowed John Doe #4 to start the business pursuant to an arrangement in which John Doe #4 would receive 40% of the pump truck profits and DiMaria and Corozzo would split the remaining profits together with Gambino family soldiers Ernie Grillo and Mario Cassarino. The pump truck business operated for a time, but the business was ultimately not profitable.

The cooperating witness's testimony will be corroborated by (i) recordings made of conversations with Gambino family members, including multiple recordings detailing John Doe #4's attempted extortion by the defendants charged in the racketeering acts and counts related to this extortion, (ii) surveillance confirming John Doe #4's contacts with various members of the Gambino family and the participants in many of the taped conversations, and (iv) multiple cooperating witnesses who were former Gambino family members familiar with the family's construction rackets who are expected to testify that individuals and companies being extorted by Gambino family members must comply with the demands of their Gambino family handlers

79

or face retaliation against their businesses, property or persons.

              v.        Extortion/Extortion Conspiracy -
                          Liberty View Harbor Construction Site

A cooperating witness is expected to testify to the following.

In April 2006, John Doe #4 started a company which constructed a portable cement plant at the Liberty View Harbor construction site at which VMS Construction served as general contractor. VMS Construction is owned by Gambino family associate Anthony Scibelli, who is controlled by Gambino family soldier Vincent Dragonetti.  In addition to the portable cement plant, two companies owned by John Doe #4 also performed work at the Liberty View Harbor site.

John Doe #4 obtained the work at the Liberty View Harbor site after Gambino family captain Nicholas Corozzo, who is Dragonetti's father-in-law, granted him permission provided he pay 60% of the portable cement plant's profits to Corozzo, Gambino family captain Leonard DiMaria and Dragonetti.  In addition, Scibelli and Dragonetti demanded that John Doe #4 pay an additional $6 or $7 per yard of cement produced and extortionate payments for the other two businesses.

Over the course of the extortion, Jon Doe #4 made extortion payments to the Gambino family of more than $200,000.

Despite these payments, during the summer of 2007, with the backing of Corozzo, DiMaria and Dragonetti, Scibelli took possession of the portable cement plant without remuneration to John Doe #4.

The cooperating witness's testimony will be corroborated by (i) recordings made of conversations with Gambino family members, including scores of recordings detailing John Doe #4's extortion by the defendants charged in the racketeering acts and counts related to this

extortion, (ii) surveillance confirming John Doe #4's contacts with various members of the Gambino family and the participants in many of the taped conversations, and (iii) multiple cooperating witnesses who were former Gambino family members familiar with the family's construction rackets who are expected to testify that individuals and companies being extorted by Gambino family members must comply with the demands of their Gambino family handlers and make the extortion payments demanded of them or face retaliation against their businesses, property or persons.

vi.    Extortion/Extortion Conspiracy -
Cement Powder Deliveries

A cooperating witness is expected to testify to the following.

In October 2007,  following Gambino family soldier Anthony Scibelli's takeover of his portable cement plant, Gambino family captains DiMaria and Corozzo approved a plan by which John Doe #4 would supply his former plant with the powder used to make cement at the Liberty View Harbor site.  For this privilege, John Doe #4 was instructed to provide 60% of his profits relating to the cement powder deliveries to be split between Corozzo, DiMaria and Dragonetti.  As directed, in the four months since, John Doe #4 has provided $6,000 in extortion payments. The cooperating witness's testimony will be corroborated by (i) recordings made of conversations with Gambino family members, including dozens of recordings detailing John Doe #4's extortion by the defendants charged in the racketeering acts and counts related to this extortion, (ii) surveillance confirming John Doe #4's contacts with various members of the Gambino family and the participants in many of the taped conversations, and (iii) multiple cooperating witnesses who were former Gambino family members familiar with the family's construction rackets who are expected to testify that individuals and companies being extorted

81

by Gambino family members must make the extortion payments demanded of them or face

retaliation against their businesses, property or persons.

       vii.    Extortion/Extortion Conspiracy - Construction List

A cooperating witness is expected to testify to the following.

In July 2005, Gambino family captain Leonard DiMaria instructed John Doe #4 to help soldier

Ernest Grillo reinitiate collections from construction companies that had been making extortion

payments to then jailed Gambino family soldier Edward Garafola prior to his incarceration.

Garafola, who had been a member of the Gambino family's "construction panel," a body which

oversees the Gambino family's construction rackets, had exacted extortionate payments from

scores of construction companies prior to his incarceration, but had not shared the identity of all

those companies with his Gambino family superiors.

John Doe #4 contacted Grillo as instructed.  Together with Ruggiero and Gambino family

associate Anthony O'Donnell, who had been Garafola's right hand in conducting the extortions,

and who had accompanied Garafola on at least one occasion while Garafola assaulted a

contractor who was late in his payments, the men repeatedly met to reconstruct a list of the

contractors who had been paying Garafola extortion and to plot the reinitiation of collections.

Under the supervision and at the direction of Corozzo and DiMaria, the four men created a list of

more than 40 construction companies and individual contractors that formerly paid extortion to

Garafola.  Grillo, Ruggiero and O'Donnell then approached a number of the companies to place

them back under Gambino family control.

During the this process, Edward Garafola's son asserted his father's right to the extortion

victims, and complained of the efforts to take away his father's former victims.  In response,

Grillo told John Doe #4 that he assaulted Garafola's son – "I choked him out."

The cooperating witness's testimony will be corroborated by (i) recordings made of

conversations with Gambino family members, including scores of recordings detailing John Doe

#4's extortion by the defendants charged in the racketeering acts and counts related to this

extortion, (ii) surveillance confirming John Doe #4's contacts with various members of the

Gambino family,  and the participants in many of the taped conversations, and (iii) the testimony

of a cooperating witnesses who was a former Gambino family member and member of the

Gambino family construction panel who was tasked with compiling the same construction list

years earlier but failed to complete the job prior to his arrest and incarceration. property or

persons.

        viii.    Extortion/Extortion Conspiracy -
                 NASCAR Construction Site

A cooperating witness is expected to testify to the following.

In January 2006, NASCAR had begun construction on a racetrack in Staten Island.  Recine

Trucking, a company under the control of Gambino family acting underboss Domenico Cefalu,

was among the first companies hired to bring fill to the site.  Thereafter, Gambino family soldier

Ernest Grillo acquired exclusive dumping rights at the site for John Doe #4.

From late January 2006 to May 2006, Grillo, Cefalu and Gambino family members Leonard

DiMaria, Vincent Dragonetti, Nicholas Corozzo and Frank Cali negotiated the amount of

extortion John Doe #4 would be required to pay for the exclusive dumping rights.  Eventually,

John Doe #4 received those rights on the condition that he make extortion payments of $.50 per

yard of fill dumped to Corozzo and DiMaria, and $.50 per yard of fill dumped to Cefalu and

Cali.

Before John Doe #4 could begin dumping at the site pursuant to these terms, the exclusive

dumping deal fell through.  Later, after a new deal was worked out, Corozzo and DiMaria

directed John Doe #4 to take the job on the condition that he pay them $1 for every yard of fill

dumped at the site.

John Doe #4 also was required to make a one-time $9,000 payment to NASCAR employee Todd

Polakoff on behalf have NASCAR executive William Kilgannon.

John Doe #4 worked at the site for a short time and made approximately $13,000 in extortion

payments to Gambino family soldier Mario Cassarino, who collected the extortion payments for

Corozzo and DiMaria.

The cooperating witness's testimony will be corroborated by (i) recordings made of

conversations with Gambino family members, including scores of recordings detailing John Doe

#4's extortion by the defendants charged in the racketeering acts and counts related to this

extortion, (ii) surveillance confirming John Doe #4's contacts with various members of the

Gambino family and the participants in many of the taped conversations, and (iii) multiple

cooperating witnesses who were former Gambino family members familiar with the family's

construction rackets who are expected to testify that individuals and companies being extorted

by Gambino family members must comply with the demands of their Gambino family handlers

and make the extortion payments demanded of them or face retaliation against their businesses,

property or persons.

    ix.    Extortion Conspiracy/Extortion - Excavation Company

A cooperating witness is expected to testify to the following.

In approximately January 2006, Gambino family captain Nicholas Corozzo instructed John Doe #4 to start an excavation business which, after a short period in which John Doe #4 would be allowed to operate the business without making extortion payments, would be required to pay 60% of its profits to Corozzo, Gambino family soldier Vincent Dragonetti and Gambino family captain Leonard DiMaria.  John Doe #4 began making these payments a few months after starting the business.  To date, John Doe #4 has paid more than $30,000 in extortion payments to DiMaria and Dragonetti, who collected the payments on Corozzo's behalf.

The cooperating witness's testimony will be corroborated by (i) recordings made of conversations with Gambino family members, including dozens of recordings detailing John Doe #4's extortion by the defendants charged in the racketeering acts and counts related to this extortion, (ii) surveillance confirming John Doe #4's contacts with various members of the Gambino family and the participants in many of the taped conversations, and (iii) multiple cooperating witnesses who were former Gambino family members familiar with the family's construction rackets who are expected to testify that individuals and companies being extorted by Gambino family members must comply with the demands of their Gambino family handlers and make the extortion payments demanded of them or face retaliation against their businesses, property or persons.

          x.      <u>Extortion/Extortion Conspiracy - John Does #4 & #12</u>

A cooperating witness is expected to testify to the following.

In July 2006, Gambino family captain Leonard DiMaria informed John Doe #4 that John Doe #12, an individual close to John Doe #4 who previously made extortion payments to the commissary of jailed Gambino family soldier Jerome Brancato, needed to begin making

extortion payments to Brancato again.  At the end of 2006, when Brancato was released from

prison, DiMaria instructed John Doe #4 to have John Doe #12 pay money to Brancato to help

him get him back on his feet.  John Doe #4 then gave $2,500 to Vincent Dragonetti, who

collected the money for Brancato.

In January 2008, Gambino family captain Nicholas Corozzo told John Doe #4 that John Doe #12

failed to provide Brancato with a year end extortion payment.  Corozzo instructed  John Doe #4

to make sure that money from John Doe #12 was given to Gambino family soldier Joseph

Chirico, who would collect it for Brancato.  The following day, John Doe #4 gave $1,500 to

Chirico for Brancato.

The cooperating witness's testimony will be corroborated by (i) recordings made of

conversations with Gambino family members, including multiple recordings detailing John Doe

#4's extortion by the defendants charged in the racketeering acts and counts related to this

extortion, (ii) surveillance confirming John Doe #4's contacts with various members of the

Gambino family and the participants in many of the taped conversations, and (iii) multiple

cooperating witnesses who were former Gambino family members who are expected to testify

that individuals being extorted by Gambino family members must comply with the demands of

their Gambino family handlers or face some form of retaliation.

      xi.      Extortion/Extortion Conspiracy - Staten Island Recycling

A cooperating witness is expected to testify to the following.

In conducting his trucking business, John Doe #4 came into frequent contact with the owners of

a recycling facility located on Staten Island.

In approximately June 2008, Nicholas Corozzo and Leonard DiMaria directed John Doe #4 to

collect extortion payments from the facility.

In January 2008, John Doe #4 told Corozzo and DiMaria that he collected $2,000 from the facility, and provided the money to DiMaria.

The cooperating witness's testimony will be corroborated by (i) recordings made of conversations with Gambino family members, including multiple recordings detailing John Doe #4's extortion by the defendants charged in the racketeering acts and counts related to this extortion, (ii) surveillance confirming John Doe #4's contacts with various members of the Gambino family and the participants in many of the taped conversations, and (iii) multiple cooperating witnesses who were former Gambino family members who are expected to testify that individuals being extorted by Gambino family members must comply with the demands of their Gambino family handlers or face some form of retaliation.

2.    Corozzo Constitutes a Danger to the Community and Should Be Detained

The defendant Nicholas Corozzo poses a danger to the community.  He is an extraordinarily powerful captain of a violent organized crime family and has himself engaged in crimes of violence that include murder and extortion.  Courts in this district and the Second Circuit repeatedly have held that high-ranking members of organized crime constitute a danger to the community.  As discussed below, each of the relevant considerations under the Bail Reform Act favors detention here.

a.    Nature and Circumstances of the Crimes Charged

In addition to racketeering and racketeering conspiracy, Corozzo is charged with murder, which is a crime of violence.  Corozzo is also charged with myriad counts of extortion and extortion conspiracy – both of which are crimes of violence.  See 18 U.S.C. § 3156(a)(4)(A) (defining

87

"crime of violence" as an offense that has as one of its elements the "attempted use, or threatened use of physical force against the person or property of another").  Moreover, given his position in the Gambino family, Corozzo currently has at his disposal several dozen made men – soldiers – sworn to follow his orders and commit violence upon his request.  Accordingly, the nature and circumstances of the crimes charged favor detention.

      b.    <u>History and Characteristics of the Defendant</u>

Corozzo is a long-standing member of the Gambino family who now serves as a captain.  He is a life-long criminal who has sworn an oath to a violent criminal enterprise.  He also is a multiple convicted felon.  Below is a brief summary of Corozzo's arrests and convictions:

- In 1996, Corozzo pled guilty in the Southern District of Florida to racketeering that included predicate acts of loansharking.  He was sentenced to six years imprisonment.

- In 1998, Corozzo pled guilty in the Eastern District of New York to racketeering including predicate acts of extortion and loansharking.   Corozzo was sentenced to imprisonment and was on supervised release while he was committing some of the crimes with which he is charged in this indictment.

- Corozzo also has multiple convictions for gambling dating back to the 1970s.

Further, Corozzo was engaged in the acts of extortion charged in the indictment while he was on supervised release from the 1998 case to which he pleaded before the Honorable Frederic Block. The fact that Corozzo has shown himself to have no regard for court ordered restrictions combined with his criminal history and the fact that he is a powerful member of a violent criminal enterprise who is charged with murder, among other things, strongly favors detention. <u>See</u> 18 U.S.C. § 3142(g)(1)(B).

      c.    <u>Seriousness of Danger Posed by the Defendant's Release\</u>

Corozzo poses a clear danger if released.  As noted above, the government will establish

Corozzo's association with, and position of authority in, the Gambino family through a variety of sources, including the testimony of more than five cooperating witnesses, consensual recordings and surveillance evidence.

Courts in this circuit routinely detain high-ranking members of organized crime based on their leadership roles in criminal enterprises that engage in acts of violence.  See, e.g, Defede, 7 F. Supp. 2d at 393 (detaining defendant on dangerousness based on the proffered testimony of cooperating witness and surveillance evidence that he was the acting boss of the Luchese family, an enterprise involved in extortionate conduct, among other crimes); Gotti, 312 F.3d at 542 ("Indeed, we made it quite clear in United States v. Colombo, 777 F.2d 96, 98 (2d Cir. 1985), that the [Bail Reform Act] 'does not require that the defendant himself commit acts of physical violence as a condition precedent to a detention order.'").

Corozzo is a powerful captain in the Gambino family and he has dozens of Gambino family members and associates working under him.  Further, he has been involved in acts of violence, including murder, murder conspiracy and myriad extortions with Gambino family captain Leonard DiMaria.  The violent nature of the Gambino family's method of collecting money is made clear in the following recording of DiMaria:  "You have to go bother these people for your money. . . they are going to tell you we got to sit down and talk and this and that.  Rough them up a little.  Tell them, 'You're a fucking stiff.'  Tell them what you have to tell them. . . . The next guy that owes you money from there with them guys, you catch them, and that's what I'm saying, that you check in with the other guys . . .  Crack a face, fuck them up.  Don't you do it, send a fucking kid to rough them up, a fucking joke."  He thus falls within the "small but identifiable group of particularly dangerous defendants as to whom neither the imposition of

stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community."  Senate Report at 3188-89.  As demonstrated by the recorded conversations, Corozzo's position in the Gambino family gives him the authority and resources to continue his criminal activities and to order and accomplish acts of violence against potential witnesses or any person he perceives as a threat – of which there will be many during the course of this prosecution.

Finally, Corozzo likely will continue his criminal conduct if released; he is a career criminal with a leadership position in a continuing criminal enterprise, the needs of which require constant monitoring, and he continued to commit crimes while on supervised release in the past, demonstrating his inability to abide by the court's restrictions.  As noted, courts in this circuit have recognized that when organized crime defendants are charged with their participation in a criminal enterprise, the risk of continued criminal conduct is substantial and justifies detention. See Salerno, 631 F. Supp. at 1375.

Under the cases cited above, the crimes charged and the facts proffered, there is little doubt that Corozzo is a danger to the community and ordered detained pending the outcome of his case.


        d.     <u>Evidence of the Defendant's Guilt</u>

The government's evidence of Corozzo's guilt on the charged crimes is strong.  To prevail on the racketeering conspiracy and racketeering counts, the government must prove the following four elements: (a) that the defendant knowingly agreed to conduct or participate – and conducted or participated –  directly or indirectly, in the conduct of the affairs of the charged enterprise through a pattern of racketeering activity; (b) that the enterprise, here the Gambino family,

exists; (c) that the enterprise engaged in, or its activities affected interstate or foreign commerce; and (d) that the defendant was employed by, or associated with, the enterprise.

First, the government will prove the existence of the Gambino family and Corozzo's membership in that enterprise through, among other evidence, cooperating witnesses, consensual recordings and surveillance photographs.  More than five cooperating witnesses, all made members of the Gambino family are expected to testify that the Gambino family exists and that Corozzo is a longstanding member of the family who currently serves as a captain.

The second element, the interstate commerce requirement, is also easily proved as the Gambino family has engaged in a variety of crimes, including narcotics trafficking, robbery, extortion of businesses and other crimes which affect interstate commerce.

Finally, to prove that Corozzo engaged in the charged pattern of racketeering activity the government will offer law enforcement witnesses, cooperating witnesses and consensual recordings.  For example, the government has over 30 recordings documenting Corozzo's involvement in the extortions for which he is indicted in this case. With respect to the two murder charges against him, cooperating witnesses, whose testimony will be corroborated by other evidence including ballistics and other crime scene evidence are expected to testify to Corozzo's role in the double murder.  Accordingly, the government's evidence against Corozzo is overwhelming and clearly favors detention.

3.      Nicholas Corozzo Also Constitutes a Risk of Flight

In addition to the reasons set forth above, given that he faces the certainty of life in prison if convicted, Corozzo constitutes a risk of flight.  See United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (finding the possibility of a "severe sentence" heightens the risk of

flight). This risk of flight is heightened as a result of the strong evidence against Corozzo, which includes a large crew of members and associates with the means to provide refuge. Accordingly, Corozzo should also be detained as a risk of flight.

H.    JOHN D'AMICO

John D'Amico is the current acting boss of the Gambino family and a convicted felon. He is charged in Count One with racketeering conspiracy, including predicate acts of extortion and extortion conspiracy. D'Amico is also charged with extortion and extortion conspiracy.

If convicted as charged, D'Amico faces a term of 20 years' imprisonment on the racketeering conspiracy count, as well as for each of the four extortion and extortion conspiracy counts. Were D'Amico sentenced consecutively for just the two extortionate schemes covered in these counts – the evidence for which includes recorded conversations detailing his guilt – he faces a term of imprisonment of 40 years. As D'Amico is 71 years old, any conviction will lead to an effective life sentence.

The government seeks to have a permanent order of detention entered against D'Amico on the ground that he is both a danger to the community and a risk of flight.

1.    Proffered Facts

The government hereby proffers the following facts relevant to the charges lodged against D'Amico.

       a.    D'Amico Is the Acting Boss of The Gambino Family

D'Amico is a longstanding member and captain in the Gambino family; he currently serves as the acting boss. The government will establish D'Amico's position in the Gambino family through the testimony of cooperating witnesses, consensual recordings and surveillance

92

evidence.  Each category of evidence is briefly discussed below.

More than five cooperating witnesses are expected to testify that D'Amico is a longstanding member and captain in the Gambino family.  At least two witnesses can testify that D'Amico is presently the acting boss of the Gambino family.

This testimony is corroborated by consensual recordings detailing his leadership role within the Gambino family and confirming his current status as a member of the family's administration.

The available surveillance evidence also establishes D'Amico's long-lived association with and position in the Gambino family.  Since 1984 – more than 20 years ago – D'Amico has been observed at locations and events relating to the Gambino family.  He has been observed with other members of the Gambino family at 19 weddings and wakes.  Cooperating witnesses and an organized crime expert are expected to testify that these events are attended by dozens of other members and associates of organized crime, many of whom are convicted felons who committed those crimes as part of an organized crime family, and that Gambino family business is routinely conducted at such events.  In the past two years alone, D'Amico was surveilled attending the January 2007 wake of Maryann Corozzo, the wife of Gambino family soldier Blaise Corozzo; the March 2007 wake of Gambino family soldier George Remini; the November 2007 wake of Gambino family captain Giuseppe "Joseph" Arcuri; and Gambino family captain (and co-defendant) Frank Cali's December 2007 Christmas party.

      b.     <u>D'Amico Is Charged with Crimes of Violence</u>

As noted above, D'Amico is charged in multiple extortions, all crimes of violence.  A brief proffer of the facts pertaining to each of the extortions follows.

          i.     Extortion Conspiracy/Extortion -
                      <u>Staten Island Cement Company Profits</u>

A cooperating witness is expected to testify to the following.

In approximately December 2003, John Doe #4 approached Gambino family captain Thomas Cacciopoli and requested permission to open a cement company on Staten Island.  Due to the Gambino family's control of the New York cement industry, Cacciopoli, together with Gambino family captain Louis Filippelli, engaged in a series of meetings to obtain permission from the Gambino family's administration to open such a company.  Cacciopoli and Filippelli succeeded and informed John Doe #4 that he could start the company provided that following a one-year grace period, the Gambino family would receive 15% or $1 per yard for all cement sold, with the payments to be collected by Filippelli and passed through to the family's administration.

John Doe #4 opened the company in April 2004.  Since May 2005, he has paid over $60,000 of extortion payments to the Gambino family.  The initial payments were collected by Gambino family soldier Vincent Pacelli on behalf of then incarcerated Louis Filippelli.  After Gambino family captain Nicholas Corozzo assumed control of John Doe #4 from Filippelli in late June 2005, payments were collected on his behalf for the administration by DiMaria, who controlled John Doe #4 for Corozzo while Corozzo was on supervised release, as well as by Gambino family soldiers Mario Cassarino and Ernest Grillo.

Multiple members of the Gambino family informed John Doe #4 that the profits from his Staten Island cement company were passed along to the Gambino family administration, and that the administration consists of acting boss John D'Amico, acting underboss Domenico Cefalu and consigliere Joseph Corozzo.

The cooperating witness's testimony will be corroborated by (i) recordings made of conversations with Gambino family members, including scores of recordings detailing John Doe

#4's extortion by the defendants charged in the racketeering acts and counts related to this

extortion, (ii) surveillance confirming John Doe #4's contacts with various members of the

Gambino family and the participants in many of the taped conversations, (iii) testimony from

multiple cooperating witnesses who were members and associates of the Gambino family that

the family controlled the cement industry on Staten Island and would not allow someone to open

a cement company without paying extortion to the Gambino family, (iv) testimony from a

cooperating witness who is a former Gambino family soldier with extensive knowledge of the

family's construction rackets that extortion payments related to cement were passed along to the

administration of the family, and (v) multiple cooperating witnesses who were former Gambino

family members familiar with the family's construction rackets who are expected to testify that

individuals and companies being extorted by Gambino family members must make the extortion

payments demanded of them or face retaliation.

        ii.    Extortion Conspiracy/Extortion -
                     Staten Island Cement Company Sale

A cooperating witness is expected to testify to the following.

During the spring of 2007, a company offered to buy John Doe #4's Staten Island cement

company.  In keeping with instructions from Gambino family captains Nicholas Corozzo and

Leonard DiMaria to consult them before making any decisions concerning his business, John

Doe #4 informed DiMaria of the offer.  DiMaria later told John Doe #4 that the family had

agreed to allow him to make the sale, provided he pay $100,000 to the Gambino family.

In January 2008, John Doe #4 sold the Staten Island cement company.  Thereafter, Gambino

family consigliere Joseph Corozzo, through Gambino family solider Gus Sclafani, directed John

Doe #4 to deliver the $100,000 to Joseph Corozzo.  Later, Nicholas Corozzo and Leonard

DiMaria directed John Doe #4 to deliver the money to Leonard DiMaria for distribution to the administration.  As directed, John Doe #4 made a payment of the proceeds of the sale of the cement company to DiMaria.

The cooperating witness's testimony will be corroborated by (i) recordings made of conversations with Gambino family members, including multiple recordings detailing John Doe #4's extortion by the defendants charged in the racketeering acts and counts related to this extortion, (ii) surveillance confirming John Doe #4's contacts with various members of the Gambino family and the participants in many of the taped conversations, (iii) testimony from multiple cooperating witnesses who were members and associates of the Gambino family that the family controlled the cement industry on Staten Island and would not allow someone to open a cement company without paying extortion to the Gambino family, (iv) testimony from a cooperating witness who is a former Gambino family soldier with extensive knowledge of the family's construction rackets that extortion payments related to cement were passed along to the administration of the family, and (v) multiple cooperating witnesses who were former Gambino family members familiar with the family's construction rackets who are expected to testify that individuals and companies being extorted by Gambino family members must make the extortion payments demanded of them or face retaliation against their businesses, property or persons.

2.      D'Amico Constitutes a Danger to the Community and Should Be Detained

The defendant John D'Amico poses a danger to the community.  He is the current acting boss of a violent organized crime family and has himself engaged in crimes of violence in furtherance of the family's illegal businesses.  Courts in this circuit repeatedly have held that high-ranking members of organized crime constitute a danger to the community.  The Second Circuit's

decision in United States v. Ciccone, 312 F.3d 535 (2d Cir. 2002) is particularly instructive.

There, Gambino family acting boss Peter Gotti was indicted on racketeering charges that

included predicate acts of extortion against others.  Peter Gotti, himself, was not charged with

any predicate acts of extortion; only money laundering and money laundering conspiracy.

At the detention hearing, the government contended that Gotti, as the leader of the Gambino

family, was able to direct the activities of his co-defendants and therefore was responsible for the

extortions and the other crimes committed by them.  Magistrate Judge Pollak ordered Gotti

detained finding that Gotti had been "charged with a crime of violence" and therefore could be

detained on grounds of dangerousness.  Id. at 538.  Judge Pollak held that the government had

clearly shown that Gotti was the acting boss of the Gambino family, and as such, was

responsible for controlling the activities of the enterprise.  Id.  Thus, while Gotti was not named

in the specific racketeering acts charging extortion, he could nonetheless be held responsible for

the acts of the members of his organization given his status as the acting boss of the family.

Because extortions are crimes of violence, Judge Pollack ordered Gotti detained as a danger to

the community.  Id. at 538-39.

On appeal, the Second Circuit upheld the court's findings that Gotti constituted a danger to the

community.  The court held that it was proper for a court to consider the RICO enterprise as a

whole when considering the dangerousness of one of its leaders.  Id. at 542.  The court found

once the government demonstrated Gotti's leadership role in the enterprise, and the enterprise

was charged with crimes of violence, there was clear and convincing evidence for the court to

have found that Gotti was a danger to the community and therefore should be detained.  Id. at

542-43.

As discussed below, D'Amico – as was Peter Gotti – is the acting boss of the Gambino family. Not only are other members of the Gambino family charged with multiple counts of extortion and murder, but here, D'Amico, himself, along with the rest of the Gambino administration, is charged with extortions.  Accordingly, the evidence supporting the government's argument for detention here is stronger than that in Ciccone.  See also United States v. Cirillo, Cr. No. 05-212 (SLT), slip op. (E.D.N.Y. 2005) (Genovese family acting bosses Dominick Cirillo and Lawrence Dentico, as well as Genovese family captain Anthony Antico, who were charged with extortion and extortion conspiracy, detained as dangers to the community), aff'd, 149 Fed. Appx. 40 (2d Cir. 2005).  As set forth below, each of the relevant considerations under the Bail Reform Act favors detention here.

      a.     <u>Nature and Circumstances of the Crimes Charged</u>

In addition to racketeering and racketeering conspiracy, D'Amico is charged with extortion and extortion conspiracy – both of which are crimes of violence.  See 18 U.S.C. § 3156(a)(4)(A) (defining "crime of violence" as an offense that has as one of its elements the "attempted use, or threatened use of physical force against the person or property of another").  Moreover, D'Amico currently leads a violent criminal enterprise and has at his disposal more than 200 made men – soldiers – sworn to follow his orders and commit murder upon his request.

      b.     <u>History and Characteristics of the Defendant</u>

D'Amico is a long-standing member of the Gambino family who now serves as its acting boss. He is a life-long criminal who has sworn an oath to a violent criminal enterprise.  Below is a brief summary of certain of D'Amico's arrests and convictions:

• D'Amico was arrested and convicted several times for illegal gambling in the 1960s.

• On June 2, 1998, D'Amico was arrested in New York on RICO charges; ultimately pled guilty to operating an illegal gambling business (18 U.S.C. § 1955) and was sentenced to 20 months in prison and three years of supervised release.

c.    Seriousness of Danger Posed by the Defendant's Release

D'Amico poses a clear danger if released.  As noted above, the government will establish D'Amico's association with, and position of authority in, the Gambino family through a variety of sources, including the testimony of cooperating witnesses, consensual recordings and surveillance evidence.

Courts in this circuit routinely detain high-ranking members of organized crime based on their leadership roles in criminal enterprises that engage in acts of violence.  See, e.g, Defede, 7 F. Supp. 2d at 393 (detaining defendant on dangerousness based on the proffered testimony of cooperating witness and surveillance evidence that he was the acting boss of the Luchese family, an enterprise involved in extortionate conduct, among other crimes); Gotti, 312 F.3d at 542 ("Indeed, we made it quite clear in United States v. Colombo, 777 F.2d 96, 98 (2d Cir. 1985), that the [Bail Reform Act] 'does not require that the defendant himself commit acts of physical violence as a condition precedent to a detention order.'").

D'Amico is the current leader of the Gambino family "on the street" and he has been involved in acts of violence, including extortions with Gambino family captain Leonard DiMaria.  The violent nature of the Gambino family's method of collecting money is made clear in the following recording of DiMaria:  "You have to go bother these people for your money. . . they are going to tell you we got to sit down and talk and this and that.  Rough them up a little. Tell them, 'You're a fucking stiff.'  Tell them what you have to tell them. . . . The next guy that

owes you money from there with them guys, you catch them, and that's what I'm saying, that you check in with the other guys . . .  Crack a face, fuck them up.  Don't you do it, send a fucking kid to rough them up, a fucking joke."

D'Amico thus falls within the "small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community."  Senate Report at 3188-89.  As demonstrated by the recorded conversations, D'Amico's position in the Gambino family gives him the authority and resources to continue his criminal activities and to order and accomplish acts of violence against potential witnesses or any person he perceives as a threat – of which there will be many during the course of this prosecution.

Finally, D'Amico likely will continue his criminal conduct if released; he heads a continuing criminal enterprise, the needs of which require constant monitoring.  As noted, courts in this circuit have recognized that when organized crime defendants are charged with their participation in a criminal enterprise, the risk of continued criminal conduct is substantial and justifies detention.  See Salerno, 631 F. Supp. at 1375.

d.     Evidence of the Defendant's Guilt

The government's evidence of D'Amico's guilt on the charged crimes is strong.  To prevail on the racketeering conspiracy the government must prove the following four elements: (a) that the defendant knowingly agreed to conduct or participate – and conducted or participated – directly or indirectly, in the conduct of the affairs of the charged enterprise through a pattern of racketeering activity; (b) that the enterprise, here the Gambino family, exists; (c) that the enterprise engaged in, or its activities affected interstate or foreign commerce;

and (d) that the defendant was employed by, or associated with, the enterprise.

First, the government will prove the existence of the Gambino family and D'Amico's membership in that enterprise through, among other evidence, the testimony of cooperating witnesses, consensual recordings and surveillance.  More than five cooperating witnesses are expected to testify that the Gambino family exists and that D'Amico is a longstanding member of the family and a captain.  At least two witnesses are expected to testify that D'Amico currently serves as the acting boss of the Gambino family.

The second element, the interstate commerce requirement, is also easily proved as the Gambino family has engaged in a variety of crimes, including narcotics trafficking, robbery, extortion of businesses and other crimes which affect interstate commerce.

Finally, to prove that D'Amico engaged in the charged pattern of racketeering activity the government will offer law enforcement witnesses, cooperating witnesses, and multiple consensual recordings that show the defendant's involvement in the charged extortions.  Accordingly, the government's evidence of D'Amico's guilt is thus strong and clearly favors detention.

### 3.    D'Amico Also Constitutes a Risk of Flight

In addition to the reasons set forth above, given that he faces 20 years' imprisonment on each count if convicted, D'Amico constitutes a risk of flight.  This risk of flight is heightened as a result of the strong evidence against D'Amico, which, at the age of 71 years old may constitute a life sentence.  As the leader of a large and organized criminal enterprise, D'Amico has the means and resources at his disposal which also increases the risk of flight.  Accordingly, D'Amico should also be detained as a risk of flight.

101

I.      LEONARD DIMARIA

Leonard DiMaria is charged in Count One with racketeering conspiracy, including 10 predicate acts of extortion, attempted extortion and extortion conspiracy, and additional predicate acts of union benefit theft, bribery of union officials, money laundering and illegal gambling.  DiMaria is also charged with extortion, attempted extortion and extortion conspiracy, union benefit theft, conspiracy to embezzle union benefits, mail fraud, mail fraud conspiracy, money laundering and money laundering conspiracy.

If convicted as charged, DiMaria faces a term of 20 years' imprisonment on the racketeering conspiracy count, as well as for each of the 20 extortion, attempted extortion and extortion conspiracy counts.  Were DiMaria sentenced consecutively for just the 10 distinct extortions covered in these counts – the evidence for which includes more than 100 hours of recorded conversations capturing DiMaria discussing the extortions –  he faces a term of imprisonment of 200 years.

Significantly, he will be sentenced as a career offender due to his past convictions for violent crime, resulting in a guidelines range of 210 to 262 months' imprisonment for each extortion conviction.  DiMaria is 67 years old and has more than 20 criminal convictions dating to 1957.

The government seeks to have a permanent order of detention entered against DiMaria on the grounds that he is a danger to the community and a risk of flight.

1.      Proffered Facts

The government hereby proffers the following facts relevant to the charges lodged against DiMaria.

102

a.     <u>DiMaria Is a Captain in the Gambino Family</u>

DiMaria is a longstanding member of the Gambino family who currently serves as a captain.  The government will establish DiMaria's position in the Gambino family through the testimony of cooperating witnesses, consensual recordings and surveillance evidence.  Each category of evidence is briefly discussed below.

More than a dozen cooperating witnesses are expected to testify that DiMaria has been a member of the Gambino family since the 1970's.  These same cooperating witness are expected to testify that since that time DiMaria has served as the right hand to powerful Gambino family captain Nicholas Corozzo.  More than five cooperating witnesses are expected to testify that DiMaria himself is a member of the Gambino family and at least two are expected to testify that presently he is a captain.

This testimony is corroborated by the more than 80 recorded conversations involving DiMaria.  During the course of the recordings, he is heard engaging in the Gambino family's business – discussing the enterprise, its criminal activities, its members and rules of operation – in which his captain status is made plain by, among other things, statements demonstrating his control of other members of members of the Gambino family.

Surveillance evidence also establishes DiMaria's long-term association with and position in the Gambino family.  Since 1976 – more than 30 years ago – DiMaria has been observed at locations and events relating to the Gambino family.  He has been observed with other members of the Gambino family at weddings and wakes in the 1970's, 1980's, 1990's and in this decade.  In addition, members of the Gambino family charged in the instant indictment, including acting boss John D'Amico, consigliere Joseph Corozzo, captain Nicholas Corozzo,

103

captain Thomas Cacciopoli, acting captain Augustus Sclafani and two other soldiers, attended

DiMaria's daughter's wedding and/or his mother's wake.  As recently as January 31, 2008,

DiMaria was observed meeting with a cooperating witness to collect $8000 for the Gambino

family's administration.  Cooperating witnesses and an organized crime expert are expected to

testify that these events are attended by dozens of other members and associates of organized

crime, many of whom are convicted felons who committed those crimes as part of an organized

crime family, and that Gambino family business is routinely conducted at such events.

b.       <u>DiMaria Is Charged with Crimes of Violence</u>

DiMaria is charged with extortion, attempted extortion and extortion conspiracy

in 10 racketeering acts within count one's RICO conspiracy charge, as well as in 20 substantive

counts of the indictment.  These charges stem from 10 separate extortions involving dozens of

businesses and business owners within the New York construction industry.  A brief proffer of

the facts pertaining to each of the extortions follows.

i.       Extortion Conspiracy/Extortion -
<u>Staten Island Cement Company Profits</u>

A cooperating witness is expected to testify to the following.

In approximately December 2003, John Doe #4 approached Gambino family

captain Thomas Cacciopoli and requested permission to open a cement company on Staten

Island.  Due to the Gambino family's control of the New York cement industry, Cacciopoli,

together with Gambino family captain Louis Filippelli, engaged in a series of meetings to obtain

permission from the Gambino family's administration to open such a company.  Cacciopoli and

Filippelli succeeded and informed John Doe #4 that he could start the company provided that

following a one-year grace period, the Gambino family would receive 15% or $1 per yard for all

104

cement sold, with the payments to be collected by Filippelli and passed through to the family's administration.

John Doe #4 opened the company in April 2004.  Since May 2005, he has paid over $60,000 of extortion payments to the Gambino family.  The initial payments were collected by Gambino family soldier Vincent Pacelli on behalf of then incarcerated Louis Filippelli.  After Gambino family captain Nicholas Corozzo assumed control of John Doe #4 from Filippelli in late June 2005, payments were collected on his behalf for the administration by DiMaria, who controlled John Doe #4 for Corozzo while Corozzo was on supervised release, as well as by Gambino family soldiers Mario Cassarino and Ernest Grillo.

Multiple members of the Gambino family informed John Doe #4 that the profits from his Staten Island cement company were passed along to the Gambino family administration, and that the administration consists of acting boss John D'Amico, acting underboss Domenico Cefalu and consigliere Joseph Corozzo.

The cooperating witness's testimony will be corroborated by (i) recordings made of conversations with Gambino family members, including scores of recordings detailing John Doe #4's extortion by the defendants charged in the racketeering acts and counts related to this extortion, (ii) surveillance confirming John Doe #4's contacts with various members of the Gambino family and the participants in many of the taped conversations, (iii) testimony from multiple cooperating witnesses who were members and associates of the Gambino family that the family controlled the cement industry on Staten Island and would not allow someone to open a cement company without paying extortion to the Gambino family, (iv) testimony from a cooperating witness who is a former Gambino family soldier with extensive knowledge of the

family's construction rackets that extortion payments related to cement were passed along to the administration of the family, and (v) multiple cooperating witnesses who were former Gambino family members familiar with the family's construction rackets who are expected to testify that individuals and companies being extorted by Gambino family members must make the extortion payments demanded of them or face retaliation.

ii.    Extortion Conspiracy/Extortion -
Staten Island Cement Company Sale

A cooperating witness is expected to testify to the following.

During the spring of 2007, a company offered to buy John Doe #4's Staten Island cement company.  In keeping with instructions from Gambino family captains Nicholas Corozzo and Leonard DiMaria to consult them before making any decisions concerning his business, John Doe #4 informed DiMaria of the offer.  DiMaria later told John Doe #4 that the family had agreed to allow him to make the sale, provided he pay $100,000 to the Gambino family.

In January 2008, John Doe #4 sold the Staten Island cement company. Thereafter, Gambino family consigliere Joseph Corozzo, through Gambino family solider Gus Sclafani, directed John Doe #4 to deliver the $100,000 to Joseph Corozzo.  Later, Nicholas Corozzo and Leonard DiMaria directed John Doe #4 to deliver the money to Leonard DiMaria for distribution to the administration.  As directed, John Doe #4 made a payment of the proceeds of the sale of the cement company to DiMaria.

The cooperating witness's testimony will be corroborated by (i) recordings made of conversations with Gambino family members, including multiple recordings detailing John Doe #4's extortion by the defendants charged in the racketeering acts and counts related to this extortion, (ii) surveillance confirming John Doe #4's contacts with various members of the

106

Gambino family and the participants in many of the taped conversations, (iii) testimony from

multiple cooperating witnesses who were members and associates of the Gambino family that

the family controlled the cement industry on Staten Island and would not allow someone to open

a cement company without paying extortion to the Gambino family, (iv) testimony from a

cooperating witness who is a former Gambino family soldier with extensive knowledge of the

family's construction rackets that extortion payments related to cement were passed along to the

administration of the family, and (v) multiple cooperating witnesses who were former Gambino

family members familiar with the family's construction rackets who are expected to testify that

individuals and companies being extorted by Gambino family members must make the extortion

payments demanded of them or face retaliation against their businesses, property or persons.

          iii.      <u>Extortion Conspiracy/Attempted Extortion - Pump Truck</u>

A cooperating witness is expected to testify to the following.

In June 2005, John Doe #4 sought permission from Gambino family captain

Leonard DiMaria, who exercised day to day control over John Doe #4 for Gambino family

captain Nicholas Corozzo, to purchase a cement pump truck and open a business.  Later,

DiMaria allowed John Doe #4 to start the business pursuant to an arrangement in which John

Doe #4 would receive 40% of the pump truck profits and DiMaria and Corozzo would split the

remaining profits together with Gambino family soldiers Ernie Grillo and Mario Cassarino.  The

pump truck business operated for a time, but ultimately the business was not profitable.

The cooperating witness's testimony will be corroborated by (i) recordings made

of conversations with Gambino family members, including multiple recordings detailing John

Doe #4's attempted extortion by the defendants charged in the racketeering acts and counts

related to this extortion, (ii) surveillance confirming John Doe #4's contacts with various members of the Gambino family and the participants in many of the taped conversations, and (iv) multiple cooperating witnesses who were former Gambino family members familiar with the family's construction rackets who are expected to testify that individuals and companies being extorted by Gambino family members must comply with the demands of their Gambino family handlers or face retaliation against their businesses, property or persons.

iv.    Extortion Conspiracy/Extortion -
Liberty View Harbor Construction Site

A cooperating witness is expected to testify to the following.

In April 2006, John Doe #4 started a company which constructed a portable cement plant at the Liberty View Harbor construction site at which VMS Construction served as general contractor.  VMS Construction is owned by Gambino family associate Anthony Scibelli, who is controlled by Gambino family soldier Vincent Dragonetti.  In addition to the portable cement plant, two companies owned by John Doe #4 also performed work at the Liberty View Harbor site.

John Doe #4 obtained the work at the Liberty View Harbor site after Gambino family captain Nicholas Corozzo, who is Dragonetti's father-in-law, granted him permission provided he pay 60% of the portable cement plant's profits to Corozzo, Gambino family captain Leonard DiMaria and Dragonetti.  In addition, Scibelli and Dragonetti demanded that John Doe #4 pay an additional $6 or $7 per yard of cement produced as well as extortionate payments for the other two businesses.

Over the course of the extortion, Jon Doe #4 made extortion payments to the Gambino family of more than $200,000.

108

Despite these payments, during the summer of 2007, with the backing of Corozzo, DiMaria and Dragonetti, Scibelli took possession of the portable cement plant without remuneration to John Doe #4.

The cooperating witness's testimony will be corroborated by (i) recordings made of conversations with Gambino family members, including scores of recordings detailing John Doe #4's extortion by the defendants charged in the racketeering acts and counts related to this extortion, (ii) surveillance confirming John Doe #4's contacts with various members of the Gambino family and the participants in many of the taped conversations, and (iii) multiple cooperating witnesses who were former Gambino family members familiar with the family's construction rackets who are expected to testify that individuals and companies being extorted by Gambino family members must comply with the demands of their Gambino family handlers and make the extortion payments demanded of them or face retaliation against their businesses, property or persons.

v.     Extortion Conspiracy/Extortion -
          Cement Powder Deliveries

A cooperating witness is expected to testify to the following.

In October 2007,  following Gambino family soldier Anthony Scibelli's takeover of his portable cement plant, Gambino family captains DiMaria and Corozzo approved a plan by which John Doe #4 would supply his former plant with the powder used to make cement at the Liberty View Harbor site.  For this privilege, John Doe #4 was instructed to provide 60% of his profits relating to the cement powder deliveries to be split between Corozzo, DiMaria and Dragonetti.  As directed, in the four months since, John Doe #4 has provided $6,000 in extortion payments.

109

John Doe #4 made the extortion payments demanded by his Gambino family

handlers because he feared retaliation from the Gambino family and their associates.

The cooperating witness's testimony will be corroborated by (i) recordings made

of conversations with Gambino family members, including dozens of recordings detailing John

Doe #4's extortion by the defendants charged in the racketeering acts and counts related to this

extortion, (ii) surveillance confirming John Doe #4's contacts with various members of the

Gambino family and the participants in many of the taped conversations, and (iii) multiple

cooperating witnesses who were former Gambino family members familiar with the family's

construction rackets who are expected to testify that individuals and companies being extorted

by Gambino family members must make the extortion payments demanded of them or face

retaliation against their businesses, property or persons.

     vi.  <u>Extortion Conspiracy/Extortion - Construction List</u>

A cooperating witness is expected to testify to the following.

In July 2005, Gambino family captain Leonard DiMaria instructed John Doe #4 to

help soldier Ernest Grillo reinitiate collections from construction companies that had been

making extortion payments to then jailed Gambino family soldier Edward Garafola prior to his

incarceration.  Garafola, who had been a member of the Gambino family's "construction panel,"

a body which oversees the Gambino family's construction rackets, had exacted extortionate

payments from scores of construction companies prior to his incarceration, but had not shared

the identity of all those companies with his Gambino family superiors.

John Doe #4 contacted Grillo as instructed.  Together with Ruggiero and

Gambino family associate Anthony O'Donnell, who had been Garafola's right hand in

conducting the extortions, and who had accompanied Garafola on one occasion while Garafola assaulted a contractor who was late in his payments, the men repeatedly met to reconstruct a list of the contractors who had been paying Garafola extortion and to plot the reinitiation of collections.   Under the supervision and at the direction of Corozzo and DiMaria, the four men created a list of more than 40 construction companies and individual contractors that formerly paid extortion to Garafola.  Grillo, Ruggiero and O'Donnell then approached a number of the companies to place them back under Gambino family control.

During the this process, Edward Garafola's son asserted his father's right to the extortion victims, and complained of the efforts to take away his father's former victims.  In response, Grillo told John Doe #4 that he assaulted Garafola's son, saying, "I choked him out."

The cooperating witness's testimony will be corroborated by (i) recordings made of conversations with Gambino family members, including scores of recordings detailing John Doe #4's extortion by the defendants charged in the racketeering acts and counts related to this extortion, (ii) surveillance confirming John Doe #4's contacts with various members of the Gambino family,  and the participants in many of the taped conversations, and (iii) the testimony of a cooperating witnesses who was a former Gambino family member and member of the Gambino family construction panel who was tasked with compiling the same construction list years earlier but failed to complete the job prior to his arrest and incarceration. property or persons.

vii.    Extortion Conspiracy/Extortion -
NASCAR Construction Site

A cooperating witness is expected to testify to the following.

In January 2006, NASCAR had begun construction on a racetrack in Staten

111

Island.  Recine Trucking, a company under the control of Gambino family acting underboss Domenico Cefalu, was among the first companies hired to bring fill to the site.  Thereafter, Gambino family soldier Ernest Grillo acquired exclusive dumping rights at the site for John Doe #4.

From late January 2006 to May 2006, Grillo, Cefalu and Gambino family members Leonard DiMaria, Vincent Dragonetti, Nicholas Corozzo and Frank Cali negotiated the amount of extortion John Doe #4 would be required to pay for the exclusive dumping rights. Eventually, John Doe #4 received those rights on the condition that he make extortion payments of $.50 per yard of fill dumped to Corozzo and DiMaria, and $.50 per yard of fill dumped to Cefalu and Cali.

Before John Doe #4 could begin dumping at the site pursuant to these terms, the exclusive dumping deal fell through.  Later, after a new deal was worked out, Corozzo and DiMaria directed John Doe #4 to take the job on the condition that he pay them $1 for every yard of fill dumped at the site.

John Doe #4 also was required to make a one-time $9,000 payment to NASCAR employee Todd Polakoff on behalf have NASCAR executive William Kilgannon.

John Doe #4 worked at the site for a short time and made approximately $13,000 in extortion payments to Gambino family soldier Mario Cassarino, who collected the extortion payments for Corozzo and DiMaria.

The cooperating witness's testimony will be corroborated by (i) recordings made of conversations with Gambino family members, including scores of recordings detailing John Doe #4's extortion by the defendants charged in the racketeering acts and counts related to this

extortion, (ii) surveillance confirming John Doe #4's contacts with various members of the Gambino family and the participants in many of the taped conversations, and (iii) multiple cooperating witnesses who were former Gambino family members familiar with the family's construction rackets who are expected to testify that individuals and companies being extorted by Gambino family members must comply with the demands of their Gambino family handlers and make the extortion payments demanded of them or face retaliation against their businesses, property or persons.

viii.    Extortion Conspiracy/Extortion - Excavation Company

A cooperating witness is expected to testify to the following.

In approximately January 2006, Gambino family captain Nicholas Corozzo instructed John Doe #4 to start an excavation business which, after a short period in which John Doe #4 would be allowed to operate the business without making extortion payments, would be required to pay 60% of its profits to Corozzo, Gambino family soldier Vincent Dragonetti and Gambino family captain Leonard DiMaria. John Doe #4 began making these payments a few months after starting the business. To date, John Doe #4 has paid more than $30,000 in extortion payments to DiMaria and Dragonetti, who collected the payments on Corozzo's behalf.

The cooperating witness's testimony will be corroborated by (i) recordings made of conversations with Gambino family members, including dozens of recordings detailing John Doe #4's extortion by the defendants charged in the racketeering acts and counts related to this extortion, (ii) surveillance confirming John Doe #4's contacts with various members of the Gambino family and the participants in many of the taped conversations, and (iii) multiple cooperating witnesses who were former Gambino family members familiar with the family's

113

construction rackets who are expected to testify that individuals and companies being extorted

by Gambino family members must comply with the demands of their Gambino family handlers

and make the extortion payments demanded of them or face retaliation against their businesses,

property or persons.

ix.     Extortion Conspiracy/Extortion - John Does #4 & #12

A cooperating witness is expected to testify to the following.

In July 2006, Gambino family captain Leonard DiMaria informed John Doe #4

that John Doe #12, an individual close to John Doe #4 who previously made extortion payments

to the commissary of jailed Gambino family soldier Jerome Brancato, needed to begin making

extortion payments to Brancato again.  At the end of 2006, when Brancato was released from

prison, DiMaria instructed John Doe #4 to have John Doe #12 pay money to Brancato to help

him get him back on his feet.  John Doe #4 then gave $2,500 to Vincent Dragonetti, who

collected the money for Brancato.

In January 2008, Gambino family captain Nicholas Corozzo told John Doe #4 that

John Doe #12 failed to provide Brancato with a year end extortion payment.  Corozzo instructed

John Doe #4 to make sure that money from John Doe #12 was given to Gambino family soldier

Joseph Chirico, who would collect it for Brancato.  The following day, John Doe #4 gave $1,500

to Chirico for Brancato.

The cooperating witness's testimony will be corroborated by (i) recordings made

of conversations with Gambino family members, including multiple recordings detailing John

Doe #4's extortion by the defendants charged in the racketeering acts and counts related to this

extortion, (ii) surveillance confirming John Doe #4's contacts with various members of the

114

Gambino family and the participants in many of the taped conversations, and (iii) multiple

cooperating witnesses who were former Gambino family members who are expected to testify

that individuals being extorted by Gambino family members must comply with the demands of

their Gambino family handlers or face some form of retaliation.

      x.   Extortion Conspiracy/Extortion - Staten Island Recycling

    A cooperating witness is expected to testify to the following.

    In conducting his trucking business, John Doe #4 came into frequent contact with

the owners of a recycling facility located on Staten Island.

    In approximately June 2008, Nicholas Corozzo and Leonard DiMaria directed

John Doe #4 to collect extortion payments from the facility.

    In January 2008, John Doe #4 told Corozzo and DiMaria that he collected $2,000

from the facility, and provided the money to DiMaria.

    The cooperating witness's testimony will be corroborated by (i) recordings made

of conversations with Gambino family members, including multiple recordings detailing John

Doe #4's extortion by the defendants charged in the racketeering acts and counts related to this

extortion, (ii) surveillance confirming John Doe #4's contacts with various members of the

Gambino family and the participants in many of the taped conversations, and (iii) multiple

cooperating witnesses who were former Gambino family members who are expected to testify

that individuals being extorted by Gambino family members must comply with the demands of

their Gambino family handlers or face some form of retaliation.

    2.   DiMaria Constitutes a Danger to the Community and Should Be Detained

    The defendant Leonard DiMaria poses a danger to the community.  He is one of

the leaders of a violent organized crime family and has himself engaged in crimes of violence in furtherance of the family's illegal businesses.  Courts in this district and the Second Circuit repeatedly have held that high-ranking members of organized crime constitute a danger to the community.  As discussed below, each of the relevant considerations under the Bail Reform Act favors detention here.

        a.      <u>Nature and Circumstances of the Crimes Charged</u>

DiMaria is charged with numerous extortions as part of the racketeering conspiracy count as well as substantively.  Extortions are crimes of violence.  <u>See</u> 18 U.S.C. § 3156(a)(4)(A) (defining "crime of violence" as an offense that has as one of its elements the "attempted use, or threatened use of physical force against the person or property of another").  Moreover, DiMaria currently holds a leadership position in an ongoing criminal enterprise and commands made men – soldiers – sworn to follow his orders and commit violence upon his request.

        b.      <u>History and Characteristics of the Defendant</u>

DiMaria is a long-standing member of the Gambino family who now serves as a captain.  He is a life-long criminal who has sworn an oath to a violent criminal enterprise.  He also is a multiple convicted felon, whose convictions include:

- In 1997, DiMaria was convicted in the Eastern District of New York of racketeering, racketeering conspiracy, loansharking, unlawful collection of debt, possession and sale of stolen property, transportation of stolen property; theft from interstate shipments, conspiracy to defraud the United States and bribery of a public official.[6]

---

[6]    Notably, DiMaria's co-defendants, included current co-defendants Nicholas Corozzo and Vincent Dragonetti, with whom he is currently charged in multiple racketeering acts and counts charging extortion, extortion conspiracy and attempted extortion.

- In 1998, DiMaria was convicted in the Southern District of Florida of Racketeering Conspiracy and sentenced to 64 months' imprisonment.[7]

    c.    <u>Seriousness of Danger Posed by the Defendant's Release</u>

DiMaria poses a clear danger if released.  As noted above, the government will establish DiMaria's membership in the Gambino family through a variety of sources, including the testimony of more than five cooperating witnesses, consensual recordings and surveillance evidence.

Courts in this circuit routinely detain high-ranking members of organized crime based on their leadership roles in criminal enterprises that engage in acts of violence.  <u>See</u>, <u>e.g.</u>, <u>Defede</u>, 7 F. Supp. 2d at 393 (detaining defendant on dangerousness based on the proffered testimony of cooperating witness and surveillance evidence that he was the acting boss of the Luchese family, an enterprise involved in extortionate conduct, among other crimes); <u>Gotti</u>, 312 F.3d at 542 ("Indeed, we made it quite clear in <u>United States v. Colombo</u>, 777 F.2d 96, 98 (2d Cir. 1985), that the [Bail Reform Act] 'does not require that the defendant himself commit acts of physical violence as a condition precedent to a detention order.'").

DiMaria is a captain in the Gambino family and he has been involved in numerous acts of violence.  In this investigation, he is caught in scores of recorded conversations related to extortion, a crime of violence.  The violent nature of the Gambino family's method of collecting money is made clear in the following recording of DiMaria:  "You have to go bother these people for your money. . . they are going to tell you we got to sit down and talk and this and that.  Rough them up a little.  Tell them, 'You're a fucking stiff.'  Tell them what you have

---

[7]    As above, Nicholas Corozzo was one of DiMaria's co-defendants in this case.

to tell them. . . . The next guy that owes you money from there with them guys, you catch them, and that's what I'm saying, that you check in with the other guys . . .  Crack a face, fuck them up. Don't you do it, send a fucking kid to rough them up, a fucking joke."

DiMaria thus falls within the "small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community."  Senate Report at 3188-89.  As demonstrated by the recorded conversations, DiMaria's position in the Gambino family gives him the authority and resources to continue his criminal activities and to order and accomplish acts of violence against potential witnesses or any person he perceives as a threat – of which there will be many during the course of this prosecution.

Finally, DiMaria likely will continue his criminal conduct if released; he is a career criminal who holds a leadership position in a continuing criminal enterprise, the needs of which require constant monitoring.  As noted, courts in this circuit have recognized that when organized crime defendants are charged with their participation in a criminal enterprise, the risk of continued criminal conduct is substantial and justifies detention.  See Salerno, 631 F. Supp. at 1375.  Under the cases cited above, the crimes charged and the facts proffered, there is little doubt that DiMaria is a danger to the community and ordered detained pending the outcome of his case.

d.    Evidence of the Defendant's Guilt

The government's evidence of DiMaria's guilt on the charged crimes is strong. To prevail on the racketeering conspiracy and racketeering counts, the government must prove the following four elements: (a) that the defendant knowingly agreed to conduct or participate –

and conducted or participated – directly or indirectly, in the conduct of the affairs of the charged enterprise through a pattern of racketeering activity; (b) that the enterprise, here the Gambino family, exists; (c) that the enterprise engaged in, or its activities affected interstate or foreign commerce; and (d) that the defendant was employed by, or associated with, the enterprise.

First, the government will prove the existence of the Gambino family and DiMaria's membership in that enterprise through, among other evidence, the testimony of cooperating witnesses, hundreds of consensual recordings and surveillance. More than five cooperating witnesses are expected to testify that the Gambino family exists and that DiMaria is a longstanding member of the family. At least two witnesses are expected to testify that DiMaria currently serves as a captain.

The second element, the interstate commerce requirement, is also easily proved as the Gambino family has engaged in a variety of crimes, including narcotics trafficking, robbery, extortion of businesses and other crimes which affect interstate commerce.

Finally, to prove that DiMaria engaged in the charged pattern of racketeering activity the government will offer law enforcement witnesses, cooperating witnesses and scores of consensual and court-authorized recordings. For example, the testimony of the cooperating witness will be corroborated by over 80 recordings that show that the defendant engaged in the crimes charged.

The government's evidence of DiMaria's guilt is thus strong and clearly favors detention.

3.      <u>DiMaria Also Constitutes a Risk of Flight</u>

DiMaria faces 21 counts covering 10 different crimes of violence each carrying a

119

penalty of 20 years' imprisonment.  In addition, DiMaria will be sentenced as a career offender

under the Sentencing Guidelines.  See United States v. Dodge, 846 F. Supp. 181, 184-85 (D.

Conn. 1994) (finding that the possibility of a "severe sentence" heightens the risk of flight).

Given his age, the strength of the evidence and the likely sentence resulting from a conviction on

even one of the charged extortions, it is a near certainty DiMaria faces an effective life sentence.

Accordingly he constitutes a risk of flight and should be detained.

      J.     VINCENT DRAGONETTI

      Vincent Dragonetti is a soldier in the Gambino family.  He is charged in Count

One with racketeering conspiracy, including more than a dozen predicate acts of extortion,

attempted extortion, extortion conspiracy, extortionate extension of credit, extortionate extension

of credit conspiracy, extortionate collection of credit, and extortionate collection of credit

conspiracy.  He is also charged with extortion, attempted extortion, extortion conspiracy,

extortionate extension of credit, extortionate extension of credit conspiracy, extortionate

collection of credit, extortionate collection of credit conspiracy, money laundering, money

laundering conspiracy and illegal gambling.

      If convicted as charged, Dragonetti faces a term of 20 years' imprisonment on the

racketeering conspiracy count, as well as each of the more than 10 counts charging crimes of

violence.  Were Dragonetti sentenced consecutively for just five of the extortionate schemes

covered in these counts – the evidence for which includes more than 60 separate recorded

conversations capturing Dragonetti discussing the extortions on tape – he faces a term of

imprisonment of 100 years.  Accordingly, the government seeks a permanent order of detention

for Dragonetti on the grounds that he is both a danger to the community and a risk of flight.

120

1.      <u>Proffered Facts</u>

The government hereby proffers the following facts relevant to the pretrial

detention of Dragonetti.

a.      <u>Dragonetti Is a Gambino Family Soldier</u>

Dragonetti is a Gambino family soldier.  The government will establish

Dragonetti's position in the Gambino family through the testimony of cooperating witnesses,

consensual recordings and surveillance evidence.  Each category of evidence is briefly discussed

below.

At least two cooperating witnesses are expected to testify that Dragonetti is a

member of the Gambino family who enjoys special ties with powerful Gambino family captain

Nicholas Corozzo, who is his father-in-law.

This testimony is corroborated by the more than 60 recorded conversations

involving Dragonetti.  During the course of the recordings, he is heard engaging in the Gambino

family's business, explicitly discussing the myriad crimes with which he is charged, the

involvement of other Gambino family members in these crimes, and his position in the Gambino

family's hierarchy.  Scores of recorded conversations with other Gambino family members

referencing Dragonetti further demonstrate his position in the family.

The available surveillance evidence also establishes Dragonetti's long association

with and position in the Gambino family.  Since 1993, Dragonetti has been observed at locations

and events relating to the Gambino family.  He has been observed with other members of the

Gambino family at three weddings and wakes.  Cooperating witnesses and an organized crime

expert are expected to testify that these events are attended by dozens of other members and

121

associates of organized crime, many of whom are convicted felons who committed those crimes as part of an organized crime family, and that Gambino family business is routinely conducted at such events.   Dragonetti was observed at the 1993 wedding of Gambino family captain Leonard DiMaria's daughter.  In the past year, Dragonetti was surveilled attending the January 2007 wake of Maryann Corozzo, the wife of Gambino family soldier Blaise Corozzo.

        b.    <u>Crimes of Violence</u>

As noted above, Dragonetti is charged in multiple extortions, all crimes of violence.  A brief proffer of the facts pertaining to each of the extortions follows.

        i.    Extortion Conspiracy/Extortion -
                <u>Liberty View Harbor Construction Site</u>

A cooperating witness is expected to testify to the following.

In April 2006, John Doe #4 started a company which constructed a portable cement plant at the Liberty View Harbor construction site at which VMS Construction served as general contractor.  VMS Construction is owned by Gambino family associate Anthony Scibelli, who is controlled by Gambino family soldier Vincent Dragonetti.  In addition to the portable cement plant, two companies owned by John Doe #4 also performed work at the Liberty View Harbor site.

John Doe #4 obtained the work at the Liberty View Harbor site after Gambino family captain Nicholas Corozzo, who is Dragonetti's father-in-law, granted him permission provided he pay 60% of the portable cement plant's profits to Corozzo, Gambino family captain Leonard DiMaria and Dragonetti.  In addition, Scibelli and Dragonetti demanded that John Doe #4 pay an additional $6 or $7 per yard of cement produced as well as extortionate payments for the other two businesses.

122

Over the course of the extortion, Jon Doe #4 made extortion payments to the Gambino family of more than $200,000.

Despite these payments, during the summer of 2007, with the backing of Corozzo, DiMaria and Dragonetti, Scibelli took possession of the portable cement plant without remuneration to John Doe #4.

The cooperating witness's testimony will be corroborated by (i) recordings made of conversations with Gambino family members, including scores of recordings detailing John Doe #4's extortion by the defendants charged in the racketeering acts and counts related to this extortion, (ii) surveillance confirming John Doe #4's contacts with various members of the Gambino family and the participants in many of the taped conversations, and (iii) multiple cooperating witnesses who were former Gambino family members familiar with the family's construction rackets who are expected to testify that individuals and companies being extorted by Gambino family members must comply with the demands of their Gambino family handlers and make the extortion payments demanded of them or face retaliation against their businesses, property or persons.

ii.      Extortion Conspiracy/Extortion -
         Cement Powder Deliveries

A cooperating witness is expected to testify to the following.

In October 2007,  following Gambino family soldier Anthony Scibelli's takeover of his portable cement plant, Gambino family captains DiMaria and Corozzo approved a plan by which John Doe #4 would supply his former plant with the powder used to make cement at the Liberty View Harbor site.  For this privilege, John Doe #4 was instructed to provide 60% of his profits relating to the cement powder deliveries to be split between Corozzo, DiMaria and

123

Dragonetti.  As directed, in the four months since, John Doe #4 has provided $6,000 in extortion payments.

        The cooperating witness's testimony will be corroborated by (i) recordings made of conversations with Gambino family members, including dozens of recordings detailing John Doe #4's extortion by the defendants charged in the racketeering acts and counts related to this extortion, (ii) surveillance confirming John Doe #4's contacts with various members of the Gambino family and the participants in many of the taped conversations, and (iii) multiple cooperating witnesses who were former Gambino family members familiar with the family's construction rackets who are expected to testify that individuals and companies being extorted by Gambino family members must make the extortion payments demanded of them or face retaliation against their businesses, property or persons.

                iii.     Extortion Conspiracy/Extortion -
                         NASCAR Construction Site

        A cooperating witness is expected to testify to the following.

        In January 2006, NASCAR had begun construction on a racetrack in Staten Island.  Recine Trucking, a company under the control of Gambino family acting underboss Domenico Cefalu, was among the first companies hired to bring fill to the site.  Thereafter, Gambino family soldier Ernest Grillo acquired exclusive dumping rights at the site for John Doe #4.

        From late January 2006 to May 2006, Grillo, Cefalu and Gambino family members Leonard DiMaria, Vincent Dragonetti, Nicholas Corozzo and Frank Cali negotiated the amount of extortion John Doe #4 would be required to pay for the exclusive dumping rights. Eventually, John Doe #4 received those rights on the condition that he make extortion payments

of $.50 per yard of fill dumped to Corozzo and DiMaria, and $.50 per yard of fill dumped to Cefalu and Cali.

Before John Doe #4 could begin dumping at the site pursuant to these terms, the exclusive dumping deal fell through. Later, after a new deal was worked out, Corozzo and DiMaria directed John Doe #4 to take the job on the condition that he pay them $1 for every yard of fill dumped at the site.

John Doe #4 also was required to make a one-time $9,000 payment to NASCAR employee Todd Polakoff on behalf have NASCAR executive William Kilgannon.

John Doe #4 worked at the site for a short time and made approximately $13,000 in extortion payments to Gambino family soldier Mario Cassarino, who collected the extortion payments for Corozzo and DiMaria.

The cooperating witness's testimony will be corroborated by (i) recordings made of conversations with Gambino family members, including scores of recordings detailing John Doe #4's extortion by the defendants charged in the racketeering acts and counts related to this extortion, (ii) surveillance confirming John Doe #4's contacts with various members of the Gambino family and the participants in many of the taped conversations, and (iii) multiple cooperating witnesses who were former Gambino family members familiar with the family's construction rackets who are expected to testify that individuals and companies being extorted by Gambino family members must comply with the demands of their Gambino family handlers and make the extortion payments demanded of them or face retaliation against their businesses, property or persons.

iv.     Extortion Conspiracy/Extortion - Excavation Company

A cooperating witness is expected to testify to the following.

In approximately January 2006, Gambino family captain Nicholas Corozzo instructed John Doe #4 to start an excavation business which, after a short period in which John Doe #4 would be allowed to operate the business without making extortion payments, would be required to pay 60% of its profits to Corozzo, Gambino family soldier Vincent Dragonetti and Gambino family captain Leonard DiMaria.  John  Doe #4 began making these payments a few months after starting the business.  To date, John Doe #4 has paid more than $30,000 in extortion payments to DiMaria and Dragonetti, who collected the payments on Corozzo's behalf.

The cooperating witness's testimony will be corroborated by (i) recordings made of conversations with Gambino family members, including dozens of recordings detailing John Doe #4's extortion by the defendants charged in the racketeering acts and counts related to this extortion, (ii) surveillance confirming John Doe #4's contacts with various members of the Gambino family and the participants in many of the taped conversations, and (iii) multiple cooperating witnesses who were former Gambino family members familiar with the family's construction rackets who are expected to testify that individuals and companies being extorted by Gambino family members must comply with the demands of their Gambino family handlers and make the extortion payments demanded of them or face retaliation against their businesses, property or persons.

v.     Extortion Conspiracy/Extortion - John Does #4 & #12

A cooperating witness is expected to testify to the following.

In July 2006, Gambino family captain Leonard DiMaria informed John Doe #4

126

that John Doe #12, an individual close to John Doe #4 who previously made extortion payments to the commissary of jailed Gambino family soldier Jerome Brancato, needed to begin making extortion payments to Brancato again.  At the end of 2006, when Brancato was released from prison, DiMaria instructed John Doe #4 to have John Doe #12 pay money to Brancato to help him get him back on his feet.  John Doe #4 then gave $2,500 to Vincent Dragonetti, who collected the money for Brancato.

In January 2008, Gambino family captain Nicholas Corozzo told John Doe #4 that John Doe #12 failed to provide Brancato with a year end extortion payment.  Corozzo instructed John Doe #4 to make sure that money from John Doe #12 was given to Gambino family soldier Joseph Chirico, who would collect it for Brancato.  The following day, John Doe #4 gave $1,500 to Chirico for Brancato.

The cooperating witness's testimony will be corroborated by (i) recordings made of conversations with Gambino family members, including multiple recordings detailing John Doe #4's extortion by the defendants charged in the racketeering acts and counts related to this extortion, (ii) surveillance confirming John Doe #4's contacts with various members of the Gambino family and the participants in many of the taped conversations, and (iii) multiple cooperating witnesses who were former Gambino family members who are expected to testify that individuals being extorted by Gambino family members must comply with the demands of their Gambino family handlers or face some form of retaliation.

2.    Dragonetti Constitutes a Danger to the
      Community and Should Be Detained

As discussed above, Dragonetti is a Gambino family soldier with a prior felony conviction for committing a crime of violence as part of the Gambino family.

a.     Nature and Circumstances of the Crimes Charged

Dragonetti has been indicted on 12 counts charging crimes of violence.  This
alone merits detention on the basis of dangerousness.

b.     History and Characteristics of the Defendant

As noted, Dragonetti is a Gambino family soldier.  He is a criminal who has
sworn an oath to a violent criminal enterprise.  He also is a convicted felon who has pled guilty
in the past – in this district - to some of the same conduct he has been charged with in the instant
indictment.

On January 23, 1997, Dragonetti was arrested in the Eastern District of New York
and charged with RICO and RICO conspiracy.  On November 3, 1997, he pled guilty before the
Honorable Frederic Block to loansharking, conducting an illegal gambling business and tax
evasion, and was sentenced to three years' imprisonment and a $60,000 fine.

c.     Seriousness of Danger Posed by the Defendant's Release

Dragonetti has long engaged in violence on behalf of the Gambino family.  His
recent involvement in acts of violence include the multiple charged extortions with Gambino
family captain Leonard DiMaria.  The violent nature of the Gambino family's method of
collecting money is made clear in the following recording of DiMaria:  "You have to go bother
these people for your money. . . they are going to tell you we got to sit down and talk and this
and that.  Rough them up a little.  Tell them, 'You're a fucking stiff.'  Tell them what you have
to tell them. . . . The next guy that owes you money from there with them guys, you catch them,
and that's what I'm saying, that you check in with the other guys . . .  Crack a face, fuck them up.
Don't you do it, send a fucking kid to rough them up, a fucking joke."

128

The crimes charged, coupled with his prior conviction, make clear that Dragonetti is a danger to the community.

d.   <u>Evidence of the Defendant's Guilt</u>

The government's evidence of Dragonetti's guilt on the charged crimes is strong. To prevail on the racketeering conspiracy charge, the government must prove the following four elements:  (a) that the defendant knowingly agreed to conduct or participate – and conducted and participated – directly or indirectly, in the conduct of the affairs of the charged enterprise through a pattern of racketeering activity; (b) that the enterprise, here the Gambino family, exists; (c) that the enterprise engaged in, or its activities affect, interstate or foreign commerce; and (d) that the defendant was employed by, or associated with, the enterprise.

First, the government will prove the existence of the Gambino family and Dragonetti's membership in that enterprise through, among other evidence, the testimony of cooperating witnesses, consensual recordings and surveillance.  At least two cooperating witnesses are expected to testify that the Gambino family exists and that Dragonetti is a member of the family.

The second element, the interstate commerce requirement, is also easily proved as the Gambino family has engaged in a variety of crimes, including narcotics trafficking, robbery, extortion of businesses and other crimes which affect interstate commerce.

Finally, to prove that Dragonetti engaged in the charged pattern of racketeering activity the government will offer law enforcement witnesses, cooperating witnesses and consensual recordings.  The government has over 100 recordings documenting Dragonetti's involvement in the extortions and other crimes for which he is indicted in this case.

129

Accordingly, the government's evidence of Dragonetti's guilt is thus strong and clearly favors detention.

3.     Dragonetti Also Constitutes a Risk of Flight

In addition to the reasons set forth above, given that he faces 20 years' imprisonment on each count if convicted, Dragonetti also constitutes a risk of flight.  See United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (finding the possibility of a "severe sentence" heightens the risk of flight).  The fact that the government has a strong case against Dragonetti heightens his incentive to flee.  Accordingly, Dragonetti should also be detained as a risk of flight.

K.     LOUIS FILIPPELLI

Louis Filippelli is an acting captain in the Gambino family.  In March 2006, Filippelli pled guilty in the Southern District of New York to racketeering conspiracy, including predicate acts of extortion.  He was sentenced to 46 months' incarceration by the Honorable Alvin K. Hellerstein on July 19, 2006.  The government seeks pretrial detention of Filippelli based on factors outlined in the Bail Reform Act: that is, the nature and circumstances of the offense charged, the weight of the evidence against Filippelli, the history and characteristics of the defendant and the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

Specifically, Filippelli is an acting captain in a violent criminal enterprise who is charged with extortions, which constitute crimes of violence.  Tape recorded conversations detail Filippelli's role in the crimes charged, for which he faces a term of incarceration of 20 years or more.  Further, Filippelli was engaged in criminal conduct while on pretrial detention [correct?].

130

He is currently incarcerated.  Should Filippelli be eligible for release during the pendency of this

case, he should continue to be detained based on based on his demonstrated disregard for the

court's orders, his dangerousness to the community and the risk that he will flee.

 L. <u>VINCENT GOTTI</u>

  Vincent Gotti is a soldier in the Gambino family and is charged in Count One,

racketeering conspiracy, with crimes of violence, including murder conspiracy, attempted

murder and loansharking.  Gotti also is charged with a narcotics offense -- conspiracy to

distribute over five kilograms of cocaine.

  Because the crimes for which Gotti has been charged constitute crimes of

violence and narcotics offenses for which the maximum term of imprisonment is life, the

government seeks a permanent order of detention for Gotti on the grounds that he is a danger to

the community and a risk of flight.

  1. <u>Proffered Facts</u>

  The government hereby proffers the following facts relevant to the pretrial

detention of Gotti.

   a. <u>Gotti Is a Gambino Family Soldier</u>

  Gotti is a Gambino family soldier.  The government will establish Gotti's position

in the Gambino family through the testimony of cooperating witnesses and surveillance

evidence.  Each category of evidence is briefly discussed below.  More than three cooperating

witnesses are expected to testify that Gotti is a soldier of the Gambino family.  This information

is corroborated by both consensual recordings in which Gotti is discussed by co-conspirators and

surveillance evidence.  For example, in the past five years, Gotti was surveilled attending the

131

November 2003 wake of John Gurino, an associate in the Gambino family, and the June 2006

wake of Anna Trucchio, mother of incarcerated Gambino family soldier Ronald Trucchio and

grandmother of Gambino family soldier Alphonse Trucchio.

        b.     <u>Crimes of Violence and Cocaine Distribution Conspiracy</u>

As noted above, Gotti is charged with crimes of violence including murder

conspiracy/attempted murder and loansharking.  Gotti is also charged with  conspiracy to

distribute over five kilograms of cocaine, for which the maximum term of imprisonment is life.

Below is a summary proffer of the facts pertaining to these charges.

        i.     <u>Murder Conspiracy/Attempted Murder of John Doe</u>

Two cooperating witnesses are expected to testify to the following.  Vincent Gotti

wanted John Doe #5 murdered.  Because Richard G. Gotti and Gambino family soldier Robert

Mormando owed Vincent Gotti a large sum of money from a loanshark debt, Vincent Gotti told

them that he would reduce the debt if they killed John Doe #5.  Angelo Ruggerio, Jr. was also

tasked to help carry out the murder.  After some planning, early in the morning on May 4, 2003,

John Doe #5 was shot several times while sitting in his car parked outside his home in Queens.

John Doe #5 survived the shooting and was able to drive away.  He ended up at Jamaica

Hospital.   Hospital records confirm that John Doe #5 was hit several times in the upper torso.

        ii.     <u>Loansharking</u>

Two cooperating witnesses are expected to testify that Vincent Gotti was partners

with Vincent DeCongilio in a loanshark operation.  Gotti and DeCongilio lent money at usurious

rates of interest from the mid-1990s to 2005.

iii.    Conspiracy to Distribute Cocaine

At least four cooperating witnesses are expected to testify that Gotti was involved with Ronald Trucchio, Joseph Corozzo and others from the mid-1980s through the mid-1990s in a conspiracy to distribute over five kilograms of cocaine from various bars in Ozone Park, Queens.  In approximately the mid-1980s, Gotti, Corozzo, Trucchio, John A. Gotti and John Alite agreed to try to consolidate the cocaine being sold in the Ozone Park area.  The drugs were being sold out of various pubs in Ozone Park including the PM Pub, which was controlled by Trucchio.  Gotti had conversations with cooperating witnesses during which he discussed trying to consolidate cocaine being sold out of bars in Ozone Park, Queens.  Trucchio was close to Corozzo at that time and Corozzo helped finance the drug activity.  The minimum amount of drugs sold per week was approximately two kilograms.  The witnesses are expected to testify that the cocaine trafficking conspiracy continued through the mid-1990s.

2.    Gotti Constitutes a Danger to the Community and Should Be Detained

As discussed above, Gotti is a Gambino family soldier with a violent past who has continued to engage in acts of violence.

a.    Nature and Circumstances of the Crimes Charged

Gotti is charged with murder conspiracy/attempted murder that occurred in 2003, loansharking, which is a crime of violence, and conspiracy to distribute over five kilograms of cocaine, for which the maximum term of imprisonment if life.  Accordingly, the nature and circumstances of the crimes charged merit detention.

b.    History and Characteristics of the Defendant

As noted, Gotti is a Gambino family soldier.  He has sworn an oath to a violent

133

criminal enterprise and as recently as 2003 he arranged to murder an individual.  He also is a multiple convicted felon.  Below is a brief summary of Gotti's arrests and convictions:

- In 1974, Gotti pled guilty to robbery in the 3rd Degree.

- In 1985, Gotti pled guilty to criminal impersonation in the 2nd Degree.

- In 1985, Gotti pled guilty to criminal sale of a controlled substance.

Gotti was sentenced to a term of imprisonment of six years to life on the drug charge.  Gotti was released in December 1991 and received life-time parole for this crime.  Thus, Gotti was on parole while he engaged in loansharking and in the murder conspiracy/attempted murder of John Doe #5.  See 18 U.S.C. § 3142(g)(3)(B).  Thus, this prong of the analysis favors detention.

> c.    Seriousness of Danger Posed by the Defendant's Release

Gotti is a soldier in a violent criminal enterprise and has himself engaged in acts of violence.  Although just a soldier, in 2003, he was able to assemble a team of others to try to kill John Doe #5.  His recent involvement in a murder conspiracy/attempted murder as well as loansharking, coupled with the narcotics trafficking, make clear that Gotti is a danger to the community.   As a soldier, Gotti has taken a sworn oath to further the interests of the criminal enterprise.  Given that he continued to commit crimes while on parole, it is likely that if called to do so, he will continue to commit crimes if he is released.  Accordingly, this prong of the analysis favors detention.

> d.    Evidence of the Defendant's Guilt

The government's evidence of Gotti's guilt on the charged crimes is strong.  To prevail on the racketeering conspiracy charge, the government must prove the following four elements:  (a) that the defendant knowingly agreed to conduct or participate – and conducted and

participated – directly or indirectly, in the conduct of the affairs of the charged enterprise through a pattern of racketeering activity; (b) that the enterprise, here the Gambino family, exists; (c) that the enterprise engaged in, or its activities affect, interstate or foreign commerce; and (d) that the defendant was employed by, or associated with, the enterprise.

First, the government will prove the existence of the Gambino family and Gotti's membership in that enterprise through, among other evidence, the testimony of numerous cooperating witnesses, consensual recordings and surveillance.  More than four cooperating witnesses are expected to testify that the Gambino family exists and that Gotti is a member of the family.

The second element, the interstate commerce requirement, is also easily proved as the Gambino family has engaged in a variety of crimes, including narcotics trafficking, robbery, extortion of businesses and other crimes which affect interstate commerce.

Finally, to prove that Gotti engaged in the charged pattern of racketeering activity the government will offer law enforcement witnesses, cooperating witnesses and consensual recordings. With respect to the murder conspiracy/attempted murder count, two cooperating witnesses will detail the agreement and testify as to what happened.  They will both implicate Gotti as the one who arranged to have the victim killed.  Further, lay witnesses will corroborate the testimony of the cooperating witnesses.  With respect to the cocaine trafficking conspiracy, over four cooperating witnesses will detail the criminal arrangement among Gotti, Joseph Corozzo and others.  These witnesses will elaborate on how the conspiracy operated, and their testimony is corroborated by law enforcement testimony.  Finally, with respect to the loansharking conspiracy, two cooperating witnesses are expected to testify as to Gotti's role in

135

that conspiracy.  Accordingly, the government's evidence of Gotti's guilt is strong and clearly

favors detention.

> 3.      Gotti Also Constitutes a Risk of Flight

In addition to the reasons set forth above, given that he faces life imprisonment if

convicted, Gotti also constitutes a risk of flight.  See United States v. Dodge, 846 F. Supp. 181,

184-85 (D. Conn. 1994) (finding the possibility of a "severe sentence" heightens the risk of

flight).  The strength of the government's case makes Gotti's incentive to flee even stronger.

Thus, he should also be detained as a risk of flight.

> M.      RICHARD G. GOTTI

Richard G. Gotti is a soldier in the Gambino family and is charged in the indictment with

the murder conspiracy/attempted murder of John Doe #5 in 2003, and conspiracy to distribute

marijuana in approximately 1997-1998.

The attempted murder/murder conspiracy with which Gotti has been charged

constitutes a crime of violence.  Accordingly, the government seeks a permanent order of

detention for Gotti on the grounds that he is a danger to the community and that a risk of flight.

> 1.      Proffered Facts

The government hereby proffers the following facts relevant to the pretrial

detention of Gotti.

> a.      Gotti Is a Gambino Family Soldier

Gotti is a longstanding Gambino family soldier.  The government will establish

Gotti's position in the Gambino family through the testimony of cooperating witnesses,

consensual recordings and surveillance evidence.  Each category of evidence is briefly discussed

below.

More than three cooperating witnesses are expected to testify that Gotti is a soldier in the Gambino family.  This testimony is corroborated by consensual recordings of co-conspirators discussing Gotti.  The available surveillance evidence of Gotti attending various Gambino family members or relatives weddings or wakes also establishes Gotti's association with and position in the Gambino family.  Cooperating witnesses and an organized crime expert are expected to testify that Gambino family business is often discusses at these events.  As early as March 11, 1993, Gotti has been observed at locations and events relating to the Gambino family, including the June 3, 2001 wedding of Frank Cali.

b.    <u>Crimes of Violence</u>

As noted above, Gotti is charged with the May 2003 murder conspiracy/attempted murder of John Doe #5.  Two cooperating witnesses are expected to testify that Vincent Gotti wanted John Doe #5 murdered.  Because Richard G. Gotti and Gambino family soldier Robert Mormando owed Vincent Gotti a large sum of money from a loanshark debt, Vincent Gotti told them that he would reduce the debt if they killed John Doe #5.  Angelo Ruggerio, Jr. was also tasked to help carry out the murder.  After some planning, early in the morning on May 4, 2003, John Doe #5 was shot several times while sitting in his car parked outside his home in Queens.  John Doe #5 survived the shooting and was able to drive away.  He ended up at Jamaica Hospital.  Hospital record confirm that John Doe #5 was hit several times in the upper torso.

2.    <u>Gotti Constitutes a Danger to the Community and Should Be Detained</u>

As discussed above, Gotti is a Gambino family soldier with a violent past who has continued to engage in acts of violence.

a.    Nature and Circumstances of the Crimes Charged

Gotti is charged with a crime of violence and he faces 20 years' imprisonment if convicted.  Gotti was also involved in a conspiracy to distribute marijuana.  These crimes alone merit detention on the basis of dangerousness.

b.    History and Characteristics of the Defendant

As noted, Gotti is a Gambino family soldier.  He is a criminal who has sworn an oath to a violent criminal enterprise.  Gotti also committed these acts while he was awaiting sentencing by the Honorable Frederic Block in United States v. Ciccone.   Gotti was convicted in March 2003 and sentenced in July 2004.   Accordingly, he continued to commit crimes even though he was on supervised release.   See 18 U.S.C. § 3142(g)(3)(B).  The fact that Gotti was involved in a murder conspiracy while he was on supervision demonstrates that he will not abide by the rules and restrictions of the court.  Accordingly, this factor strongly favors detention.

c.    Seriousness of Danger Posed by the Defendant's Release

Gotti has engaged in violence on behalf of the Gambino family while he was on pretrial supervision, demonstrating that he is a danger to the community.   Gotti's disregard for court orders and his oath to a violent criminal enterprise to do its bidding weighs strongly in favor of detaining Gotti, as he has shown himself to be a danger when out on release.

d.    Evidence of the Defendant's Guilt

The government's evidence of Gotti's guilt on the charged crimes is strong.  To prevail on the racketeering conspiracy charge, the government must prove the following four elements:  (a) that the defendant knowingly agreed to conduct or participate – and conducted and participated – directly or indirectly, in the conduct of the affairs of the charged enterprise

138

through a pattern of racketeering activity; (b) that the enterprise, here the Gambino family, exists; (c) that the enterprise engaged in, or its activities affect, interstate or foreign commerce; and (d) that the defendant was employed by, or associated with, the enterprise.

First, the government will prove the existence of the Gambino family and Gotti's membership in that enterprise through, among other evidence, the testimony of cooperating witnesses, consensual recordings and surveillance. At least three cooperating witnesses are expected to testify that the Gambino family exists and that Gotti is a longstanding member of the family.

The second element, the interstate commerce requirement, is also easily proved as the Gambino family has engaged in a variety of crimes, including narcotics trafficking, robbery, extortion of businesses and other crimes which affect, interstate commerce.

Finally, to prove that Gotti engaged in the charged pattern of racketeering activity the government will offer law enforcement witnesses, cooperating witnesses and lay witnesses. Two cooperating witnesses will detail the planning and execution of the murder conspiracy/attempted murder and law enforcement officers and lay witnesses will corroborate their testimony. Accordingly, the government's evidence of Gotti's guilt is overwhelming and clearly favors detention.

3.    Gotti Also Constitutes a Risk of Flight

In addition to the reasons set forth above, given that he faces 20 years' imprisonment if convicted, Gotti also constitutes a risk of flight. See United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (finding that the possibility of a "severe sentence" heightens the risk of flight). The strength of the government's case makes Gotti's incentive to

139

flee even stronger.  Thus, he should also be detained as a risk of flight.

      N.      ERNEST GRILLO

      Ernest Grillo is a longtime soldier in the Gambino family.  He is charged in Count One with racketeering conspiracy, including three predicate acts of extortion, attempted extortion and extortion conspiracy.  Grillo is also charged with extortion, attempted extortion and extortion conspiracy.

      The counts in which Grillo has been charged constitute crimes of violence.  Accordingly, the government seeks a permanent order of detention for Grillo on the grounds that he is both a danger to the community and a risk of flight.

      1.      Proffered Facts

      The government hereby proffers the following facts relevant to the pretrial detention of Grillo.

      a.      Grillo Is a Gambino Family Soldier

      Grillo is a longstanding Gambino family soldier.  The government will establish Grillo's position in the Gambino family through the testimony of cooperating witnesses, consensual recordings and surveillance evidence.  Each category of evidence is briefly discussed below.

      At least three cooperating witnesses are expected to testify that Grillo is a member of the Gambino family.

      This testimony is corroborated by the more than 150 recorded conversations involving Grillo.  During the course of the recordings, he is heard engaging in the Gambino family's business, explicitly discussing the crimes with which he is charged, the involvement of

140

other Gambino family members in these crimes, and his position in the Gambino family's

hierarchy.  Scores of recorded conversations with other Gambino family members referencing

Grillo further demonstrate his position in the family.

 The available surveillance evidence also establishes Grillo's long-lived

association with and position in the Gambino family.  As early as 1984 – nearly 25 years ago –

Grillo has been observed at locations and events relating to the Gambino family.  He has been

observed with other members of the Gambino family at multiple weddings and wakes.

Cooperating witnesses and an organized crime expert are expected to testify that these events are

attended by dozens of other members and associates of organized crime, many of whom are

convicted felons who committed those crimes as part of an organized crime family, and that

Gambino family business is routinely conducted at such events.  Grillo was observed at the

December 1984 Agnello-Gotti wedding, the 1985 wake of underboss Aniello Dellacroce, and the

1986 wake of former Gambino family underboss Frank DeCicco.  In the past year, Grillo was

surveilled at the November 2007 wake of Gambino family captain Giuseppe "Joseph" Arcuri.

> b.  <u>Crimes of Violence</u>

 As noted above, Grillo is charged in multiple extortions, all crimes of violence.  A

brief proffer of the facts pertaining to each of the extortions follows.

> i.  Extortion Conspiracy/Extortion -
> <u>Staten Island Cement Company Profits</u>

 A cooperating witness is expected to testify to the following.

 In approximately December 2003, John Doe #4 approached Gambino family

captain Thomas Cacciopoli and requested permission to open a cement company on Staten

Island.  Due to the Gambino family's control of the New York cement industry, Cacciopoli,

together with Gambino family captain Louis Filippelli, engaged in a series of meetings to obtain

permission from the Gambino family's administration to open such a company. Cacciopoli and

Filippelli succeeded and informed John Doe #4 that he could start the company provided that

following a one-year grace period, the Gambino family would receive 15% or $1 per yard for all

cement sold, with the payments to be collected by Filippelli and passed through to the family's

administration.

John Doe #4 opened the company in April 2004. Since May 2005, he has paid

over $60,000 of extortion payments to the Gambino family. The initial payments were collected

by Gambino family soldier Vincent Pacelli on behalf of the then incarcerated Filippelli. After

Gambino family captain Nicholas Corozzo assumed control of John Doe #4 from Filippelli in

late June 2005, payments were collected on his behalf for the administration by Gambino family

captain Leonard DiMaria, who controlled John Doe #4 for Corozzo while Corozzo was on

supervised release, as well as by Grillo and Gambino family soldier Mario Cassarino.

Multiple members of the Gambino family informed John Doe #4 that the profits

from his Staten Island cement company were passed along to the Gambino family

administration, and that the administration consists of acting boss John D'Amico, acting

underboss Domenico Cefalu and consigliere Joseph Corozzo.

The cooperating witness's testimony will be corroborated by (i) recordings made

of conversations with Gambino family members, including scores of recordings detailing John

Doe #4's extortion by the defendants charged in the racketeering acts and counts related to this

extortion; (ii) surveillance confirming John Doe #4's contacts with various members of the

Gambino family and the participants in many of the taped conversations; (iii) testimony from

142

multiple cooperating witnesses who were members and associates of the Gambino family that

the family controlled the cement industry on Staten Island and would not allow anyone to open a

cement company without paying extortion to the family; (iv) testimony from a cooperating

witness who is a former Gambino family soldier with extensive knowledge of the family's

construction rackets that extortion payments related to cement were passed along to the

administration of the family; and (v) multiple cooperating witnesses who were former Gambino

family members familiar with the family's construction rackets who are expected to testify that

individuals and companies being extorted by Gambino family members must make the extortion

payments demanded of them or face retaliation.

ii.    <u>Extortion Conspiracy/Extortion - Construction List</u>

A cooperating witness is expected to testify to the following.

In July 2005, Gambino family captain Leonard DiMaria instructed John Doe #4 to

help soldier Ernest Grillo reinitiate collections from construction companies that had been

making extortion payments to then jailed Gambino family soldier Edward Garafola prior to his

incarceration.  Garafola, who had been a member of the Gambino family's "construction panel,"

a body which oversees the Gambino family's construction rackets, had exacted extortionate

payments from scores of construction companies prior to his incarceration, but had not shared

the identity of all those companies with his Gambino family superiors.

John Doe #4 contacted Grillo as instructed.  Together with Ruggiero and

Gambino family associate Anthony O'Donnell, who had been Garafola's right hand in

conducting the extortions, and who had accompanied Garafola on one occasion while Garafola

assaulted a contractor who was late in his payments, the men repeatedly met to reconstruct a list

143

of the contractors who had been paying Garafola extortion and to plot the reinitiation of collections.   Under the supervision and at the direction of Corozzo and DiMaria, the four men created a list of more than 40 construction companies and individual contractors that formerly paid extortion to Garafola.  Grillo, Ruggiero and O'Donnell then approached a number of the companies to place them back under Gambino family control.

During the this process, Edward Garafola's son asserted his father's right to the extortion victims, and complained of the efforts to take away his father's former victims.  In response, Grillo told John Doe #4 that he assaulted Garafola's son, saying, "I choked him out."

The cooperating witness's testimony will be corroborated by (i) recordings made of conversations with Gambino family members, including scores of recordings detailing John Doe #4's extortion by the defendants charged in the racketeering acts and counts related to this extortion, (ii) surveillance confirming John Doe #4's contacts with various members of the Gambino family,  and the participants in many of the taped conversations, and (iii) the testimony of a cooperating witnesses who was a former Gambino family member and member of the Gambino family construction panel who was tasked with compiling the same construction list years earlier but failed to complete the job prior to his arrest and incarceration. property or persons.

iii.     Extortion Conspiracy/Extortion -
NASCAR Construction Site

A cooperating witness is expected to testify to the following.

In January 2006, NASCAR had begun construction on a racetrack in Staten Island.  Recine Trucking, a company under the control of Gambino family acting underboss Domenico Cefalu, was among the first companies hired to bring fill to the site.  Thereafter,

144

Gambino family soldier Ernest Grillo acquired exclusive dumping rights at the site for John Doe #4.

From late January 2006 to May 2006, Grillo, Cefalu and Gambino family members Leonard DiMaria, Vincent Dragonetti, Nicholas Corozzo and Frank Cali negotiated the amount of extortion John Doe #4 would be required to pay for the exclusive dumping rights. Eventually, John Doe #4 received those rights on the condition that he make extortion payments of $.50 per yard of fill dumped to Corozzo and DiMaria, and $.50 per yard of fill dumped to Cefalu and Cali.

Before John Doe #4 could begin dumping at the site pursuant to these terms, the exclusive dumping deal fell through. Later, after a new deal was worked out, Corozzo and DiMaria directed John Doe #4 to take the job on the condition that he pay them $1 for every yard of fill dumped at the site.

John Doe #4 also was required to make a one-time $9,000 payment to NASCAR employee Todd Polakoff on behalf have NASCAR executive William Kilgannon.

John Doe #4 worked at the site for a short time and made approximately $13,000 in extortion payments to Gambino family soldier Mario Cassarino, who collected the extortion payments for Corozzo and DiMaria.

The cooperating witness's testimony will be corroborated by (i) recordings made of conversations with Gambino family members, including scores of recordings detailing John Doe #4's extortion by the defendants charged in the racketeering acts and counts related to this extortion, (ii) surveillance confirming John Doe #4's contacts with various members of the Gambino family and the participants in many of the taped conversations, and (iii) multiple

145

cooperating witnesses who were former Gambino family members familiar with the family's construction rackets who are expected to testify that individuals and companies being extorted by Gambino family members must comply with the demands of their Gambino family handlers and make the extortion payments demanded of them or face retaliation against their businesses, property or persons.

2.     Grillo Constitutes a Danger to the Community and Should Be Detained

As discussed above, Grillo is a Gambino family soldier with a violent past who has continued to engage in acts of violence.

a.     Nature and Circumstances of the Crimes Charged

Grillo is charged with multiple extortions.  These crimes alone merit detention on the basis of dangerousness.

b.     History and Characteristics of the Defendant

As noted, Grillo is a Gambino family soldier.  He is a life-long criminal who has sworn an oath to a violent criminal enterprise.  He also is a multiple convicted felon.  Below is a brief summary of Grillo's arrests and convictions:

- On July 5, 1973, Grillo was arrested for Possession of a Loaded Firearm, Forgery in the Second Degree and Driver's Licence Violations.  On September 5, 1973, he was convicted of an Attemped Class E Felony and Driver's License Violations. Grillo received a sentence of five years probation.

- On October 17, 1974, Grillo was arrested for Possession of Stolen Property in the Third Degree and Petit Larceny.  On January 21, 1975, Grillo pled guilty to Attempted Possession of Stolen Property and received a sentence of conditional discharge.

- On October 2, 1977, Grillo was arrested for Attempted Burglary and Harassment.  On December 1, 1977, Grillo pled guilty to Harassment and was given a sentence of a fine of $150 or 10 days' imprisonment.

146

- On October 12, 1988, Grillo was arrested for Murder in the Second Degree, Conspiracy in the Second Degree, Grand Larceny in the Second Degree, Coercion in the First Degree, Criminal Usury in the First Degree and Promoting Gambling in the First Degree, among other charges.  On April 17, 1989, Grillo pled guilty to Enterprise Corruption and received a sentence of six to 18 years' imprisonment.  Grillo was incarcerated until October 6, 2000, and released from parole on October 29, 2003.

    c.    <u>Seriousness of Danger Posed by the Defendant's Release</u>

Grillo has long engaged in violence on behalf of the Gambino family.  His recent involvement in acts of violence include the multiple charged extortions with Gambino family captain Leonard DiMaria.  The violent nature of the Gambino family's method of collecting money is made clear in the following recording of DiMaria:  "You have to go bother these people for your money. . . they are going to tell you we got to sit down and talk and this and that.  Rough them up a little.  Tell them, 'You're a fucking stiff.'  Tell them what you have to tell them. . . . The next guy that owes you money from there with them guys, you catch them, and that's what I'm saying, that you check in with the other guys . . .  Crack a face, fuck them up.  Don't you do it, send a fucking kid to rough them up, a fucking joke."

The crimes charged, coupled with Grillo's prior conviction for a crime of violence, make clear that Grillo is a danger to the community.

    d.    <u>Evidence of the Defendant's Guilt</u>

The government's evidence of Grillo's guilt on the charged crimes is strong.  To prevail on the racketeering conspiracy charge, the government must prove the following four elements:  (a) that the defendant knowingly agreed to conduct or participate – and conducted and participated – directly or indirectly, in the conduct of the affairs of the charged enterprise through a pattern of racketeering activity; (b) that the enterprise, here the Gambino family,

exists; (c) that the enterprise engaged in, or its activities affect, interstate or foreign commerce; and (d) that the defendant was employed by, or associated with, the enterprise.

First, the government will prove the existence of the Gambino family and Grillo's membership in that enterprise through, among other evidence, the testimony of cooperating witnesses, consensual recordings and surveillance. At least three cooperating witnesses are expected to testify that the Gambino family exists and that Grillo is a longstanding member of the family.

The second element, the interstate commerce requirement, is also easily proved as the Gambino family has engaged in a variety of crimes, including narcotics trafficking, robbery, extortion of businesses and other crimes which affect, interstate commerce.

Finally, to prove that Grillo engaged in the charged pattern of racketeering activity the government will offer law enforcement witnesses, cooperating witnesses, consensual recordings and court-authorized wiretaps.

The government has more than 100 consensual recordings documenting Grillo's involvement in the extortions for which he is indicted in this case.

The government's evidence of Grillo's guilt is thus overwhelming and clearly favors detention.


3.      Grillo Also Constitutes a Risk of Flight

In addition to the reasons set for above, given that he faces 20 years' imprisonment if convicted, Grillo also constitutes a risk of flight. See United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (finding that the possibility of a "severe sentence"

heightens the risk of flight).  The strength of the government's case makes Grillo's incentive to flee even stronger.  Thus, he should also be detained as a risk of flight.

        O.     <u>JAMES OUTERIE</u>

        James Outerie, a Gambino family soldier, is charged with RICO conspiracy, including four predicate acts of extortionate collection of credit and extortionate collection of credit conspiracy, and an additional predicate act of illegal gambling.  Outerie is also charged in substantive counts with extortionate collection of credit, extortionate collection of credit conspiracy and illegal gambling.

        If convicted, Outerie faces a term of 20 years' imprisonment on the racketeering conspiracy count, as well as for each of the four extortionate collection of credit and extortionate collection of credit conspiracy counts.  Were Outerie sentenced to consecutive terms of imprisonment for just the four extortionate schemes covered in these counts – the evidence of which includes recorded conversations capturing Outerie's active participation in the extortions – he faces a combined term of imprisonment of 80 years.  Outerie is a 54-year-old recidivist with more than 11 arrests and four criminal convictions dating back over 35 years.  He has been imprisoned twice, once for armed robbery.  He is currently under home detention while awaiting trial under separate RICO conspiracy charges brought against him in this district last year.

        The government seeks a permanent order of detention against Outerie on the ground that he is both a danger to the community and a risk of flight.

1.    Proffered Facts

The government hereby proffers the following facts relevant to the pretrial
detention of Outerie.

a.    Outerie Is a Gambino Family Soldier

Outerie is a longstanding Gambino family soldier.  The government will establish
Outerie's position in the Gambino family through the testimony of cooperating witnesses,
consensual recordings and surveillance evidence.  Each category of evidence is briefly discussed
below.

Cooperating witnesses are expected to testify that Outerie is a longstanding
member of the Gambino family.  This testimony will be corroborated by multiple consensual
recordings and surveillance evidence which also establishes Outerie's position in the Gambino
family.  As early as 1996, Outerie has been observed with other members of the Gambino family
at various organized crime-related events.  In the past two years, Outerie was surveilled
attending the June 2006 wake of Anna Trucchio, mother of incarcerated Gambino family soldier
Ronald Trucchio and grandmother of Gambino family soldier Alphonse Trucchio and the
January 2007 wake of Maryann Corozzo, the wife of Gambino family soldier Blaise Corozzo.
During the same time period, Outerie has also been observed meeting with co-defendants
Leonard DiMaria, Richard Ranieri, and Gambino family associate Steven Iaria and others on
multiple occasions in social clubs, diners and other locations throughout Brooklyn and Staten
Island.

b.    Crimes of Violence

As noted above, the four acts of loansharking charged against Outerie are all

crimes of violence.

> i.      Extortionate Collection of Credit/Extortionate
>           Collection of Credit Conspiracy - John Does #6-9

Outerie is charged with extortionate collection of credit and extortionate collection of credit conspiracy – loansharking – with respect to four loanshark victims, John Does #6 through #9, from approximately November 2005 to June 2006.  Outerie was involved in the day-to-day collection of loanshark monies owed to him.  In this role, Outerie was involved in threatening debtors and instructing others to threaten debtors, among other criminal activities. The government will establish Outerie's involvement in loansharking through the testimony of cooperating witnesses and consensual recordings.

For example, consensual recordings from late 2005 and early 2006 reveal Outerie discussing a loanshark victim's "shy loan."  At one point, Outerie's co-defendant Richard Ranieri made arrangements for John Doe #6 to meet Outerie and Ranieri late one evening. Ranieri commented how John Doe #6 had "fucking paid James with a check," and how "[f]ucking James takes checks now," referring to Outerie.  At one point, Ranieri said, again referring to Outerie, "he said tell this fucking kid to bring some fucking dough with him." Ranieri later said, "See if he can bring some money, 'cause he's going to get fucking crazy something," again referring to Outerie.  In another recording, it is explained that Outerie and Ranieri had attempted to collect the debts from a victim by calling his house and speaking with his family members.

2.      Outerie Constitutes a Danger to the Community and Should Be Detained

As discussed above, Outerie is a Gambino family soldier with a violent past who has continued to engage in acts of violence.

a.      Nature and Circumstances of the Crimes Charged

Outerie is charged with four acts of extortion.  Extortions are crimes of violence. See 18 U.S.C. § 3156(a)(4)(A) (defining "crime of violence" as an offense that has as one of its elements the "attempted use, or threatened use of physical force against the person or property of another").  These crimes alone merit detention on the basis of dangerousness.

b.      History and Characteristics of the Defendant

As noted, Outerie is a Gambino family soldier.  He is a life-long criminal who has sworn an oath to a violent criminal enterprise.  He also is a multiple convicted felon.  Below is a brief summary of Outerie's arrests and convictions:

- On July 16, 1972, Outerie was arrested in Kings County for Attempted Robbery in the 1st Degree involving the use or threatened use of a dangerous instrument, among other charges.  He pled guilty to Petit Larceny and received a probationary sentence of three years.

- On January 6, 1982, Outerie was arrested in Kings County for Robbery in the 1st Degree, Kidnapping in the 2nd Degree, Criminal Use of a Firearm in the 1st Degree, Criminal Possession of a Loaded Firearm in the 3rd Degree, and Grand Larceny in the 2nd Degree.  He pled guilty to Robbery in the 1st Degree and was sentenced to two to six years in prison.

- On March 28, 1991, Outerie was arrested in Kings County for Grand Larceny in the 2nd Degree: Property Obtained by Extortion.  He pled guilty to Grand Larceny in the 4th Degree and was sentenced to 20 to 42 months in prison.

- On June 28, 1996, Outerie was arrested in Richmond County for a misdemeanor fireworks-related offense.  He pled guilty and paid a fine.

- On February 27, 2007, Outerie was arrested in the Eastern District of New

152

York and charged with RICO conspiracy, including predicate acts involving loansharking; those charges are currently pending.

Given Outerie's past history of involvement in violent crimes, including armed robbery, and arrests for loansharking, extortion and gambling – similar to the very crimes with which he is currently charged – his "history and characteristics" favor detention.

     c.    <u>Seriousness of Danger Posed by the Defendant's Release</u>

Outerie's recent involvement in loansharking, coupled with his prior conviction for a crime of violence (the 1982 armed robbery), make clear that he is a danger to the community.

     d.    <u>Evidence of the Defendant's Guilt</u>

The government's evidence of Outerie's guilt on the charged crimes is strong.  To prevail on the racketeering conspiracy charge, the government must prove the following four elements:  (a) that the defendant knowingly agreed to conduct or participate – and conducted and participated – directly or indirectly, in the conduct of the affairs of the charged enterprise through a pattern of racketeering activity; (b) that the enterprise, here the Gambino family, exists; (c) that the enterprise engaged in, or its activities affect, interstate or foreign commerce; and (d) that the defendant was employed by, or associated with, the enterprise.

First, the government intends to prove the existence of the Gambino family and Outerie's membership in that enterprise through, among other evidence, the testimony of cooperating witnesses, consensual recordings and surveillance evidence.  Cooperating witnesses are expected to testify that the Gambino family exists and that Outerie is a longstanding associate and member of the family.

The second element, the interstate commerce requirement, is also easily proved as

153

the Gambino family has engaged in a variety of crimes, including narcotics trafficking, robbery, extortion of businesses and other crimes which affect, interstate commerce.

Finally, to prove that Outerie engaged in the charged pattern of racketeering activity the government will offer law enforcement witnesses and consensual recordings in which he is overheard discussing his involvement in loansharking.  The government's evidence of Outerie's guilt is thus overwhelming and clearly favors detention.

       3.      <u>Outerie Also Constitutes a Risk of Flight</u>

In addition to the reasons set for above, given that he faces 20 years' imprisonment if convicted, Outerie also constitutes a risk of flight.  <u>See</u> <u>United States v. Dodge</u>, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (finding that the possibility of a "severe sentence" heightens the risk of flight).  The strength of the government's case makes Outerie's incentive to flee even stronger.  Thus, he should also be detained as a risk of flight.

      P.      <u>RICHARD RANIERI</u>

Richard Ranieri, a Gambino family associate, is charged with RICO conspiracy, including six predicate acts of extortionate collection of credit and extortionate collection of credit conspiracy, and an additional predicate act of illegal gambling.  Ranieri is also charged in substantive counts with extortionate collection of credit, extortionate collection of credit conspiracy and illegal gambling.

If convicted, Ranieri faces a term of 20 years' imprisonment on the racketeering conspiracy count, as well as for each of the 11 extortionate collection of credit and extortionate collection of credit conspiracy counts.  Were Ranieri sentenced to consecutive terms of imprisonment for just the six extortionate schemes covered in these counts – the evidence of

which includes recorded conversations capturing Ranieri's active participation in the

loansharking – he faces a combined term of imprisonment of 120 years.

The government seeks a permanent order of detention against Ranieri on the

ground that he is both a danger to the community and a risk of flight.

1.      Proffered Facts

The government hereby proffers the following facts relevant to the pretrial

detention of Ranieri.

a.      Ranieri Is a Gambino Family Associate

Ranieri has been associated with the Gambino family and Nicholas Corozzo's

crew for years.  The government will establish Ranieri's position in the Gambino family through

the testimony of cooperating witnesses, consensual recordings and surveillance evidence.  Each

category of evidence is briefly discussed below.

Cooperating witnesses are expected to testify that Ranieri is a longstanding

associate of the Gambino family.  This testimony will be corroborated by multiple consensual

recordings and surveillance evidence.  In January 2007, Ranieri was surveilled attending the

January 2007 wake of Maryann Corozzo, the wife of Gambino family soldier Blaise Corozzo.  In

2006, Ranieri was also observed meeting with co-defendants Leonard DiMaria, James Outerie

and Gambino family associate Steven Iaria and others on multiple occasions in restaurants, on

piers and at other locations throughout Brooklyn and Staten Island.

b.      Crimes of Violence

As noted above, the six acts of loansharking charged against Ranieri are all

crimes of violence.

155

i.      Extortionate Collection of Credit/Extortionate
Collection of Credit Conspiracy - John Does #6-#11

Ranieri is charged with extortionate collection of credit and extortionate

collection of credit conspiracy – loansharking – with respect to six loanshark victims, John Does

#6 through #11, from approximately November 2005 to September 2006.  Ranieri was involved

in the day-to-day collection of loanshark monies owed to him and Outerie.  In this role, Ranieri

was involved in threatening debtors, among other activities.  The government will establish

Ranieri's involvement in loansharking through the testimony of cooperating witnesses and

consensual recordings.

For example, consensual recordings from late 2005 and early 2006 reveal Outerie

discussing a loanshark victim's "shy loan."  At one point, Ranieri made arrangements for John

Doe #6 to meet him and Outerie late one evening.  Ranieri commented how John Doe #6 had

"fucking paid James with a check," and how "[f]ucking James takes checks now," referring to

Outerie.  At one point, Ranieri said, again referring to Outerie, "he said tell this fucking kid to

bring some fucking dough with him."  Ranieri later said, "See if he can bring some money,

'cause he's going to get fucking crazy something," again referring to Outerie.  In another

recording, it is explained that Ranieri and Outerie had attempted to collect the debts from a

victim by calling his house and speaking with his family members.

2.      Ranieri Constitutes a Danger to the Community and Should Be Detained

As discussed above, Ranieri is a Gambino family associate who is engaging in

acts of violence.

156

a.      Nature and Circumstances of the Crimes Charged

Ranieri is charged with six acts of extortion.  Extortions are crimes of violence.

See 18 U.S.C. § 3156(a)(4)(A) (defining "crime of violence" as an offense that has as one of its

elements the "attempted use, or threatened use of physical force against the person or property of

another").  These crimes alone merit detention on the basis of dangerousness.

b.      History and Characteristics of the Defendant

Ranieri is an associate of the Gambino family who engages in a variety of

criminal activities, including serving as the enforcer for the loansharking operation run by

Outerie.

c.      Seriousness of Danger Posed by the Defendant's Release

Ranieri's association with the Gambino family and his willingness to do

Outierie's bidding make clear that he is a danger to the community.

d.      Evidence of the Defendant's Guilt

The government's evidence of Ranieri's guilt on the charged crimes is strong.  To

prevail on the racketeering conspiracy charge, the government must prove the following four

elements:  (a) that the defendant knowingly agreed to conduct or participate – and conducted and

participated – directly or indirectly, in the conduct of the affairs of the charged enterprise

through a pattern of racketeering activity; (b) that the enterprise, here the Gambino family,

exists; (c) that the enterprise engaged in, or its activities affect, interstate or foreign commerce;

and (d) that the defendant was employed by, or associated with, the enterprise.

First, the government intends to prove the existence of the Gambino family and

Outerie's membership in that enterprise through, among other evidence, the testimony of

157

cooperating witnesses, consensual recordings and surveillance evidence.  Cooperating witnesses are expected to testify that the Gambino family exists and that Ranieri is a longstanding associate of the family.

The second element, the interstate commerce requirement, is also easily proved as the Gambino family has engaged in a variety of crimes, including narcotics trafficking, robbery, extortion of businesses and other crimes which affect, interstate commerce.

Finally, to prove that Ranieri engaged in the charged pattern of racketeering activity the government will offer law enforcement witnesses and consensual recordings in which he is overheard discussing his involvement in loansharking.  The government's evidence of Ranieri's guilt is thus overwhelming and clearly favors detention.

3.  Ranieri Also Constitutes a Risk of Flight

In addition to the reasons set for above, given that he faces 20 years' imprisonment if convicted, Ranieri also constitutes a risk of flight.  See United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (finding that the possibility of a "severe sentence" heightens the risk of flight).  The strength of the government's case makes Ranieri's incentive to flee even stronger.  Thus, he should also be detained as a risk of flight..

Q.  ANGELO RUGGIERO, JR.

Angelo Ruggiero, Jr. is a solider in the Gambino family.  In October 2007, after charges in the Eastern District of New York were transferred to the Southern District of New York, Ruggerio pled guilty to money laundering conspiracy.  He also pled guilty in a separate case in the Southern District of New York to extortion conspiracy.  Those cases are pending before the Honorable Lawrence McKenna and are scheduled for sentencing in March 2008.

Ruggerio has prior criminal convictions for possession of illegal vehicle identification numbers and grand larceny.  Cooperating witnesses also are expected to testify that he ran an auto-body shop where he would receive stolen vehicles.  He is presently incarcerated while awaiting sentencing.

The government moves for pre-trial detention of Ruggerio based on the fact that he is a danger to the community and a risk of flight.  Ruggerio is charged with racketeering conspiracy including murder conspiracy/attempted murder as a predicate act.  In May 2003, Ruggerio and others were involved in a conspiracy to murder John Doe #5 for Vincent Gotti, another soldier in the Gambino family.  John Doe #5 was shot several times, but survived.  The evidence on this charge, detailed in previous sections, is strong.  Two cooperating witnesses will detail the facts surrounding the attempted murder and both lay witnesses and law enforcement witnesses corroborate the cooperating witnesses' testimony.

Ruggiero also is charged with extortion conspiracy and attempted extortion as predicate acts.  A brief summary of the evidence against Ruggiero in connection with those charges is described below.

A cooperating witness is expected to testify to the following.

In July 2005, Gambino family captain Leonard DiMaria instructed John Doe #4 to help soldier Ernest Grillo reinitiate collections from construction companies that had been making extortion payments to then jailed Gambino family soldier Edward Garafola prior to his incarceration.  Garafola, who had been a member of the Gambino family's "construction panel," a body which oversees the Gambino family's construction rackets, had exacted extortionate payments from scores of construction companies prior to his incarceration, but had not shared

159

the identity of all those companies with his Gambino family superiors.

John Doe #4 contacted Grillo as instructed.  Together with Ruggiero and Gambino family associate Anthony O'Donnell, who had been Garafola's right hand in conducting the extortions, and who had accompanied Garafola on one occasion while Garafola assaulted a contractor who was late in his payments, the men repeatedly met to reconstruct a list of the contractors who had been paying Garafola extortion and to plot the reinitiation of collections.   Under the supervision and at the direction of Corozzo and DiMaria, the four men created a list of more than 40 construction companies and individual contractors that formerly paid extortion to Garafola.  Grillo, Ruggiero and O'Donnell then approached a number of the companies to place them back under Gambino family control.

During the this process, Edward Garafola's son asserted his father's right to the extortion victims, and complained of the efforts to take away his father's former victims.  In response, Grillo told John Doe #4 that he assaulted Garafola's son, saying, "I choked him out."

John Doe #4's testimony regarding Ruggiero's involvement in these extortions will be corroborated by (i) more than 10 recordings in which Ruggiero was either captured on tape discussing the crimes charged or referenced by his criminal associates concerning those crimes, (ii) surveillance confirming John Doe #4's contacts with various members of the Gambino family,  and the participants in many of the taped conversations, and (iii) the testimony of a cooperating witnesses who was a former Gambino family member and member of the Gambino family construction panel who was tasked with compiling the same construction list years earlier but failed to complete the job prior to his arrest and incarceration.

Ruggeiro is a soldier in a violent criminal enterprise charged with crimes of

160

violence, including attempted murder in 2003. He is currently incarcerated. Should he be eligible for release during the pendency of this case, he should be detained due to his criminal history of violence as a danger to the community. In addition, given the substantial sentence he faces for the crimes charged, he should also be detained as a risk of flight.

  R.  <u>WILLIAM SCOTTO</u>

    William Scotto is a soldier in the Gambino family. He is charged in Count One with racketeering conspiracy, including three predicate acts of extortion, extortion conspiracy, extortionate collection of credit, and extortionate collection of credit conspiracy. Scotto is also charged in substantive counts with extortion, extortion conspiracy, extortionate collection of credit, and extortionate collection of credit conspiracy. Further, Scotto recently pled guilty to racketeering with predicate acts of extortion that were unrelated to the charges in this case. On February 4, 2008, the Honorable Charles Sifton sentenced Scotto to 33 months imprisonment. Scotto is scheduled to surrender in April 2008.

    The government seeks a permanent order of detention for Scotto on the grounds that he is both a danger to the community and a risk of flight.

    1.  <u>Proffered Facts</u>

    The government hereby proffers the following facts relevant to the pretrial detention of Scotto.

    a.  <u>Scotto Is a Gambino Family Soldier</u>

    Scotto is a Gambino family soldier. The government will establish Scotto's position in the Gambino family through the testimony of cooperating witnesses, consensual recordings and surveillance evidence. Each category of evidence is briefly discussed below.

161

At least three cooperating witnesses are expected to testify that Scotto is a soldier in the Gambino family.  This testimony is corroborated by consensual recordings showing Scotto engaging in Gambino family business.

The available surveillance evidence also establishes Scotto's association with and position in the Gambino family.  In the last two years alone, Scotto was surveilled attending the June 2006 wake of Anna Trucchio, mother of incarcerated Gambino family soldier Ronald Trucchio and grandmother of Gambino family soldier Alphonse Trucchio, and the September 2006 wake of the sister of Gambino family captain Bartolomeo "Baboots" Vernace.

b.      Crimes of Violence

As noted above, Scotto is charged in crimes of violence.  A brief proffer of the facts pertaining to each of the extortions follows.

i.      Extortion/Extortionate Collection of
Credit - ADCO Electrical Corporation

A cooperating witness is expected to testify to the following.

In late April 2005, Scotto approached John Doe #4 to collect a debt owed to ADCO Electrical Corporation, a company that had come under Scotto's control.  John Doe #4 paid $4,000 demanded of him by Scotto.

The cooperating witness's testimony will be corroborated by (i) recordings made of conversations with Gambino family members, including a recording of the conversation in which Scotto demanded and John Doe #4 paid the debt to ADCO Electrical Corporation, (ii) surveillance confirming John Doe #4's contacts with various members of the Gambino family and the participants in many of the taped conversations, and (iii) testimony from multiple cooperating witnesses who were former Gambino family members that individuals and

162

companies being extorted by Gambino family members must make the extortion payments demanded of them or face retaliation against their businesses, property or persons.

ii.    Extortion/Extortionate Collection
of Credit - El Camino Trucking

A cooperating witness is expected to testify to the following.

In early June 2005, Scotto approached John Doe #4 to collect a debt owed to El Camino Trucking, a company that had come under Scotto's control. John Doe #4 paid the $5,000 demanded of him by Scotto to El Camino Trucking in the form of free trucking services.

The cooperating witness's testimony will be corroborated by (i) recordings made of conversations with Gambino family members, including a recording of the conversation in which Scotto demanded that John Doe #4 pay the debt to El Camino Trucking, (ii) surveillance confirming John Doe #4's contacts with various members of the Gambino family and the participants in many of the taped conversations, and (iii) testimony from multiple cooperating witnesses who were former Gambino family members that individuals and companies being extorted by Gambino family members must make the extortion payments demanded of them or face retaliation against their businesses, property or persons.

iii.    Extortion Conspiracy/Attempted
Extortion - Cracolici Dispute

A cooperating witness is expected to testify to the following.

In approximately January 2006, Gambino family associate Gino Cracolici asserted that John Doe #4 owed him $70,000 in connection with a certain trucking business and turned to Scotto and Gambino family soldier Anthony Licata to force John Doe #4 to pay the money. Thereafter, Scotto participated in meetings with other members of the Gambino family

163

to resolve the dispute in favor of Cracolici.

The cooperating witness's testimony will be corroborated by (i) recordings made of conversations with Gambino family members, including multiple recordings detailing John Doe #4's extortion by the defendants charged in the racketeering acts and counts related to this extortion, (ii) surveillance confirming John Doe #4's contacts with various members of the Gambino family and the participants in many of the taped conversations, including surveillance of the February 2006 meeting relating to Cracolici's claims described above, and (iii) multiple cooperating witnesses who were former Gambino family members who are expected to testify that individuals being extorted by Gambino family members must comply with the demands of their Gambino family handlers or face some form of retaliation.

     2.    <u>Scotto Constitutes a Danger to the Community and Should Be Detained</u>

As discussed above, Scotto is a Gambino family soldier with a violent past who has continued to engage in acts of violence.

     a.    <u>Nature and Circumstances of the Crimes Charged</u>

Scotto is charged with numerous extortions, which alone merit detention on the basis of dangerousness.

     b.    <u>History and Characteristics of the Defendant</u>

As noted, Scotto is a Gambino family soldier.  He is a criminal who has sworn an oath to a violent criminal enterprise.  He also is a convicted felon, having pled guilty in 2007 to racketeering that included predicate acts of extortion dating back to 1995 – for which he received a term of incarceration of 33 months.

     c.    <u>Seriousness of Danger Posed by the Defendant's Release</u>

Scotto has engaged in acts of extortion dating back to 1995 on behalf of the Gambino family and his recent involvement in acts of violence, including the three extortions detailed above make clear that Scotto is a danger to the community.

d.      <u>Evidence of the Defendant's Guilt</u>

The government's evidence of Scotto's guilt on the charged crimes is strong.  To prevail on the racketeering conspiracy charge, the government must prove the following four elements:  (a) that the defendant knowingly agreed to conduct or participate – and conducted and participated – directly or indirectly, in the conduct of the affairs of the charged enterprise through a pattern of racketeering activity; (b) that the enterprise, here the Gambino family, exists; (c) that the enterprise engaged in, or its activities affect, interstate or foreign commerce; and (d) that the defendant was employed by, or associated with, the enterprise.

First, the government will prove the existence of the Gambino family and Scotto's membership in that enterprise through, among other evidence, the testimony of cooperating witnesses, consensual recordings and surveillance.  At least three cooperating witnesses are expected to testify that the Gambino family exists and that Scotto is a longstanding member of the family.

The second element, the interstate commerce requirement, is also easily proved as the Gambino family has engaged in a variety of crimes, including narcotics trafficking, robbery, extortion of businesses and other crimes which affect interstate commerce.

Finally, to prove that Scotto engaged in the charged pattern of racketeering activity the government will offer law enforcement witnesses, cooperating witnesses and multiple consensual recordings.  The government's evidence of Scotto's guilt is thus very strong

165

and clearly favors detention.

     3.  <u>Scotto Also Constitutes a Risk of Flight</u>

    In addition to the reasons set for above, given that he is due to surrender to serve a

33-month prison term and now faces another 20 years' imprisonment if convicted, Scotto also

constitutes a risk of flight.  <u>See</u> <u>United States v. Dodge</u>, 846 F. Supp. 181, 184-85 (D. Conn.

1994) (finding that the possibility of a "severe sentence" heightens the risk of flight).  The

strength of the government's case makes Scotto's incentive to flee even stronger.  Thus, he

should also be detained as a risk of flight.

IV.   <u>Conclusion</u>

For the reasons cited above, the government hereby moves for a permanent order of detention with respect to the following defendants:  Thomas Cacciopoli, Frank Cali, Charles Carneglia, Mario Cassarino, Domenico Cefalu, Joseph Corozzo, Nicholas Corozzo, John D'Amico, Leonard DiMaria, Vincent Dragonetti, Louis Filippelli, Vincent Gotti, Richard G. Gotti, Ernest Grillo, James Outerie, Richard Ranieri, Angelo Ruggiero, Jr. and William Scotto.

Dated:  Brooklyn, New York
        February 7, 2008

Respectfully submitted,

BENTON J. CAMPBELL
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York  11201

MITRA HORMOZI
JOEY LIPTON
ROGER BURLINGAME
DANIEL BROWNELL
EVAN NORRIS
Assistant United States Attorneys
AMY COHN
Special Assistant United States Attorney
        (Of Counsel)